1  RODRIGO A. CASTRO-SILVA
   Interim Inspector General, Bar No. 185251
2  CATHLEEN BELTZ
   Assistant Inspector General, Bar No. 245593
3  InspectorGeneral@oig.lacounty.gov
   OFFICE OF INSPECTOR GENERAL
4  312 South Hill Street, 3rd Floor
   Los Angeles, California 90013
5  Telephone: (213) 974-6100; Fax: (213) 974-9346

6  **Monitors**

7              **UNITED STATES DISTRICT COURT**

8        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

9
   PETER JOHNSON, DONALD                    CASE NO. CV 08-03515 DDP
10 PETERSON and MICHAEL
   CURFMAN, on behalf of themselves         **INSPECTOR GENERAL'S**
11 and all others similarly situated,       **FOURTH IMPLEMENTATION**
                                            **STATUS REPORT**
12                          Plaintiffs,

13              v.

14 LOS ANGELES COUNTY
   SHERIFF'S DEPARTMENT, a public
15 entity; LEROY BACA, as Sheriff of
   County of Los Angeles, and COUNTY
16 OF LOS ANGELES, a public entity,
   MICHAEL D. ANTONOVICH,
17 YVONNE B. BURKE, DON KNABE,
   GLORIA MOLINA, ZEV
18 YAROSLAVSKY, as Supervisors of
   the County of Los Angeles
19
                            Defendants.
20

1    Pursuant to Section V, subsection M, of the Settlement Agreement

2  ("Agreement"), the Office of Inspector General ("OIG"), the Monitor appointed by

3  this Court, submits the attached *Inspector General's Fourth Implementation Status*

4  *Report* ("Report") evaluating Defendants' compliance with the terms of the

5  Agreement. This report was prepared by the OIG to provide "reasonable and

6  regular reports" to the Parties and the Court. This is the fourth report on the

7  implementation status of the Agreement. The OIG is available to answer any

8  questions the Court may have regarding this Report and Defendants' compliance

9  with the Agreement.

10

11  Dated:    April 26, 2019          Respectfully submitted,

12

13                                   By: _____

14                                       Cathleen Beltz
                                         Assistant Inspector General
15                                       Los Angeles County Office of Inspector
                                         General
16

17

18

19

20

INSPECTOR GENERAL'S FOURTH        -2-                    CV 08-03515 DDP
IMPLEMENTATION STATUS
REPORT

# INSPECTOR GENERAL'S FOURTH IMPLEMENTATION
# STATUS REPORT

The Agreement in the above-captioned case provides that the OIG will prepare and submit periodic reports to Plaintiffs and Defendants (collectively referred to as "the Parties") and the Court which evaluate Defendants' compliance with the Agreement. Defendants have agreed to implement system-wide reform of the conditions of confinement for Class Members within the Los Angeles County jails. The Agreement defines Class Members as "all present and future detainees and inmates with mobility impairments who, because of their disabilities, need appropriate accommodations, modifications, services and/or physical access in accordance with federal and state disabilities law." The OIG filed with this Court the *Inspector General's Third Implementation Status Report* ("*Third Implementation Status Report*") on April 30, 2018. This Report, unless otherwise stated, takes into account all data collected and analyzed, and observations made, from April 1, 2018, through March 31, 2019.

On August 24, 2016, the Parties agreed on compliance measures that would serve as a guideline for implementation of the terms of the Agreement and establish the Agreement's minimum compliance standards. The measures were written based on the Los Angeles County Sheriff's Department's ("LASD" or "the Department") predictions about policies, procedures, practices, and systems that it

1  intended to use or implement to ensure compliance with the terms of the

2  Agreement. For some compliance measures, the Department's information about

3  existing or available data and systems was limited or its predictions were incorrect.

4  Where necessary to serve the interests of Class Members and the Department, and

5  to promote effective implementation of the Agreement, the OIG is willing to

6  consider alternative evidence as proof of compliance. Precisely how the

7  Department proves its compliance with each provision is less important than

8  whether each provision is effectively and sustainably implemented. Though the

9  OIG is not rigid in its consideration of the types of evidence that support

10  compliance, all evidence submitted must be verifiable, replicable, and sufficient to

11  make a compliance determination. The Department's Custody Compliance and

12  Sustainability Bureau ("CCSB") is responsible for preparing the Department's self-

13  assessments and coordinating any additional documentation as requested by the

14  OIG.

15      The OIG will make a compliance finding for each provision based on the

16  degree to which each provision has been effectively and sustainably implemented.

17  A non-compliance finding means the Department has made no notable progress in

18  achieving compliance with any of the key components of a particular provision. A

19  partial compliance finding means the Department has made notable progress in

20  achieving compliance with the key components of a particular provision. A

1   substantial compliance finding means the Department has successfully

2   implemented all or nearly all of the key components of a particular provision. A

3   sustained compliance finding means the Department has maintained substantial

4   compliance for a period of at least 12 months following the OIG's initial

5   substantial compliance finding. Once a provision has achieved sustained

6   compliance, the OIG will stop monitoring that provision for purposes of the

7   Agreement.

8       There are several provisions that the OIG has determined require

9   consultation with subject matter experts before compliance findings can be made.

10   There was no such expert consultation during this reporting period. However, to

11   verify compliance with some provisions, Defendants have agreed to retain subject

12   matter experts who specialize in the Americans with Disabilities Act of 1990

13   ("ADA"). 42 U.S.C. § 12101 *et seq*. The Department is in the process of retaining

14   medical and physical-plant experts.

15       Relevant housing locations for Class Members are at Century Regional

16   Detention Facility ("CRDF"), Men's Central Jail ("MCJ"), and Twin Towers

17   Correctional Facility ("TTCF"). During this reporting period, the OIG conducted

18   34 site visits, which included interviews of individual Class Members, Department

19   and Correctional Health Services ("CHS") personnel, OIG-led town halls, and

20   compliance spot checks.

1    As of March 31, 2019, the Department had achieved substantial compliance

2 with 8, and sustained compliance with 22, of the 49 provisions. The Department

3 remains in partial compliance with 14 provisions. In this reporting period, the OIG

4 reduced the Defendants' compliance rating for two provisions: provision D.4 from

5 substantial to partial compliance and provision K.1 from substantial to partial

6 compliance. Five of the forty-nine provisions were documented as "completed" in

7 the Agreement and on January 11, 2017, the Parties agreed those five provisions

8 would not be subject to OIG monitoring.[1]

9    The following table reflects Defendants' compliance progress since the April

10 2018 reporting period:

| Defendants' *Johnson* Compliance Status | | |
|---|---|---|
| Compliance Ratings | Third Implementation Status Report (April 2018) | Fourth Implementation Status Report (April 2019) |
| Non-Compliance | 0 | 0 |
| Partial Compliance | 20 | 14 |
| Substantial Compliance | 12 | 8 |
| Sustained Compliance | 12 | 22 |
| Completed | 5 | 5 |

16 Several of the provisions that remain in partial compliance require improved

17 coordination between the Department and CHS, the agency responsible for

18 providing medical and mental health services to Class Members and for

19 _____

20 [1] The five provisions are under the heading "Physical Accessibility," in section C, paragraph 4, subsections (a) through (e), of the Agreement.

INSPECTOR GENERAL'S FOURTH      -6-                     CV 08-03515 DDP
IMPLEMENTATION STATUS
REPORT

1  coordinating, as necessary, with the Department in providing required

2  accommodations. CHS has dedicated one registered nurse position to assist the

3  CCSB in preparing proof of compliance documentation. However, the nurse

4  assigned currently lacks the authority to implement policy or to initiate training

5  consistent with the terms of the Agreement. In the *Third Implementation Status*

6  *Report*, the OIG noted that better collaboration between CHS and the Department

7  could bring the Department into compliance with several provisions, but there

8  appears to have been little improvement. Several of the provisions still require

9  more direct CHS involvement and the authority of involved CHS personnel to

10  implement compliance-related reforms.

11       On June 30, 2016, the Department implemented Custody Division Manual

12  ("CDM") policy section 5-12/005.10, "Handling of Inmates with Mobility and/or

13  Sensory Impairment." Unless otherwise noted, references to "policy" or "*Johnson*

14  policy" pertain to this CDM section.

15  **IMPLEMENTATION STATUS OF AGREEMENT PROVISIONS**

16  <u>**SECTION A – Programming**</u>

17  **Provision A.1 – Access to All Programming – Sustained Compliance on**

18  **December 10, 2018. No Further Monitoring.**

19       Under paragraph 1 of section A of the Agreement, "Defendants agree that

20  Class Members have and will continue to have access to all programming

1   (including the same programming made available to veterans) that non-mobility

2   impaired inmates have in jail settings." Among other requirements, the compliance

3   measures require the Department to promulgate policy consistent with this

4   provision and to provide the OIG with a list that indicates for each Class Member

5   sampled within the selected time period whether that prisoner accepted, rejected, or

6   was denied programming. As previously reported, the Department included

7   language consistent with this provision in the *Johnson* policy. The OIG selected

8   and reviewed data from a representative sample of Class Members who were in

9   custody from April 9 to April 17, 2018, and from July 16 to July 24, 2018.

10          On November 20, 2018, the Department provided the OIG with its self-

11  assessment and supporting documentation. According to the documentation, 102 of

12  the 108 sampled Class Members – or 90 percent – received access to

13  programming. The remaining six Class Members were in custody for a brief period

14  of time and were continuously moved between facilities, which prevented them

15  from participating in Education Based Incarceration ("EBI") classes. The OIG

16  verified through site visits and interviews that Class Members indeed had access to

17  programming. Defendants have achieved sustained compliance with this provision,

18  and the OIG will no longer monitor compliance with this provision for purposes of

19  the Agreement.

20

**Provision A.2 – No Disability-Based Disqualification from Programming – Sustained Compliance on December 10, 2018. No Further Monitoring.**

Under paragraph 2 of section A of the Agreement, Defendants agree that "[m]obility impairment(s) will not serve to disqualify Class Members from participating in programming in which they are otherwise eligible to participate." The corresponding compliance measures require the Department to promulgate policy consistent with this provision and to produce the same records as required by Provision A.1 above. The Department promulgated policy consistent with this provision and provided supporting documentation to the OIG on November 20, 2018.

The OIG requested and received the ADA Weekly Disqualification List produced by the EBI Unit that shows all Class Members who were disqualified from participating in programming. Based on this list, during the first sampled week of April 9, 2018 to April 17, 2018, eight Class Members were disqualified from programming out of 398 total Class Members. Six of the eight disqualifications were based on security classification and the remaining two Class Members were disqualified based on their behavior while in custody. None of the Class Members were disqualified because of a mobility impairment. During the second sampled week of July 16 to July 24, 2018, four Class Members were disqualified from programming out of the 422 total Class Members. All four

1   disqualifications were based on security classification.

2       The Department's self-assessment findings are consistent with OIG

3   observations during regular site visits and frequent discussions with Class

4   Members. Defendants have achieved sustained compliance with this provision, and

5   the OIG will no longer monitor compliance with this provision for purposes of the

6   Agreement.

7   **Provision A.3 – Escorting to Programming – Sustained Compliance on**

8   **December 10, 2018. No Further Monitoring.**

9       Under paragraph 3 of section A of the Agreement, "Class Members will be

10   escorted, to the extent necessary, to any program in which they are otherwise

11   eligible to participate, provided that program is available in the facility in which

12   the inmate is housed." The corresponding compliance measures for this provision

13   require the Department to promulgate policy and to provide documentation

14   showing sampled Class Members' attendance at EBI programs. As previously

15   reported, the Department included language consistent with this provision in the

16   *Johnson* policy.

17       The OIG reviewed records of sampled Class Members which showed that all

18   Class Members enrolled in EBI programs attended scheduled classes. Interviews

19   conducted by the OIG at MCJ, TTCF, and CRDF confirmed that Class Members

20   are escorted to programming as necessary. All interviewed Class Members made

1  positive comments regarding escorting to programming. Defendants have achieved

2  sustained compliance with this provision, and the OIG will no longer monitor

3  compliance with this provision for purposes of the Agreement.

4  **Provision A.5(a) – Class Members Serve as Trustys on Same Floor –**

5  **Substantial Compliance as of January 2, 2019.**

6  Under subsection (a) of paragraph 5 of section A of the Agreement,

7  "[s]ubject to security classification and eligibility requirements, Defendants agree

8  that Class Members may serve as trustys on the same floor on which they are

9  housed." The corresponding compliance measures require the Department to

10  promulgate policy consistent with this provision, train personnel accordingly, and

11  provide prisoner-worker records from each relevant housing location for a one-

12  month period selected by the OIG. The OIG selected the period of September

13  2018.

14  The Department's January 2, 2019, self-assessment indicates that it has

15  achieved substantial compliance with this provision. As previously reported, the

16  Department included language consistent with this provision in the *Johnson* policy.

17  In order to train personnel accordingly, the Department disseminated the *Johnson*

18  policy to personnel at MCJ, TTCF, and CRDF through the Scheduling

19  Management System ("SMS") and provided the OIG with rosters indicating

20  whether personnel acknowledged their receipt and understanding of the policy.  In

INSPECTOR GENERAL'S FOURTH  -11-  CV 08-03515 DDP
IMPLEMENTATION STATUS
REPORT

1  addition, a number of Department personnel from MCJ and TTCF received

2  supplemental training courses on the *Johnson* policy. The Department provided the

3  OIG with sign-in sheets from each supplemental training course. The SMS rosters

4  from MCJ and TTCF, and the supplemental training sign-in sheets indicate

5  whether listed personnel worked in Class Members' housing locations as

6  previously requested by the OIG.[2] As discussed in detail under Provision J.1, the

7  Department's efforts in training personnel are commendable.

8      The OIG reviewed Class Member trusty records for September 2018 to

9  determine whether Class Members were provided the opportunity to serve as

10  trustys on the same floor on which they were housed. The records were extracted

11  from the electronic Uniform Daily Activity Log (e-UDAL) system that documents

12  prisoner-worker information, including: name, booking number, security level,

13  work location, and shift worked (day, evening, or night). The records yielded zero

14  trusty records from CRDF, three trusty records from MCJ, and 10 trusty records

15  from TTCF. All 13 Class Member trustys from MCJ and TTCF worked on the

16  same floor on which they were housed.

17

18

19

20

[2] SMS rosters from CRDF did not indicate whether listed personnel worked in Class Members' housing locations because, unlike MCJ and TTCF, CRDF does not have a designated housing location for mobility-impaired prisoners. Instead, those prisoners are housed in various locations throughout the facility.

INSPECTOR GENERAL'S FOURTH   -12-
IMPLEMENTATION STATUS
REPORT

CV 08-03515 DDP

1    During the selected time period, 40 Class Members were housed at CRDF.

2  Of the 40 Class Members, 28 – or 70 percent – were disqualified from serving as

3  trustys based on the Department's internal criteria that precludes prisoners charged

4  with certain crimes from serving as trustys.[3] The Department has agreed to re-

5  evaluate its criteria for allowing CRDF Class Members to serve as trustys as part

6  of its gender responsive efforts. The OIG will monitor the Department's progress

7  in this area. Of the remaining 12 qualified Class Members, 6 chose to participate in

8  EBI programming instead of serving as trustys and 6 were incarcerated for fewer

9  than three months and were thus ineligible to earn work credit.[4]

10    Despite the lack of Class Member trusty records from CRDF during the

11  selected time period, the OIG confirmed that CRDF has established facility-

12  specific policies to allow Class Member trustys to work on the same floor on

13  which they are housed. CRDF Unit Order 5-23-010, "Inmate Workers," establishes

14  specific hiring procedures for prisoner-workers at CRDF. The Unit Order

15  specifically provides that an ADA prisoner with a mobility impairment "may be

16  hired as an inmate worker and housed in their current housing location." The OIG

17  also confirmed that personnel assigned to the Prison Personnel Office at CRDF

18  ─────────────────────

19  [3] Of the 28 Class Members disqualified from serving as trustys, 17 were disqualified due to violent felony charges, 5 were disqualified due to administrative segregation, 4 were disqualified due to high security classifications, 1 was disqualified due to a "felon in possession of firearm" charge, and 1 was disqualified due to disciplinary actions.

20  [4] The Department's Inmate Worker Agreement provides, "[i]n order to participate in the Conservation Work Program ("CWP") and earn credits, you must be fully sentenced. You must have at least 90 days left to serve and have no serious medical or psychological impairments."

INSPECTOR GENERAL'S FOURTH    -13-
IMPLEMENTATION STATUS
REPORT

CV 08-03515 DDP

1    understand these requirements. Defendants have achieved substantial compliance

2    with this provision as of January 2, 2019.

3    **Provision A.5(b) – Trusty Tasks – Sustained Compliance on October 5, 2017.**

4    **No Further Monitoring.**

5            Defendants achieved sustained compliance with this provision on

6    October 5, 2017, and the OIG discontinued compliance monitoring of this

7    provision for purposes of the Agreement.

8    **Provision A.5(c) – Identify Jobs – Sustained Compliance on December 2,**

9    **2017. No Further Monitoring.**

10           Defendants achieved sustained compliance with this provision on

11   December 2, 2017, and the OIG discontinued compliance monitoring of this

12   provision for purposes of the Agreement.

13   **Provision A.6 – Notify Class Members of Programs – Sustained Compliance**

14   **on January 22, 2019. No Further Monitoring.**

15           Under paragraph 6 of section A of the Agreement, "Defendants agree to

16   notify Class Members of the programs available to them in either paper or

17   electronic format, or both." The corresponding compliance measures for this

18   provision require the Department to display posters containing the Assistive

19   Device Leaflet ("ADL") information throughout relevant housing locations and to

20   make the ADL accessible to Class Members.

1   The OIG verified that the Department continues to display posters

2   containing the ADL information in all relevant housing locations. The Department

3   also continues to maintain adequate supplies of ADLs throughout all relevant

4   housing locations and Class Members continue to have unrestricted self-service

5   access to them. In addition, the Department notifies all prisoners, including Class

6   Members, of the programs available to them through the "Inmate Orientation

7   Presentation" shown on televisions in classification cells at the Inmate Reception

8   Center ("IRC") and CRDF Reception. On March 13, 2017, the OIG verified that

9   the "Inmate Orientation Presentation" notifies prisoners of available programs. On

10  March 19, 2019, the OIG verified that both IRC and CRDF continue to show the

11  "Inmate Orientation Presentation." Defendants have achieved sustained

12  compliance with this provision, and the OIG will no longer monitor compliance

13  with this provision for purposes of the Agreement.

14  **Provision A.7 – Notification in Town Hall Meetings – Partial Compliance**

15  Under paragraph 7 of section A of the Agreement, "[n]otification of

16  available programs will also be provided during 'town hall' meetings at the Jail

17  where appropriate." The corresponding compliance measures for this provision

18  require the Department to promulgate policy and to provide minutes from town

19  hall meetings. As previously reported, the Department promulgated policy

20  consistent with this provision.

1    The Department's January 11, 2019, self-assessment indicates that the

2    Department achieved partial compliance with this provision. The Department has

3    made progress in documenting town hall meetings. CRDF continues to notify all

4    Class Members of available programs during town hall meetings and submitted

5    town hall meeting memos from all modules housing Class Members during the

6    selected time period. However, MCJ did not submit memos from two modules and

7    TTCF did not submit memos from five modules. Based on documentation

8    provided and OIG monitoring, the Department is not holding town hall meetings in

9    accordance with Department policy to ensure that Class Members are notified of

10    available programs at MCJ and TTCF. Defendants remain in partial compliance

11    with this provision.

12    **SECTION B – Physical Therapy and Outdoor Recreation**

13    **Provision B.1(a) – Access to Physical Therapy – Partial Compliance**

14    Under subsection (a) of paragraph 1 of section B of the Agreement,

15    "Defendants agree that Class Members will have access to physical therapy as

16    prescribed by LASD medical professionals." The corresponding compliance

17    measures require the Department to promulgate policy consistent with this

18    provision and to provide evidence that Class Members who were prescribed

19    physical therapy within two, one-week periods selected by the OIG received

20

1  physical therapy as prescribed. Substantial compliance will be achieved when 90

2  percent of Class Members received physical therapy as prescribed.

3        CHS provided policy M206.13, "Mobility – Provider Evaluation," that

4  includes language consistent with this provision. CHS reports that it follows the

5  California Correctional Health Care Services ("CCHCS") guideline of providing

6  physical therapy within 90 calendar days of being prescribed. However, the

7  CCHCS guidelines distinguish between three types of consultations and

8  procedures: emergency consultations and procedures that are to be provided

9  immediately, high priority consultations and procedures that are to be provided

10  within 14 calendar days of being prescribed, and routine consultations and

11  procedures that are to be provided within 90 calendar days of being prescribed. *See*

12  California Correctional Health Care Services, *Inmate Medical Services Policies*

13  *and Procedure*, vol. 1, ch. 8, section 4-8-1. The policy provided by CHS does not

14  distinguish between different types of procedures or require that routine procedures

15  be provided within 90 calendar days of a provider's prescription.

16        The Department's January 24, 2019, self-assessment indicates that it has

17  achieved partial compliance with this provision. Documentation provided by the

18  Department reflects that 28 Class Members were prescribed physical therapy

19  within the two one-week periods selected by the OIG. Seven of the 28 Class

20  Members were released before receiving physical therapy and were thus excluded

1   from the self-assessment. Of the remaining 21 Class Members, 15 – or 71 percent

2   – received physical therapy as prescribed.

3       CHS physical therapists and other medical staff expressed concern about the

4   lack of collaboration between the Department and CHS that impacts Class

5   Members' access to physical therapy. When patients are prescribed physical

6   therapy, they typically require a custody escort from their housing areas to

7   treatment rooms. Physical therapists and medical staff reported that at times

8   patients miss their appointments because there are no available custody escorts. As

9   the OIG has previously recommended, the Department and CHS should work

10  together to address this concern. The OIG recommends that the Department

11  dedicate personnel from the Access to Care Bureau to fulfill medical passes,

12  provide consistent coverage, and ensure that all patients receive prescribed

13  physical therapy in a timely manner.

14      In addition to inadequate patient escorts, physical therapy staffing is

15  insufficient. As discussed below under Provision B.1(b), the Department and CHS

16  have successfully maintained and staffed physical therapy rooms at MCJ, TTCF,

17  and CRDF. However, two full-time therapists do not appear to be meeting the

18  needs of the jail population. Currently, therapists are required to prioritize patients

19  based on medical necessity, leaving some patients without therapy.

20

1    Refining CHS policy, dedicating escort personnel, and hiring additional

2  physical therapists will likely help the Department achieve the 90 percent

3  substantial compliance threshold. As previously reported, the OIG awaits an

4  expert's evaluation on the suitability of the physical therapy exam room at CRDF.

5  During this reporting period, the OIG also received information that the physical

6  therapy rooms in MCJ and TTCF may not be sufficient for providing adequate

7  physical therapy and will require expert evaluation as well. Defendants remain in

8  partial compliance with this provision.

9  **Provision B.1(b) – Maintenance of Physical Therapy Room at MCJ and**

10  **Provision of Physical Therapy Room at TTCF – Sustained Compliance on**

11  **February 23, 2019. No Further Monitoring.**

12    Under subsection (b) of paragraph 1 of section B of the Agreement,

13  "Defendants shall continue to maintain and staff a physical therapy room in MCJ

14  and further agree to attempt to locate space in TTCF for a similar room

15  (essentially, a mini clinic) to provide physical therapy to Class Members once they

16  are moved to housing locations in that facility." The corresponding compliance

17  measures for this provision require the Department to maintain existing physical

18  therapy rooms and to provide schedules for physical therapists for two, one-week

19  periods selected by the OIG.

20

1    The Department continues to maintain the physical therapy rooms at MCJ

2    and TTCF, which it staffs with two physical therapists: one full-time physical

3    therapist who provides services at MCJ and one contract physical therapist who

4    provides services at TTCF and CRDF. OIG personnel reviewed the physical

5    therapists' schedules and time cards to ensure that the Department regularly staffs

6    the physical therapy rooms. In addition, OIG personnel met with both physical

7    therapists and observed them treating patients at MCJ and TTCF. Defendants have

8    achieved sustained compliance with this provision, and the OIG will no longer

9    monitor compliance with this provision for purposes of the Agreement.

10   **Provision B.1(c) – Physical Therapy Availability – Sustained Compliance on**

11   **February 21, 2018. No Further Monitoring.**

12   Defendants achieved sustained compliance with this provision on

13   February 21, 2018, and the OIG discontinued compliance monitoring of this

14   provision for purposes of the Agreement.

15   **Provision B.2 – Outdoor Recreation Time – Partial Compliance**

16   Under paragraph 2 of section B of the Agreement,

17   "[t]he LASD will continue to count outdoor recreation time for Class

18   Members from when the [prisoners] arrive at the recreation area, not

19   when they leave their housing location. LASD shall develop and

20

1    distribute unit order to ensure that all LASD personnel are aware of this

2    policy."

3    As required by the corresponding compliance measures, the Department

4    promulgated policy consistent with this provision and provided the OIG with a

5    copy of the ADL that included consistent language. Between April 2018 and

6    January 2019, OIG personnel conducted site visits at relevant housing locations at

7    MCJ, TTCF, and CRDF to determine whether the policy had been implemented.

8    All Department personnel who were interviewed during those site visits were

9    aware of the policy and accurately communicated their understanding of tracking

10    outdoor recreation time for Class Members.

11    Between April 2018 and January 2019, OIG personnel conducted several

12    site visits at CRDF and determined that Class Members continued to have direct

13    access to outdoor recreation areas at various times throughout the day. On

14    January 31, 2019, the Department provided the OIG with its self-assessment and

15    supporting documentation, which indicated that the Department had achieved

16    partial compliance with this provision. The supporting documentation reflects

17    inconsistencies between the time Class Members received outdoor recreation and

18    the corresponding e-UDAL entries at MCJ and TTCF. The Department identified

19    certain instances where e-UDAL entries indicated that Class Members received

20    outdoor recreation time even though CCTV footage revealed otherwise. The OIG

1  has recommended that the Department investigate these incidents. Furthermore,

2  some housing modules did not document any outdoor recreation time in e-UDAL

3  during the time period reviewed. Defendants remain in partial compliance with this

4  provision.

5  **Provision B.3 – Rotation of Outdoor Recreation Time – Substantial**

6  **Compliance as of March 15, 2019.**

7  Under paragraph 3 of section B of the Agreement, "[t]o the extent possible,

8  and taking into account operations and logistical considerations, the time of day

9  Class Members are offered outdoor recreation will rotate." The corresponding

10  compliance measures require the Department to promulgate policy consistent with

11  this provision and to provide records reflecting outdoor recreation times from each

12  relevant housing location for a period of six months. The Department included

13  language consistent with this provision in the *Johnson* policy. The OIG selected

14  and reviewed records from June 2018 through November 2018.

15  The Department provided outdoor recreation schedules reflecting that

16  outdoor recreation times rotated at MCJ and TTCF. Even though CCTV footage

17  revealed that Department personnel from MCJ and TTCF were not consistently

18  following documented outdoor recreation schedules, they were sufficiently rotating

19  the time of day outdoor recreation was offered to Class Members, including those

20  who were administratively segregated.

1   The Department was not required to provide the same documentation for

2 CRDF because at that facility Class Members can access the outdoor recreation

3 space directly from their housing units at their leisure during programming. The

4 OIG confirmed CRDF's compliance through monitoring that included site visits

5 and conversations with Class Members and Department personnel.

6   On March 12, 2019, the OIG requested information regarding the outdoor

7 recreation schedules for Class Members who are administratively segregated at

8 CRDF. The OIG confirmed that the time of day outdoor recreation was offered to

9 administratively segregated Class Members rotated in accordance with the terms of

10 the Agreement. Defendants have achieved substantial compliance with this

11 provision as March 15, 2019.

12 **Provision B.4 – Thermal Clothing – Partial Compliance**

13   Under paragraph 4 of section B of the Agreement,

14  "Class Members who have been prescribed thermal clothing as a

15  reasonable accommodation for their disability so that they may

16  participate in outdoor recreation will be provided warm coats and/or

17  thermal clothing. LASD shall inform Class Members that they may

18  request thermal clothing as a reasonable accommodation, and shall

19  develop and distribute a unit order to ensure that all LASD personnel

20  are aware of this policy."

1   As previously reported, the Department represented that it would provide all Class

2   Members with thermals, without requiring a prescription. The corresponding

3   compliance measures require that CCSB and the OIG – through regular facility

4   visits and interviews with Class Members and Department personnel – confirm that

5   relevant housing locations maintain an adequate supply of thermal clothing and

6   that all Class Members are provided with thermals.

7          On February 27, 2019, the Department provided the OIG with a provision

8   summary indicating that it has achieved substantial compliance with this provision.

9   Since the *Third Implementation Status Report*, the OIG has regularly monitored the

10  supply and distribution of thermal clothing at MCJ, TTCF, and CRDF. At all three

11  facilities, Class Members stated that thermals were difficult to obtain and retain,

12  particularly at linen exchange due to inconsistent availability of all sizes. The OIG

13  routinely inspected the supply of thermal clothing at each facility and found that

14  supply closets were not consistently stocked with tops, bottoms, or both. On

15  December 13, 2018, CCSB and OIG personnel conducted a joint site visit at

16  CRDF. Class Members they spoke with reported that they had not received

17  thermals despite having requested them.

18         The Department continues to lack a sustainable mechanism to adequately

19  and consistently supply and distribute thermal clothing throughout MCJ, TTCF,

20  and CRDF. Defendants remain in partial compliance with this provision.

**SECTION C – Physical Accessibility**

**Provision C.4(a) through C.4(e) – Housing Expansion for Class Members – Completed and Not Subject to Monitoring.**

As reported above, the Parties agreed on January 11, 2017, that these provisions were "completed" and not subject to compliance monitoring.

**Provision C.4(f) – Additional Grab Bars and Shower Benches – Partial Compliance**

Under subsection (f) of paragraph 4 of section C of the Agreement, "Defendants are required to install grab bars and shower benches in approximately thirty (30) cells outside of TTCF modules 231 and 232." The corresponding compliance measure for this provision requires the Department to regularly update the OIG on the construction status.

On February 24, 2016, the Department provided the OIG with a list of shower benches and grab bars that had been installed in the cells outside of modules 231 and 232. On October 18, 2016, and October 25, 2017, the OIG inspected the cells to verify the bar and bench installations and found that the Department had installed more than 30 grab bars, but only 17 benches. The Department has since provided an updated list that includes 30 grab bars and 30 benches. However, the Department has not provided documentation indicating that the installations comply with ADA requirements. In order to achieve substantial

compliance with this provision, an expert must evaluate and determine that all installations meet ADA requirements. Defendants remain in partial compliance with this provision.

**Provision C.4(g) – Construction of Accessible Beds – Partial Compliance**

Under subsection (g) of paragraph 4 of section C of the Agreement, "Defendants are required to construct approximately ninety-six (96) accessible beds at TTCF module 272." The compliance measure for this provision requires the Department to regularly update the OIG on the construction status. As previously reported, the Department completed construction at TTCF module 272 on May 30, 2017, and began populating the floor with Class Members on June 8, 2017.

On February 7, 2019, OIG personnel verified that TTCF module 272 continues to house Class Members. The Department provided documentation that all 96 beds in the housing module meet ADA requirements. However, the accompanying toilet and shower modifications have not been ADA certified. In order to achieve substantial compliance with this provision an expert must evaluate and determine that all toilet and shower modifications comply with ADA requirements. Defendants remain in partial compliance with this provision.

**Provision C.5 – Construction Plans – Sustained Compliance on November 7, 2017. No Further Monitoring.**

Defendants achieved sustained compliance with this provision on November 7, 2017, and the OIG discontinued compliance monitoring of this provision for purposes of the Agreement.

**SECTION D – Use of Mobility Devices**

**Provision D.1 – Initial Decisions and Ongoing Evaluations Made by LASD Medical Professionals – Partial Compliance**

Under paragraph 1 of section D of the Agreement, "[i]nitial decisions and ongoing evaluations regarding Class Members' need, if any, for the use of a mobility assistive device are and will continue to be made by LASD medical professionals." As previously reported, the OIG confirmed that the Department and CHS promulgated policy consistent with this provision.

In accordance with the Agreement, Class Members should be assessed and re-evaluated "in accordance with established medical standards" for their need for medical assistive devices. To achieve substantial compliance with this provision, an expert must determine whether the evaluations made by medical professionals meet the accepted medical standard of care. Defendants remain in partial compliance with this provision.

**Provision D.2 – Secondary Reviews – Partial Compliance**

Under paragraph 2 of section D of the Agreement,

"[i]n an event a Class Member disputes a decision made by LASD Medical Professionals regarding the need, if any, for a mobility assistive device, the Class Member may receive a secondary review of the determination regarding his or her need for a mobility assistive device and or the type of device requested. (a) The secondary review will be conducted by the Chief Physician or his/her designee; and (b) The secondary review will include an independent evaluation."

The Department and CHS created a tab in the Cerner medical records system to track the progress and completion of secondary review requests (see Provision H.3 below). However, as discussed under Provision D.1, initial assessments and ongoing evaluations, including secondary reviews, should meet the accepted medical standard of care. To achieve substantial compliance with this provision, an expert must determine whether the evaluations made by medical professionals meet the required standard. Defendants remain in partial compliance with this provision.

**Provision D.3 – Assistive Device Leaflet – Substantial Compliance as of March 1, 2019.**

Under paragraph 3 of section D of the Agreement, Defendants are required

1   to "create and distribute" the ADL advising Class Members of their rights

2   "pertaining to determinations regarding their need, if any, for mobility assistive

3   devices." The compliance measures require the Department to promulgate policy

4   consistent with this provision and to post ADL information in relevant housing

5   locations.

6       On March 19, 2019, the OIG determined that line personnel at the IRC and

7   CRDF Reception have an adequate supply of ADLs. The OIG also confirmed in

8   addition to the reception areas, Class Members continue to have unrestricted self-

9   service access to the ADLs.

10       Between April 2018 and January 2019, OIG personnel conducted site visits

11   at all relevant housing locations and determined that the Department continues to

12   display posters containing the ADL information in all relevant housing locations.

13   The Department has achieved substantial compliance with this provision as of

14   March 1, 2019.

15   **Provision D.4 – Tracking Complications – Partial Compliance (Previously**

16   **Substantial Compliance)**

17       Paragraph 4 of section D of the Agreement provides,

18     "Defendants have policies and guidelines for tracking complications

19     common to inmates with mobility impairments and Defendants agree

20     to continue to track such complications using existing policies and

INSPECTOR GENERAL'S FOURTH   -29-
IMPLEMENTATION STATUS
REPORT
                                    CV 08-03515 DDP

guidelines. Defendants do not currently have the ability to run searches and provide statistics about assistive device usage to Plaintiffs' counsel, but may have this ability in the future once the LASD's medical records system is fully upgraded – this process is underway. Defendants agree to provide statistics from the upgraded system, to the extent feasible, when the upgrades are completed."

As discussed in the *Inspector General's Second Implementation Status Report* ("*Second Implementation Status Report*"), because Cerner is unable to capture the data as required by this provision, the OIG approved an alternative implementation plan for CHS to conduct thorough qualitative reviews of information, including medical records and grievances, on a semi-annual basis to identify complications common to mobility-impaired Class Members. The Department and the OIG agreed that these reviews, if completed regularly and if corrective action is taken, are an effective means of identifying and treating complications.

The Department's May 2018 retrospective review indicates that six paraplegic patients experienced Urinary Tract Infections ("UTI") while in custody during the sampled time period. CHS conducted a review of the patients' medical records and concluded that the complications did not result from inadequate care.

The OIG conducted a review of Custody Automated Reporting and Tracking System ("CARTS") entries for the Class Members listed in the May 2018

1 assessments and found that several of the listed Class Members submitted

2 complaints regarding UTIs and insufficient access to catheters. The OIG verified

3 during site visits and interviews that paraplegic Class Members at MCJ indeed had

4 ongoing complications with UTIs and insufficient or delayed access to catheters.

5 CHS personnel reported to the OIG that they must ration catheters because of

6 insufficient supplies and one CHS provider was under the mistaken impression that

7 the disposable catheters are reusable.

8      The Department provided an additional retrospective review dated

9 February 26, 2019, which identified six paraplegic Class Members suffered from

10 pressure wounds or UTIs. As with the May 2018 review, CHS determined that the

11 complications identified "did not demonstrate preventable actions by medical

12 staff" because they were "directly attributed to being paraplegic."

13      It is unlikely the Department and CHS can accurately track mobility

14 impairment complications, and determine whether they are being identified and

15 treated, without a thorough review of all available information, including medical

16 and custody prisoner grievances. The OIG shared these concerns with CHS and the

17 Department on October 30, 2018, and on February 7, 2019. The Department's

18 February 26, 2019, self-assessment included "Health Services Request[s]," but did

19 not reflect an analysis of additional data sources, such as Class Member

20 grievances.

1   On April 26, 2018, July 3, 2018, and October 23, 2018, the OIG notified the

2 Department that it must revise or create a supplemental unit order providing that

3 retrospective reviews of the paraplegic population are to be conducted every six

4 months. On March 19, 2019, the OIG requested a copy of the supplemental unit

5 order, and the Department reported that the policy that governs retrospective

6 reviews was written as a directive and has been "delayed by CHS executives

7 indefinitely."

8   As a result of the deficiencies cited above, Defendants' compliance with this

9 provision has reduced from substantial to partial compliance. To achieve

10 substantial compliance, the Department and CHS must promulgate policy

11 consistent with the alternative implementation plan, conduct thorough retrospective

12 reviews of all available information, including medical records and grievances, and

13 obtain an expert's evaluation on the quality and accuracy of the retrospective

14 reviews. The review must include an analysis of information relating to

15 complications of patients with paraplegia. Defendants have achieved partial

16 compliance with this provision.

17 //

18 //

19 //

20 //

**Provision D.5 – Wheelchair Seating Training – Sustained Compliance on December 13, 2017. No Further Monitoring.**

Defendants achieved sustained compliance with this provision on December 13, 2017, and the OIG discontinued compliance monitoring of this provision for purposes of the Agreement.

**Provision D.6 – Publication of Guidelines for Tracking Complications – Sustained Compliance on February 8, 2019. No Further Monitoring.**

Under paragraph 6 of section D of the Agreement, "Defendants' policies and guidelines for tracking complications common to individuals with mobility impairments will be made public in all jail settings." The corresponding compliance measures for this provision require the Department to promulgate policy consistent with this provision and to notify Class Members of the guidelines or policies for tracking complications common to individuals with mobility impairments.

As reported in the *Third Implementation Status Report*, CHS developed policy M12.03, "Complications – Patients with Mobility Impairments," which outlines procedures to analyze complications common to Class Members. The ADL states, "[j]ail medical professionals do continuous quality improvement studies on a regular basis. Such reviews include monitoring complications common to mobility [impaired prisoners]." As discussed under Provision A.6, the

1  Department continues to display posters containing the ADL information in

2  relevant housing locations and Class Members continue to have self-service access

3  to the ADL.

4          Between April 2018 and March 2019, OIG personnel conducted site visits at

5  MCJ, TTCF, and CRDF and confirmed that the Department continues to display

6  the posters containing the ADL information. Defendants have achieved sustained

7  compliance with this provision, and the OIG will no longer monitor compliance

8  with this provision for the purpose of the Agreement.

9  **SECTION E – Wheelchairs and Prostheses**

10  **Provision E.1(a) – Wheelchair Maintenance – Sustained Compliance on**

11  **February 8, 2019. No Further Monitoring.**

12          Under subsection (a) of paragraph 1 of section E of the Agreement,

13  "Defendants agree that wheelchairs that are medically prescribed will be

14  maintained in working order (including functional brakes and footrests as may be

15  used unless otherwise prescribed by LASD Medical Professionals) and will be

16  serviced on a regular basis to the extent feasible." The corresponding compliance

17  measures require the Department to promulgate policy consistent with this

18  provision and provide the OIG with data related to grievances about wheelchair

19  conditions and corresponding maintenance logs for two one-week periods. As

20

1  previously reported, the Department promulgated policy consistent with this

2  provision.

3    The OIG has determined through observations and interviews during regular

4  site visits at MCJ, TTCF, and CRDF, that Department personnel are exchanging

5  broken wheelchairs for working wheelchairs upon verbal requests by Class

6  Members. These requests and wheelchair exchanges are not tracked, but the repairs

7  of the broken wheelchairs are tracked on the Department's wheelchair maintenance

8  log.

9    The OIG selected and reviewed data related to grievances about wheelchair

10  conditions and maintenance logs from April 18 to April 26, 2018, and from

11  August 22 to August 30, 2018. The maintenance logs provided contain a list of 42

12  broken wheelchairs. The logs reflect that 41 of the 42 wheelchairs – or over 97

13  percent – were either serviced or service was in progress. Defendants have

14  achieved sustained compliance with this provision, and the OIG will no longer

15  monitor compliance with this provision for the purpose of the Agreement.

16  **Provision E.1(b) – Maintenance of the Wheelchair Repair Shop – Sustained**

17  **Compliance on September 20, 2017. No Further Monitoring.**

18    Defendants achieved sustained compliance with this provision on

19  September 20, 2017, and the OIG discontinued compliance monitoring of this

20  provision for purposes of the Agreement.

1    **Provision E.1(c) – Installing RFID Transmitters – Sustained Compliance on**

2    **January 5, 2018. No Further Monitoring.**

3        Defendants achieved sustained compliance with this provision on

4    January 5, 2018, and the OIG discontinued compliance monitoring of this

5    provision for purposes of the Agreement.

6    **Provision E.1(d) – Wheelchairs with Moveable Armrests – Substantial**

7    **Compliance on February 5, 2019.**

8        Under subsection (d) of paragraph 1 of section E of the Agreement,

9        "Defendants further agree that wheelchairs with movable armrests may

10        be provided to Class Members who require them if a custody safe

11        option can be located at a comparable price to wheelchairs the LASD

12        currently purchases. Defendants agree to explore the availability of

13        such wheelchairs and welcome any suggestions Plaintiffs may have."

14    The corresponding compliance measure for this provision requires the Department

15    to provide the OIG with a brief summary of the Department's efforts to explore the

16    availability and feasibility of purchasing custody-safe wheelchairs with movable

17    armrests.

18        As reported in the *Third Implementation Status Report*, on February 6, 2018,

19    the Department purchased seven standard-size wheelchairs and three extra-wide

20    wheelchairs with removable, but not movable, armrests. On December 16, 2018,

1   the Department made wheelchairs with removable armrests available to Class

2   Members who require them. Department personnel report that the wheelchair

3   vender is registered with the County, which allows them to promptly obtain

4   additional wheelchairs if required. Defendants have achieved substantial

5   compliance with this provision as of February 5, 2019.

6   **Provision E.2 – Return of Personal Wheelchairs – Sustained Compliance on**

7   **February 13, 2018. No Further Monitoring.**

8       Paragraph 2 of section E of the Agreement provides, "[p]ersonal wheelchairs

9   are currently and will continue to be stored and returned to Class Members upon

10   release from custody." The corresponding compliance measures for this provision

11   require the Department to provide property receipts for personal wheelchairs for a

12   randomly selected representative sample of Class Members released from custody.

13   As reported in the *Third Implementation Status Report,* the first sample provided

14   by the Department, based on two one-week periods, was too small to support a

15   compliance finding, so the OIG expanded the time frame for this provision. In

16   partnership with the Department's Audit and Accountability Bureau ("AAB"), the

17   Department provided information based on a six-month period for this provision,

18   from March 1 to August 31, 2018.

19       On January 19, 2019, the Department provided the OIG with documentation

20   reflecting that 96 percent of sampled Class Members received their wheelchairs

1 upon release from custody. The Department reports that it excluded ten Class

2 Members from its sample analysis because the prisoners had either been released

3 from Los Angeles County to the custody of another jurisdiction or the mobility

4 impairment designations were assigned in error.

5       The OIG conducted a site visit at the IRC on March 19, 2019, to inventory

6 stored personal wheelchairs to verify that all chairs were assigned to Class

7 Members in custody. On March 19, 2019, the OIG completed a similar inventory

8 at CRDF. The OIG confirmed that the Department's self-assessment was accurate

9 and that some agencies refuse to take personal wheelchairs when assuming custody

10 of a Class Member.

11       The OIG recommends that the Department continue working to coordinate

12 with agencies assuming custody of Class Members to ensure that prisoners'

13 property transfers with them or to ensure that Class Members' families are aware

14 that designated family members can retrieve prisoners' property at the IRC or

15 CRDF upon their release. Defendants have achieved sustained compliance with

16 this provision, and the OIG will no longer monitor compliance with this provision

17 for purposes of the Agreement.

18 **Provision E.3 – Policy Regarding Assistive Devices – Sustained Compliance on**

19 **December 2, 2017. No Further Monitoring.**

20       Defendants achieved sustained compliance with this provision on

1   December 2, 2017, and the OIG discontinued compliance monitoring of this

2   provision for purposes of the Agreement.

3   **Provision E.4 – Return of Prostheses within 24 Hours – Substantial**

4   **Compliance on February 18, 2019.**

5          Under paragraph 4 of section E of the Agreement, "[c]onsistent with existing

6   LASD policy, Defendants will ensure that all prostheses are returned to Class

7   Members within 24 hours if not determined to pose a security risk." The

8   corresponding compliance measures require the Department to promulgate policy

9   consistent with this provision and to analyze a sample of Class Members who use

10  prosthetics for two one-week periods selected by the OIG.

11         The Department has promulgated two policies consistent with this provision:

12  the *Johnson* policy and CDM section 5-03/080.00, "Medical Appliances." On

13  March 19, 2019, the OIG interviewed personnel at the IRC Booking Front area,

14  where medical appliances are first evaluated, and determined that all relevant

15  personnel were familiar with the requirements of the *Johnson* policy. On March

16  19, 2019, OIG personnel interviewed personnel at CRDF's reception area and

17  determined that CRDF personnel were also familiar with the requirements of the

18  policies.

19         As reported in the *Third Implementation Status Report,* the Department has

20  indicated that it identified issues related to documentation under this provision and

INSPECTOR GENERAL'S FOURTH   -39-                    CV 08-03515 DDP
IMPLEMENTATION STATUS
REPORT

1  conducted a self-assessment of the current populations of Class Members with

2  prostheses. On February 28, 2019, the Department provided the OIG with its self-

3  assessment showing that 100 percent of Class Members interviewed reported

4  receiving their prosthetic devices within 24 hours. The OIG has determined

5  through interviews during regular site visits at MCJ, TTCF, and CRDF that Class

6  Members are receiving their prosthetic devices within 24 hours if the devices do

7  not pose a security risk.

8      To address the issues with documentation, the Department has revised the

9  "Arrestee Medical Appliance Clearance Record Form" to include a reference

10  number, which will allow the form to be tracked in the CARTS. The form and

11  updated policy was approved and placed in circulation on February 22, 2019. The

12  Department is in the process of preparing a tutorial to ensure that personnel

13  complete the form accurately. Defendants have achieved substantial compliance

14  with this provision as February 18, 2019.

15  **SECTION F – ADA Coordinators**

16  **Provision F.1 – ADA Duties – Partial Compliance**

17      Under paragraph 1 of section F of the Agreement, "the Department is

18  required to designate one or more ADA coordinator(s) in each Jail Setting and

19  dedicate sufficient resources to ensure that necessary duties are carried out in an

20  appropriate fashion." The provision enumerates duties specific to ADA

1  coordinators, including: ensuring that Class Members receive reasonable

2  accommodations as prescribed by LASD Medical Professionals; reviewing,

3  investigating, and resolving ADA grievances in accordance with LASD's

4  grievance policy; answering and logging phone calls made to the LASD ADA

5  Coordinator telephone number; training LASD personnel working in units that

6  house Class Members; and reporting back to Class Counsel, in writing, on the

7  resolution of ADA grievances submitted by Class Counsel.

8  Pursuant to the corresponding compliance measures, the Department

9  provided the OIG with a list of all ADA Coordinators and a log of complaints

10  related to mobility impairments received by the ADA team email group from

11  January 1 through June 30, 2018. The log contains complaints submitted by the

12  OIG, the ACLU, and other third parties during the selected time period. All of the

13  complaints were resolved in a timely manner and were consistent with the OIG's

14  internal records.

15  The log of complaints received by the email group reflects ADA

16  Coordinators' direct involvement in resolving certain ADA issues. However, the

17  complaints contained within the log constitute only a fraction of all ADA-related

18  grievances received by the Department. As discussed in more detail below under

19  Provision G.2, the Department and CHS currently use a multi-category designation

20  system for handling grievances where ADA Coordinators resolve certain types of

1  grievances and requests while medical personnel resolve others. As a result, ADA

2  Coordinators are not reviewing and tracking ADA grievances that are processed by

3  medical personnel to ensure they are resolved adequately. Although ADA

4  Coordinators do not currently have access to medical records, the Department and

5  CHS should work together to implement an effective method for ADA

6  Coordinators to assume a greater role in "reviewing, investigating, and resolving"

7  *all* ADA grievances as required by this provision.

8       The Department also provided the OIG with a log of phone calls made to the

9  ADA Coordinator telephone number from June 1, 2018, through February 14,

10  2019. Department personnel advised that they first started to log telephone calls in

11  June 2018. The log recorded information such as the name and telephone number

12  of the caller, a description of the inquiry, the prisoner's information, and the action

13  taken by the ADA Coordinators. The Department should continue its efforts to log

14  telephone calls made to the ADA Coordinator telephone number and ensure that

15  ADA-related inquiries are addressed in a timely manner.

16       The Department's ADA Coordinators make tremendous efforts to perform

17  their duties in accordance with the Agreement. However, certain duties essential to

18  providing Class Members with adequate care are not performed sufficiently due, in

19  part, to a lack of collaboration between the Department and CHS. Defendants

20  remain in partial compliance with this provision.

**Provision F.2 – ADA Coordinator(s) Authority – Sustained Compliance on October 31, 2017. No Further Monitoring.**

Defendants achieved sustained compliance with this provision on October 31, 2017, and the OIG discontinued compliance monitoring of this provision for purposes of the Agreement.

**Provision F.3 – Training ADA Coordinators – Substantial Compliance as of March 12, 2019.**

Paragraph 3 of section F of the Agreement provides,

"[p]laintiffs will assist in training the ADA coordinator(s). The ADA coordinator(s) will be assigned and trained within 60 days of the effective date."

The corresponding compliance measure for this provision requires the Department to provide the OIG with training records for ADA coordinators, including rosters and curriculum. As of March 2019, the Department has a total of eight ADA Coordinators, seven of whom were assigned in 2018, and one Division ADA Coordinator.

In the *Third Implementation Status Report,* the OIG identified several ADA Coordinators who held ADA Coordinator positions for more than a year before receiving training. Since then, the Department has made a substantial improvement in providing newly-assigned ADA Coordinators with training within 60 days of

assuming ADA-Coordinator responsibilities. Six of the seven newly assigned ADA Coordinators received training within 30 days of assuming their respective roles, and one received training within 60 days. The OIG reviewed the videotaped course to ensure that appropriate ADA topics were covered.

The Department should continue its efforts to provide ADA Coordinators with training as soon as reasonably possible, but no later than 60 days of assuming ADA-Coordinator responsibilities. Defendants have achieved substantial compliance with this provision as of March 12, 2019.

## SECTION G – Grievance Form

**Provision G.1 – Grievance Form Shall Include an "ADA" Box – Sustained Compliance on April 22, 2016. No Further Monitoring.**

Defendants achieved sustained compliance with this provision on April 22, 2016, and the OIG discontinued compliance monitoring of this provision for purposes of the Agreement.

**Provision G.2 – "ADA" Designation of ADA Grievances – Partial Compliance**

Under paragraph 2 of section G of the Agreement, "[a]ll grievances involving mobility assistive devices and the physical accessibility of the Jail shall be designated 'ADA' grievances even if the inmate who filed the grievance did not check the 'ADA' box." The corresponding compliance measures require the Department and CHS to promulgate policy consistent with the provision, to

1   provide a list of ADA-related grievances, and to show that those grievances were

2   properly designated ADA grievances. As previously reported, the Department

3   created several policies related to this provision, including the *Johnson* policy and

4   CDM section 8-03/030.00, "ADA-Related Requests and Grievances."

5       The Department reports that ADA-related grievances fall under three

6   separate designations within CARTS: "Medical Services," "ADA (Medical)," and

7   "ADA." The Department's self-assessment indicates that the majority of ADA-

8   related grievances are designated as either "Medical Services" or "ADA

9   (Medical)." According to the self-assessment, 58 percent of ADA-related

10  grievances were designated as "Medical Services" and 26 percent were designated

11  as "ADA (Medical)." All grievances that are designated as "Medical Services" or

12  "ADA (Medical)" are processed by CHS personnel.

13      ADA-related grievances that fall under the "ADA" designation within

14  CARTS are processed by Custody personnel. None of the ADA-related grievances

15  included in the Department's self-assessment were designated as "ADA." As

16  discussed above under Provision F.1, it appears that ADA Coordinators are

17  handling only a portion of ADA-related grievances and are not tracking the

18  majority of them.

19      As previously reported in the *Third Implementation Status Report*, the multi-

20  category designation system creates confusion and untimely and/or insufficient

INSPECTOR GENERAL'S FOURTH   -45-                           CV 08-03515 DDP
IMPLEMENTATION STATUS
REPORT

1  responses to Class Members and ADA grievances. Based on the results of the self-

2  assessment received by the OIG, there have been no efforts made to stop the use of

3  the "Medical Services" designation on ADA-related grievances, despite CHS

4  policy M12.04, "Grievances – Health Care and Against Staff," which requires that

5  ADA grievances be designated as "ADA (Medical)." Defendants remain in partial

6  compliance with this provision.

7  **Provision G.3 – Grievance Response Time – Partial Compliance**

8      Under paragraph 3 of section G of the Agreement, "[t]he response time for

9  ADA grievances will be no more than that allowed under the standard grievance

10  policy." The corresponding compliance measures require the Department to

11  promulgate policy consistent with this provision and to provide a randomly

12  selected representative sample of ADA grievances received by the Department

13  within time frames selected by the OIG.

14      As previously reported, the Department created policies consistent with this

15  provision, including CDM section 8-03/005.00, "Inmate Grievances," CDM

16  section 8-03/030.00, "ADA-related Requests and Grievances," and CDM section

17  8-04/040.00, "Time Frames." These policies require a response time of 15 days for

18  all non-emergency ADA grievances and five days for emergency grievances. CHS

19  policy M12.04, "Grievances – Health Care and Against Staff," requires that all

20  health care grievances be analyzed within 24 hours to determine whether there is

1   an urgent or emergent medical condition that requires immediate attention. If not,

2   the response time for medical grievances is 15 days, as with Department policy.

3          The Department provided the OIG with a spreadsheet showing that the

4   Department or CHS responded to 88 percent of the sampled grievances within 15

5   days. However, the documentation provided indicates that response timeframes

6   were analyzed based only on the 15-day requirement and do not include data or

7   analysis of emergency grievance response timeframes. The OIG determined that

8   over one-half of the sampled grievances were originally marked "Emergency" by

9   Class Members, but were processed as non-emergency grievances without proper

10  documentation of custody or medical personnel decisions to downgrade them.

11  Though many of these grievances do not constitute emergencies, the Department

12  and CHS must provide source documentation that indicates both agencies are

13  processing grievances consistent with their respective policies.

14         As previously reported, when prisoners check the "Emergency" box on the

15  Department's grievance form, personnel must promptly notify the facility watch

16  commander to ensure that appropriate action is taken. The watch commander or

17  designated sergeant may downgrade grievances to non-emergent, but must notify

18  the prisoner that the grievance will be handled as non-emergent as soon as

19  practicable and reflect that determination in CARTS. Downgraded grievances may

20  then be resolved within the non-emergency grievance 15-day timeframe.

1   The Department provided source documents for some information contained

2   in the spreadsheet; however, the OIG has requested and is awaiting additional

3   source documents on medical-grievance processing. This documentation is

4   necessary to verify the spreadsheet data provided and to make a compliance

5   finding for this provision. This same information was requested for the previous

6   reporting period but was not provided.

7   In addition to not providing proper source documentation to determine

8   whether grievances were emergent, there are ongoing issues with the way in which

9   CHS responds to grievances. CHS personnel have stated that a grievance is

10   considered to have been "responded to" after a supervising nurse looks at the

11   grievance and makes a referral. However, in some cases included in the self-

12   assessment the actual grievances had not been *resolved* at the time a referral was

13   made yet the grievance was marked as completed. The OIG brought this to the

14   attention of the Department, but the Department and CHS has not implemented a

15   remedy to these issues. Defendants remain in partial compliance with this

16   provision.

17   **Provision G.4 – "ADA" Grievances Not Designated as "Basic" Grievances –**

18   **Sustained Compliance on January 15, 2019. No Further Monitoring.**

19   Under paragraph 4 of section G of the Agreement, "ADA grievances will not

20   be designated as 'basic' grievances." The corresponding compliance measure for

1  this provision requires the Department to provide the same data as was provided

2  under Provision G.2. The Department circulated policy related to this provision,

3  including the *Johnson* policy and multiple sections within CDM Volume 8,

4  "Inmate Grievance Manual."

5      The Department and CHS provided documentation related to this provision

6  on January 15, 2019, that confirms the Department does not designate ADA-

7  related grievances as "basic" grievances. Defendants have achieved sustained

8  compliance with this provision, and the OIG will no longer monitor compliance

9  with this provision for purposes of the Agreement.

10 **Provision G.5 – Keep All ADA-related Grievances – Sustained Compliance on**

11 **May 4, 2018. No Further Monitoring.**

12     Under paragraph 5 of section G of the Agreement, "Defendants will keep

13 copies of all ADA grievances, for purposes of monitoring in this matter." As

14 previously reported, all prisoner grievances are automatically scanned and retained

15 in CARTS. Defendants have achieved sustained compliance with this provision,

16 and the OIG will no longer monitor compliance with this provision for purposes of

17 the Agreement.

18 **SECTION H – Accommodations**

19 **Provision H.1 – Reasonable Accommodations – Partial Compliance**

20     Under paragraph 1 of section H of the Agreement,

1    "Defendants agree that Class Members shall receive reasonable

2    accommodations when they request them and as prescribed by LASD

3    medical professionals. Accommodations may include, but are not

4    limited to: assignment to lower bunks; changes of clothing; extra

5    blankets; allowance of extra time to respond to visitor calls and attorney

6    visits; shower benches; assistive device to travel outside of a housing

7    module; and assignment to a cell with accessible features."

8    The Department has revised its policies consistent with the terms of the Agreement

9    to ensure that extra blankets and extra sets of clothing are not considered

10   contraband for Class Members. The Department has also made revisions consistent

11   with this provision to the following policies: CDM section 5-06/010.05,

12   "Allowable Inmate Property – Male Inmates"; CDM section 5-06/010.10,

13   "Allowable Inmate Property – Female Inmates"; and CDM section 5.07/010.00,

14   "Contraband Defined."

15        Between April 2018 and March 2019, OIG personnel conducted site visits at

16   relevant housing locations and verified that Department personnel are familiar with

17   the *Johnson* policy's requirement that Class Members receive reasonable

18   accommodations. However, because the Department is deficient in several areas

19   related to Class-Member accommodations (as discussed throughout this report in

20

INSPECTOR GENERAL'S FOURTH     -50-                    CV 08-03515 DDP
IMPLEMENTATION STATUS
REPORT

1  compliance findings for provisions K.1 and B.4), Defendants remain in partial

2  compliance with this provision.

3  **Provision H.2 – Accessibility of Information Reflecting Orders by LASD**

4  **Medical Professionals – Sustained Compliance on November 3, 2017. No**

5  **Further Monitoring.**

6       Defendants achieved sustained compliance with this provision on

7  November 3, 2018, and the OIG discontinued compliance monitoring of this

8  provision for purposes of the Agreement.

9  **Provision H.3 – Tracking Mobility Assistive Device Requests – Substantial**

10 **Compliance as of February 28, 2019.**

11      Under paragraph 3 of section H of the Agreement, "Defendants agree to

12 explore the feasibility of adding a tab to the current medical records system (as part

13 of upgrades), to track mobility assistive device requests and assessments by LASD

14 Medical Professionals of Class Members." The corresponding compliance measure

15 for this provision requires the Department to provide documentation related to

16 upgrades to Cerner, as well as their efforts to comply with this provision.

17      On February 28, 2019, the Department provided the OIG with a provision

18 summary stating, "the feasibility of upgrading Cerner with a tab to track the initial

19 request for assistive devices is not probable, nor is it cost effective" and therefore,

20 "the procedures currently in place are [the Department's] best options for capturing

1  the required information for this provision." The Department continues to rely on a

2  manual process to identify and track prisoners who are designated as Class

3  Members with a "W" or "U" designation consistent with their initial medical

4  assistive assessments. Department personnel manually review the Automated

5  Justice Information System ("AJIS") to identify newly-designated Class Members

6  and manually log their information in a spreadsheet. However, prisoners who are

7  not designated with a "W" or "U" classification during their initial assessment are

8  not recorded in the AJIS system for the Department to track. To ensure that all

9  prisoners are notified of their right to a secondary review in the event that they

10  dispute the outcome of their initial assessment, the Department created policy that

11  requires medical professionals to notify all prisoners of this right during the initial

12  medical assessment.

13        On August 28, 2018, the Department implemented a tab in Cerner to track

14  secondary review requests. When the tab was first implemented, all personnel who

15  opened Cerner received a pop-up screen explaining the secondary review tab and

16  related policy. OIG personnel received documentation reflecting the

17  implementation of the new tab and observed Department personnel using the tab.

18  The Department reports that the tracking system is working effectively and has

19  streamlined the previous process of manually recording secondary review

20

1  information. OIG personnel spoke with several medical personnel who use the tab

2  – including nurses, clinicians, and providers – and received positive feedback.

3        Even though initial mobility device assessments are not currently tracked in

4  a systematic manner, the Department has made substantial efforts to implement

5  this provision. In addition, the Department added the new tab in Cerner, which has

6  streamlined the process of tracking secondary reviews. Defendants have achieved

7  substantial compliance with this provision as of February 28, 2019.

8  **SECTION I – Notifications of Rights**

9  **Provision I.1 – Notification of Rights – Sustained Compliance on June 2, 2016.**

10 **No Further Monitoring.**

11       Defendants achieved sustained compliance with this provision on

12 June 2, 2016, and the OIG discontinued compliance monitoring of this provision

13 for purposes of the Agreement.

14 **SECTION J – Training**

15 **Provision J.1 – Training – Substantial Compliance as of February 28, 2019.**

16       Under paragraph 1 of section J of the Agreement, "[w]ithin 60 days of

17 April 22, 2015, Defendants will begin providing reasonable training to Jail

18 personnel (including medical personnel) consistent with the terms of this

19 Agreement." Among other requirements, the compliance measures for this

20

1   provision require the Department to provide training rosters, training curricula, and

2   attendance rosters to the OIG.

3       In the *Second Implementation Status Report*, Defendants achieved

4   substantial compliance with this provision. However, in the *Third Implementation*

5   *Status Report*, the Department was deficient in several areas related to *Johnson*-

6   policy training and policy compliance and the finding was reduced to partial

7   compliance.

8   On February 28, 2019, the Department provided the OIG with a self-assessment

9   with supporting documentation related to this provision, including:

10  • SMS rosters of all Custody personnel from MCJ, TTCF, and CRDF

11      indicating whether or not they acknowledged their receipt and understanding

12      of the *Johnson* policy;

13  • Attendance rosters (including personnel from MCJ, TTCF, and IRC) and a

14      PowerPoint training titled, "Disability Rights Laws within Correctional

15      Facilities," that occurred throughout January and February 2019; and

16  • Rosters of personnel from MCJ, TTCF, and CRDF who received a

17      Disability Accommodation Policy ("DAP") card – a quick reference card

18      that summarizes the rights and accommodations of Class Members.

19  The Department is also issuing DAP cards to non-custody personnel who are

20  regularly assigned to work overtime in custody for their use as a reference guide

INSPECTOR GENERAL'S FOURTH   -54-
IMPLEMENTATION STATUS
REPORT

CV 08-03515 DDP

1 when interacting with Class Members. The OIG reviewed training attendance

2 rosters to ensure that appropriate personnel were in attendance, as well as the

3 training curriculum and the DAP card to ensure that appropriate topics were

4 included. Defendants have achieved substantial compliance with this provision as

5 of February 28, 2019.

6 **SECTION K – Transportation**

7 **Provision K.1 – Transportation in Accessible Vans – Partial Compliance**

8 **(Previously Substantial Compliance)**

9       Under paragraph 1 of section K of the Agreement, "Class Members who use

10 wheelchairs or other mobility aides are and will continue to be transported in

11 accessible vans and will be secured during transport."

12       As previously reported, the Department promulgated policy consistent with

13 this provision. In the *Second Implementation Status Report*, the OIG found the

14 Department in Substantial Compliance with this provision.[5]

15       Between April 2018 and January 2019, OIG personnel conducted site visits

16 at MCJ, TTCF, and CRDF and spoke to Class Members regarding this provision.

17 Interviews revealed that Class Members were being transported in accessible vans

18 and secured during transport at TTCF and MCJ. However, the OIG received

19

20 [5] In the *Third Implementation Status Report*, the OIG again found the Department in substantial compliance because the reporting period ended one month before the Department achieved sustained compliance.

INSPECTOR GENERAL'S FOURTH    -55-
IMPLEMENTATION STATUS
REPORT

1    several complaints from Class Members housed at CRDF about either being

2    transported to their medical appointments in a radio car or missing their medical

3    appointments because a wheelchair-accessible van was unavailable. The OIG

4    notified the Department of this concern on December 14, 2018. On April 15, 2019,

5    the Department reported that it has purchased two new accessible vans, which are

6    in the process of being appropriately outfitted. The Department further reported

7    that the necessary modifications to the vans will take approximately three to four

8    months. Defendants have achieved partial compliance with this provision.

9

10

11

12

13

14

15

16

17

18

19

20

CV 08-03515 DDP

INSPECTOR GENERAL'S FOURTH   -56-
IMPLEMENTATION STATUS
REPORT