1  MAX HUNTSMAN
   Inspector General, Bar No. 156780
2  CATHLEEN BELTZ
   Assistant Inspector General, Bar No. 245593
3  InspectorGeneral@oig.lacounty.gov
   OFFICE OF INSPECTOR GENERAL
4  312 South Hill Street, 3rd Floor
   Los Angeles, California 90013
5  Telephone: (213) 974-6100; Fax: (213) 974-9346

6  **Monitors**

7              **UNITED STATES DISTRICT COURT**

8        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

9
   PETER JOHNSON, DONALD              CASE NO. CV 08-03515 DDP
10 PETERSON and MICHAEL
   CURFMAN, on behalf of themselves   **INSPECTOR GENERAL'S FIFTH**
11 and all others similarly situated, **IMPLEMENTATION STATUS**
                                       **REPORT**
12                        Plaintiffs,

13              v.

14 LOS ANGELES COUNTY
   SHERIFF'S DEPARTMENT, a public
15 entity; LEROY BACA, as Sheriff of
   County of Los Angeles, and COUNTY
16 OF LOS ANGELES, a public entity,
   MICHAEL D. ANTONOVICH,
17 YVONNE B. BURKE, DON KNABE,
   GLORIA MOLINA, ZEV
18 YAROSLAVSKY, as Supervisors of
   the County of Los Angeles
19
                        Defendants.
20

1       Pursuant to Section V, subsection M, of the Settlement Agreement

2 ("Agreement"), the Office of Inspector General ("OIG"), the Monitor appointed by

3 this Court, submits the attached *Inspector General's Fifth Implementation Status*

4 *Report* ("Report") evaluating Defendants' compliance with the terms of the

5 Agreement. This report was prepared by the OIG to provide "reasonable and

6 regular reports" to the Parties and the Court. This is the fifth report on the

7 implementation status of the Agreement. The OIG is available to answer any

8 questions the Court may have regarding this Report and Defendants' compliance

9 with the Agreement.

10

11 Dated:   March 31, 2020           Respectfully submitted,

12

13                             By: _____

14                               Max Huntsman
                              Inspector General

15                               Los Angeles County Office of Inspector
                              General

16

17

18

19

20

                                              CV 08-03515 DDP

INSPECTOR GENERAL'S FIFTH      -2-
IMPLEMENTATION STATUS
REPORT

## INSPECTOR GENERAL'S FIFTH IMPLEMENTATION

## STATUS REPORT

The Agreement in the above-captioned case provides that the OIG will prepare and submit periodic reports to Plaintiffs and Defendants (collectively referred to as the "Parties") and the Court that evaluate Defendants' compliance with the Agreement. Defendants have agreed to implement system-wide reform of the conditions of confinement for Class Members within Los Angeles County jails. The Agreement defines Class Members as "all present and future detainees and inmates with mobility impairments who, because of their disabilities, need appropriate accommodations, modifications, services and/or physical access in accordance with federal and state disabilities law." Docket No. 210.2 at 3. This Report, unless otherwise stated, takes into account all data collected and analyzed and observations made from April 1, 2019, to March 31, 2020.

On August 24, 2016, the Parties agreed on compliance measures that would serve as a guideline for implementation of the terms of the Agreement and establish the Agreement's minimum compliance standards. The measures were written based on the Los Angeles County Sheriff's Department's ("LASD" or the "Department") predictions about policies, procedures, practices, and systems that it intended to use or implement to ensure compliance with the terms of the Agreement. For some compliance measures, the Department's information about

1    existing or available data and systems was limited or its predictions were incorrect.

2    Where necessary to serve the interests of Class Members and the Department, and

3    to promote effective implementation of the Agreement, the OIG is willing to

4    consider alternative evidence as proof of compliance. Precisely how the

5    Department proves its compliance with each provision is less important than

6    whether each provision is effectively and durably implemented. Though the OIG is

7    not rigid in its consideration of the types of evidence that support compliance, all

8    evidence submitted must be verifiable, replicable, and sufficient to make a

9    compliance determination. The Department's Custody Compliance and

10   Sustainability Bureau ("CCSB") is responsible for preparing self-assessments and

11   coordinating any additional documentation as requested by the OIG.

12         The OIG will make a compliance finding for each provision based on the

13   degree to which each provision has been effectively and durably implemented. A

14   non-compliance finding means the Department has made no notable progress in

15   achieving compliance with any of the key components of a particular provision. A

16   partial compliance finding means the Department has made notable progress in

17   achieving compliance with the key components of a particular provision. A

18   substantial compliance finding means the Department has successfully met all, or

19   nearly all, of the compliance thresholds for a particular provision. A sustained

20   compliance finding means the Department has maintained substantial compliance

1    for a period of at least twelve months following the OIG's initial substantial

2    compliance finding. Once a provision has achieved sustained compliance, the OIG

3    will stop monitoring that provision for purposes of the Agreement.

4          On June 30, 2016, the Department implemented Custody Division Manual

5    ("CDM") policy section 5-12/005.10, "Handling of Inmates with Mobility and/or

6    Sensory Impairment." Unless otherwise noted, references to "policy" or "*Johnson*

7    policy" pertain to this CDM section. Relevant housing locations for Class

8    Members include Men's Central Jail ("MCJ"), Twin Towers Correctional Facility

9    ("TTCF"), and Century Regional Detention Facility ("CRDF").

10         There are several provisions that the OIG has determined require

11    consultation with physical-plant and medical experts who specialize in the

12    Americans with Disabilities Act of 1990 ("ADA") before compliance findings can

13    be made. 42 U.S.C. § 12101 *et seq*. During this reporting period, a physical-plant

14    expert was retained to perform a limited accessibility inspection of all relevant

15    housing locations based on the requirements of the Agreement. In June 2019, the

16    Parties agreed on a medical expert but due to unforeseen circumstances, the expert

17    was not available to serve in this capacity. The Parties are in the process of

18    searching for replacement candidates.

19

20

CV 08-03515 DDP

INSPECTOR GENERAL'S FIFTH      -5-
IMPLEMENTATION STATUS
REPORT

1    On May 14, 2019, pursuant to stipulation between the Parties, the Court

2  severed 27 provisions[1] from the Agreement that were either found to be in

3  sustained compliance or were documented as "completed" during settlement

4  negotiations and are no longer subject to monitoring by the OIG for purposes of

5  the Agreement.[2] Docket No. 237. Thus, the severed provisions are no longer

6  addressed in implementation status reports, and the OIG will only issue findings on

7  the remaining 22 provisions.

8    The OIG conducted 15 *Johnson* site visits during this reporting period,

9  which included interviews with individual Class Members and Department and

10  Correctional Health Services ("CHS") personnel, OIG-led town halls, and

11  compliance spot checks. As of March 31, 2020, Defendants have achieved

12  substantial compliance with 4, and sustained compliance with 8, of the 22

13  provisions. Defendants remain in partial compliance with 10 provisions.[3]

14    CHS is responsible for providing medical and mental health services to all

15  incarcerated individuals in Los Angeles County, including Class Members, and for

16  coordinating, as necessary, with the Department in providing required

17

---

[1] The 27 severed provisions included, A.1, A.2, A.3, A.5(b), A.5(c), A.6, B.1(b), B.1(c), C.4(a), C.4(b), C.4(c), C.4(d), C.4(e), C.5, D.5, D.6, E.1(a), E.1(b), E.1(c), E.2, E.3, F.2, G.1, G.4, G.5, H.2, and I.1. *See* Appendix.
[2] In addition, the Court extended the term of the Agreement by one year to April 22, 2020, ordered the Parties meet and confer to discuss the issues that have hindered efforts to achieve sustained compliance with the provisions that remain in partial compliance, and the efforts being made to address those issues. The Parties met on June 25, 2019, and the OIG filed an update with the Court on July 11, 2019. *See* Docket No. 238.
[3] The compliance ratings for all 49 provisions as of March 31, 2020, is set forth in the Appendix.

CV 08-03515 DDP

1   accommodations. In previous implementation status reports, the OIG noted that

2   improved collaboration and coordination between the Department and CHS was

3   necessary in order to achieve compliance with several provisions. While there has

4   been some improvement, several provisions that remain in partial compliance

5   require purposeful, consistent coordination between the Department and CHS.

6           **IMPLEMENTATION STATUS OF AGREEMENT PROVISIONS**

7   **SECTION A – Programming**

8   **Provision A.5(a) – Class Members Serve as Trustys on Same Floor –**

9   **Sustained Compliance on January 2, 2020. No Further Monitoring.**

10          Under subsection (a) of paragraph 5 of section A of the Agreement,

11  "[s]ubject to security classification and eligibility requirements, Defendants agree

12  that Class Members may serve as trustys on the same floor on which they are

13  housed." The corresponding compliance measures require the Department to

14  promulgate policy consistent with this provision, train personnel accordingly, and

15  provide Class Member trusty records from each relevant housing location for a

16  one-month period selected by the OIG. The OIG selected the period of

17  August 2019.

18          On November 20, 2019, the Department provided the OIG with a self-

19  assessment indicating that it has maintained substantial compliance with this

20  provision for a one year period. As previously reported, the Department included

1    language consistent with this provision in the *Johnson* policy, which was

2    disseminated to all existing personnel. As discussed in detail under Provision J.1

3    below, the Department continues to train new personnel on the *Johnson* policy in

4    accordance with the Agreement.

5         The OIG reviewed Class Member trusty records for August 2019 to

6    determine whether Class Members were provided the opportunity to serve as

7    trustys on the same floor on which they were housed. The records were extracted

8    from the electronic Uniform Daily Activity Log ("e-UDAL") system that

9    documents trusty information such as work location and shift worked (day,

10    evening, or early morning). The records yielded three trusty records from MCJ,

11    eight trusty records from TTCF, and zero trusty records from CRDF. All 11 Class

12    Member trustys from MCJ and TTCF worked on the same floor on which they

13    were housed.

14         During the selected time period, 29 Class Members were housed at CRDF.

15    Of the 29 Class Members, 19 did not meet the Department's internal criteria to

16    serve as trustys.[4] Of the remaining 10 Class Members that did meet the

17    Department's internal criteria, 6 chose to participate in programming instead of

18

19    _____

[4] Of the 19 Class Members who did not meet the Department's internal criteria to serve as trustys, 8 were
disqualified due to violent felony charges, 5 were disqualified due to mental health classifications, 2 were
20    disqualified due to security classifications, and 1 was disqualified due to administrative segregation. The remaining 3
Class Members were temporary court returnees from state prisons.

INSPECTOR GENERAL'S FIFTH    
IMPLEMENTATION STATUS
REPORT

1  serving as trustys and 4 did not request to serve as trustys. Due to the lack of Class

2  Member trustys from CRDF during the selected time period, the Department

3  submitted Class Member trusty records from May, June, and July of 2019. These

4  records reflect that two Class Members served as trustys at CRDF, one of whom

5  served on the same floor on which the Class Member was housed.

6        Defendants have achieved sustained compliance with this provision, and the

7  OIG will no longer monitor compliance with this provision for purposes of the

8  Agreement.

9  **Provision A.7 – Notification in Town Hall Meetings – Partial Compliance**

10        Under paragraph 7 of section A of the Agreement, "[n]otification of

11  available programs will also be provided during 'town hall' meetings at the Jail

12  where appropriate." The corresponding compliance measures for this provision

13  require the Department to promulgate policy and to provide minutes from town

14  hall meetings for two, one-month periods selected by the OIG. As previously

15  reported, the Department promulgated policy consistent with this provision. The

16  OIG selected the periods of June 2019 and August 2019.

17        On November 11, 2019, the Department provided the OIG with a self-

18  assessment indicating that it had achieved substantial compliance with this

19  provision. The Department has made substantial progress in documenting town

20  hall meetings. The self-assessment contained 33 meeting minutes documents from

1  town halls held at relevant housing locations during the selected periods. Of the 32

2  meeting minutes provided, 7 were from CRDF, 16 were from MCJ, and 9 were

3  from TTCF. The meeting minutes documented the names and booking numbers of

4  Class Member attendees and/or participants, whether Class Members were notified

5  of available programing, and in some but not all of the meeting minutes, the

6  number of Class Members that were offered the opportunity to attend. Only one of

7  the submitted minutes did not indicate whether Class Members were notified of

8  available programming.

9      TTCF has implemented an effective and durable method of conducting and

10  documenting town halls. TTCF submitted minutes from all but one Class Member

11  of the housing modules during the selected periods. The minutes documented the

12  number of Class Members who were offered town hall meetings, in addition to

13  distinguishing between Class Member participants and attendees.

14      However, CRDF and MCJ have not implemented effective and durable

15  methods of conducting and documenting town hall meetings at all relevant housing

16  locations throughout the facilities. While the Department provided several sets of

17  meeting minutes from CRDF and MCJ, supporting documentation reflects that a

18  limited number of Class Member were reached during the selected periods,

19  especially at MCJ where a large proportion of Class Members are housed.

20      As recommended in the *Inspector General's Second Implementation Status*

INSPECTOR GENERAL'S FIFTH            -10-
IMPLEMENTATION STATUS
REPORT

1   *Report* ("*Second Implementation Status Report*"), MCJ's town hall meetings could

2   be improved by implementing a town hall meeting schedule for all Class Member

3   housing locations and by conducting the meetings in the day rooms of each floor.

4   In addition to documenting the number of town hall participants, MCJ should

5   document the number of Class Members that were offered the opportunity to

6   attend. CRDF's town hall meetings could be improved by conducting ADA-

7   specific town hall meetings for Class Members since mobility-impaired prisoners

8   are housed throughout the facility. As reported in the *Second Implementation*

9   *Status Report,* ADA-specific town hall meetings proved to be an effective way to

10   reach the majority of Class Members. Based on documentation provided and OIG

11   monitoring, Defendants remain in partial compliance with this provision.

12   **<u>SECTION B – Physical Therapy and Outdoor Recreation</u>**

13   **Provision B.1(a) – Access to Physical Therapy – Substantial Compliance as of**

14   **November 20, 2019.**

15           Under subsection (a) of paragraph 1 of section B of the Agreement,

16   "Defendants agree that Class Members will have access to physical therapy as

17   prescribed by LASD medical professionals." The corresponding compliance

18   measures require the Department to promulgate policy consistent with this

19   provision and to provide evidence that Class Members who were prescribed

20   physical therapy within two, one-week periods selected by the OIG received

1   physical therapy as prescribed. Substantial compliance will be achieved when 90

2   percent of sampled Class Members receive physical therapy as prescribed. The

3   OIG selected the two, one-week periods of July 22, 2019, to July 29, 2019, and

4   September 9, 2019, to September 16, 2019.

5       In the *Inspector General's Fourth Implementation Status Report* ("*Fourth*

6   *Implementation Status Report*"), the OIG reported that CHS follows the California

7   Correctional Health Care Services ("CCHCS") guideline on timeframes for

8   completing consultations and procedures. However, the CHS policy did not

9   distinguish between different types of procedures or require that routine procedures

10  be provided within ninety calendar days of a provider's prescription, as do the

11  CCHCS guidelines. The OIG recommended that CHS refine its policy to reflect the

12  different types of consultations and procedures identified in the CCHCS guidelines

13  to account for acute injuries that may require more immediate attention. On

14  September 25, 2019, CHS promulgated policy distinguishing between routine and

15  urgent physical therapy consultations. CHS Policy M230.06, "Physical Therapy,"

16  provides that routine physical therapy consultations are to be provided within 90

17  calendar days. For patients in need of more immediate attention providers may

18  submit urgent referrals for physical therapy consultations, which are to be provided

19  within 30 calendar days.

20

1    On November 20, 2019, the Department provided the OIG with a self-

2  assessment indicating that it had achieved substantial compliance with this

3  provision. Documentation provided reflects that 30 Class Members were

4  prescribed physical therapy within the two, one-week periods selected by the OIG.

5  Of the 30 Class Members, 6 were released before receiving physical therapy or

6  reportedly refused physical therapy and were thus excluded from the self-

7  assessment. Of the remaining 24 Class Members, 22 – or 92 percent – received

8  physical therapy as prescribed. Defendants have achieved substantial compliance

9  with this provision.

10  **Provision B.2 – Outdoor Recreation Time – Substantial Compliance as of**

11  **November 20, 2019.**

12    Under paragraph 2 of section B of the Agreement,

13    "[t]he LASD will continue to count outdoor recreation time for Class

14    Members from when the inmates arrive at the recreation area, not when

15    they leave their housing location. LASD shall develop and distribute a

16    unit order to ensure that all LASD personnel are aware of this policy."

17  As required by the corresponding compliance measures, the Department

18  promulgated policy consistent with this provision and provided the OIG with a

19  copy of the Assistive Device Leaflet ("ADL") that included consistent language.

20    During this reporting period, OIG personnel conducted site visits at relevant

1   housing locations to determine whether the Department continues to adhere the

2   requirements of this provision. All Department personnel who were interviewed

3   were aware of the policy and communicated an understanding of the requirements

4   for tracking outdoor recreation time for Class Members.

5         On November 20, 2019, the Department provided the OIG with a self-

6   assessment indicating that it had achieved substantial compliance with this

7   provision. OIG personnel determined that Class Members at CRDF continued to

8   have direct access to outdoor recreation areas at various times throughout the day.

9   For MCJ and TTCF, supporting documentation and spot checks of CCTV footage

10   from all relevant housing locations for morning and evening shifts reflect that

11   outdoor recreation started when the last Class Member arrived at the recreation

12   area. The Department has made notable progress in accurately documenting in the

13   e-UDAL system the times that Class Members receive outdoor recreation.

14   Defendants have achieved substantial compliance with this provision.

15   **Provision B.3 – Rotation of Outdoor Recreation Time – Sustained Compliance**

16   **on March 15, 2020. No Further Monitoring.**

17         Under paragraph 3 of section B of the Agreement, "[t]o the extent possible,

18   and taking into account operations and logistical considerations, the time of day

19   Class Members are offered outdoor recreation will rotate." The corresponding

20   compliance measures require the Department to promulgate policy consistent with

1   this provision and to provide records reflecting outdoor recreation times from each

2   relevant housing location for a period of six months. As previously reported, the

3   Department included language consistent with this provision in the *Johnson* policy.

4   The OIG selected the period of April to September 2019.

5        On November 20, 2019, the Department provided the OIG with a self-

6   assessment indicating that it has maintained substantial compliance for a period of

7   one year. The self-assessment includes outdoor recreation schedules for MCJ and

8   TTCF reflecting the periodic rotation of outdoor recreation time for Class Member

9   housing locations.[5] Although the outdoor recreation schedules were not followed

10  precisely, supporting documentation and CCTV footage revealed that personnel

11  from MCJ and TTCF were sufficiently rotating the time of day outdoor recreation

12  was offered to Class Members.

13       As previously reported, the Department was not required to provide the

14  same documentation for CRDF because Class Members can access the outdoor

15  recreation space directly from their housing units during programming. During this

16  reporting period, OIG personnel confirmed CRDF's compliance through site visits

17  and conversations with Class Members and Department personnel. Defendants

18

19

---

[5] TTCF's schedules reflect that outdoor recreation time for Class Member housing locations rotates between AM and PM on a weekly basis. Due to operational and logistical considerations, MCJ's schedules reflect that outdoor recreation time for each relevant housing location rotates between AM and PM once every three to four months, which was authorized by the OIG.

20

CV 08-03515 DDP

INSPECTOR GENERAL'S FIFTH          -15-
IMPLEMENTATION STATUS
REPORT

1  have achieved sustained compliance with this provision, and the OIG will no

2  longer monitor compliance with this provision for purposes of the Agreement.

3  **Provision B.4 – Thermal Clothing – Partial Compliance**

4      Under paragraph 4 of section B of the Agreement,

5      "Class Members who have been prescribed thermal clothing as a

6      reasonable accommodation for their disability so that they may

7      participate in outdoor recreation will be provided warm coats and/or

8      thermal clothing. LASD shall inform Class Members that they may

9      request thermal clothing as a reasonable accommodation and shall

10      develop and distribute a unit order to ensure that all LASD personnel

11      are aware of this policy."[6]

12      As previously reported, the Department indicated that it would provide all

13  Class Members with thermals, including tops and bottoms, without requiring a

14  prescription. The corresponding compliance measures include the  requirement that

15  CCSB and the OIG, through regular facility visits and interviews with Class

16  Members and Department personnel, confirm that relevant housing locations

17  maintain an adequate supply of thermal clothing and that all Class Members are

18  provided with thermal tops and bottoms.

19

20  _____

[6] As reported in the *Second Implementation Status Report*, the OIG has determined that "thermal clothing" includes both tops and bottoms, particularly since mobility impairment usually affects individuals below the torso.

CV 08-03515 DDP

1    On October 29, 2019, the Department provided the OIG with a self-

2  assessment indicating that it had achieved substantial compliance with this

3  provision. The self-assessment contains e-UDAL records and CCTV footage of

4  several thermal clothing distributions and/or exchanges from April 1, 2019, to

5  September 30, 2019, for all relevant housing locations. The Department also

6  provided a summary of its review process and findings for each relevant housing

7  location.

8    The Department has made a marked improvement in the distribution of

9  thermal clothing at TTCF and CRDF, where Class Members reported having

10  received thermal tops and bottoms, which were regularly exchanged for laundry.

11  However, while most Class Members reported having received thermal tops at

12  MCJ, only a limited number reported having received thermal bottoms. CCTV

13  footage of several thermal clothing exchanges at MCJ reveal mostly thermal tops

14  being distributed and/or exchanged, and a limited number of Class Members with

15  thermal bottoms. In addition, the supply closets at MCJ were not consistently

16  stocked with thermals.

17    On February 20, 2020, the OIG met with CCSB personnel and the ADA

18  coordinators from MCJ and learned that Department personnel at MCJ may have

19  been providing thermal bottoms to Class Members mainly upon request instead of

20  as a matter of course. CCSB personnel and the ADA coordinators have since

1   developed what is likely an effective and durable method of distributing thermal

2   clothing at MCJ, which includes offering thermal tops and bottoms to all Class

3   Members upon entry to their assigned housing locations, continuing to provide

4   thermal tops and bottoms upon request, and notifying Class Members of the

5   availability of thermal tops and bottoms during town hall meetings. If the

6   Department implements these improvements at MCJ as anticipated and continues

7   its efforts at TTCF and CRDF, Defendants will likely achieve substantial

8   compliance in the next reporting period. Defendants remain in partial compliance

9   with this provision.

10  <u>**SECTION C – Physical Accessibility**</u>

11  **Provision C.4(f) – Additional Grab Bars and Shower Benches – Partial**

12  **Compliance**

13          Under subsection (f) of paragraph 4 of section C of the Agreement,

14  "Defendants are required to install grab bars and shower benches in approximately

15  thirty (30) cells outside of TTCF modules 231 and 232."[7] The corresponding

16  compliance measure for this provision requires the Department to regularly update

17  the OIG on the construction status. As previously reported, the Department has

18

19

20

___

[7] The Parties have agreed that "outside of TTCF modules 231 and 232" refers to any relevant housing location except for modules 231 and 232 at TTCF.

1  installed 30 grab bars and 30 shower benches throughout CRDF and MCJ, and in

2  TTCF module 272. In order to achieve substantial compliance with this provision,

3  a physical-plant expert must evaluate and determine that all installations meet

4  ADA requirements.

5       On September 5, 2019, the Department retained an ADA physical-plant

6  expert to evaluate all installations and physical plant modifications required under

7  provision C.4(f) at MCJ, TTCF, and CRDF. On November 4, 2019, the expert

8  evaluated 14 shower areas utilized by Class Members at CRDF. The expert

9  reported that all 14 shower areas require some additional modifications to meet

10  ADA requirements, including all 14 shower benches and 12 of 14 sets of grab bars.

11  Expert site visits for MCJ and TTCF are expected to take place within the next

12  reporting period. Defendants remain in partial compliance with this provision.

13  **Provision C.4(g) – Construction of Accessible Beds – Partial Compliance**

14       Under subsection (g) of paragraph 4 of section C of the Agreement,

15  "Defendants are required to construct approximately ninety-six (96) accessible

16  beds at TTCF module 272." The compliance measure for this provision requires

17  the Department to regularly update the OIG on the construction status. As

18  previously reported, the Department completed construction of the 96 beds at

19  TTCF module 272 on May 30, 2017, and began populating the housing unit with

20  Class Members on June 8, 2017. The Department continues to house Class

1   Members in TTCF module 272.

2        As previously reported, the Department provided documentation that all 96

3   beds in the housing module meet ADA requirements. However, the accompanying

4   toilet and shower modifications have not yet been ADA certified. In order to

5   achieve substantial compliance with this provision, a physical-plant expert must

6   evaluate and determine that all toilet and shower modifications comply with ADA

7   requirements. As discussed under Provision C.4(f) above, a physical-plant expert

8   has been retained, and a site visit for TTCF is expected to take place within the

9   next reporting period. Defendants remain in partial compliance with this provision.

10  **SECTION D – Use of Mobility Devices**

11  **Provision D.1 – Initial Decisions and Ongoing Evaluations Made by LASD**

12  **Medical Professionals – Partial Compliance**

13       Under paragraph 1 of section D of the Agreement, "[i]nitial decisions and

14  ongoing evaluations regarding Class Members' need, if any, for the use of a

15  mobility assistive device are and will continue to be made by LASD medical

16  professionals." As previously reported, the OIG confirmed that the Department and

17  CHS promulgated policy consistent with this provision.

18       Initial decisions and ongoing evaluations continue to be conducted by CHS

19  medical professionals. Determining whether evaluations comply with established

20  medical standards requires consultation with a medical expert. Defendants are in

1  the process of retaining a medical expert who will make these determinations.

2  Defendants remain in partial compliance with this provision.

3  **Provision D.2 – Secondary Reviews – Partial Compliance**

4      Under paragraph 2 of section D of the Agreement,

5      "[i]n an event a Class Member disputes a decision made by LASD

6      Medical Professionals regarding the need, if any, for a mobility

7      assistive device, the Class Member may receive a secondary review of

8      the determination regarding his or her need for a mobility assistive

9      device and or the type of device requested. (a) The secondary review

10     will be conducted by the Chief Physician or his/her designee; and (b)

11     The secondary review will include an independent evaluation."

12  As previously reported, the Department and CHS created a tab in Cerner, the

13  medical records system, to track the progress and completion of secondary review

14  requests (see Provision H.3 below). However, as discussed under Provision D.1

15  above, initial assessments and ongoing evaluations, including secondary reviews,

16  must meet the accepted medical standard of care. Defendants are in the process of

17  retaining a medical expert who will make these determinations. Defendants remain

18  in partial compliance with this provision.

19  **Provision D.3 – Assistive Device Leaflet – Sustained Compliance on**

20  **March 1, 2020. No Further Monitoring.**

1    Under paragraph 3 of section D of the Agreement, Defendants are required

2    to "create and distribute" the Assistive Device Leaflet (ADL) advising Class

3    Members of their rights "pertaining to determinations regarding their need, if any,

4    for mobility assistive devices." The corresponding compliance measures require

5    the Department to promulgate policy consistent with this provision and to post

6    ADL information in relevant housing locations.

7    The Department agreed to two methods of providing Class Members with

8    the ADL: distributing the ADL to all incoming Class Members at the Inmate

9    Reception Center ("IRC") and the CRDF reception area, and stocking the

10   distribution bins at relevant housing locations with ADLs for unrestricted self-

11   service access. In addition, the Department agreed to display posters containing

12   ADL information at all relevant housing locations.

13   During this reporting period, OIG personnel verified that the Department

14   continues to display posters containing the ADL information in all relevant

15   housing locations. IRC continues to distribute the ADL to incoming Class

16   Members who are housed in TTCF and MCJ. While CRDF reception has not

17   consistently distributed the ADL during this reporting period, ADLs were available

18   to Class Members in the distribution bins throughout the facility.

19   Class Members housed at TTCF continue to have unrestricted self-service

20   access to the ADLs. MCJ did not consistently stock ADLs in the distribution bins,

CV 08-03515 DDP

INSPECTOR GENERAL'S FIFTH          -22-
IMPLEMENTATION STATUS
REPORT

1 but most Class Members interviewed by the OIG reported having received it.

2 Although the Department is relying on different methods of distribution to provide

3 Class Members with the ADL, OIG site visits and interviews confirm that the

4 Department has met the requirements of this provision. Defendants have achieved

5 sustained compliance with this provision, and the OIG will no longer monitor

6 compliance with this provision for the purposes of the Agreement.

7 **Provision D.4 – Tracking Complications – Partial Compliance**

8      Paragraph 4 of section D of the Agreement provides,

9      "Defendants have policies and guidelines for tracking complications

10      common to inmates with mobility impairments and Defendants agree

11      to continue to track such complications using existing policies and

12      guidelines. Defendants do not currently have the ability to run searches

13      and provide statistics about assistive device usage to Plaintiffs' counsel,

14      but may have this ability in the future once the LASD's medical records

15      system is fully upgraded – this process is underway. Defendants agree

16      to provide statistics from the upgraded system, to the extent feasible,

17      when the upgrades are completed."

18 As discussed in the *Second Implementation Status Report,* because Cerner is

19 unable to capture the data as required by this provision, the OIG approved an

20 alternative implementation plan for CHS to conduct thorough qualitative reviews

CV 08-03515 DDP

1  of information, including medical records and grievances, on a semi-annual basis

2  to identify complications common to mobility-impaired Class Members. The

3  Department and the OIG agreed that these reviews, if completed regularly and

4  appropriate corrective action is taken, are an effective means of identifying and

5  treating complications.

6       As previously reported, the OIG notified the Department and CHS of the

7  need to formalize the manual process of conducting retrospective reviews of the

8  paraplegic population, either through policy or other means. On April 25, 2019,

9  CHS provided the OIG with an updated duty statement for the Compliance Nurse

10  Coordinator, which requires that on a semi-annual basis, the Compliance Nurse

11  Coordinator conduct a review of complications experienced by the paraplegic

12  population. The duty statement provides a detailed description of the procedure for

13  conducting the review and requires an analysis of several data sources, including

14  Class Member grievances and medical records. The duty statement formalizing the

15  manual process of conducting retrospective reviews of the paraplegic population is

16  sufficient.

17       CHS's retrospective review dated November 5, 2019, reflects improvements

18  in utilizing all available information, including Class Member grievances. CHS

19  conducted a review of 28 Class Members and determined that "medical orders

20  pursuant to initial evaluations by medical professionals required adjustment."

CV 08-03515 DDP

1   According to the review, "issues were identified and addressed by CHS

2   administrative executives." However, the retrospective review was void of any

3   additional detail and analysis. In order to achieve substantial compliance with this

4   provision, CHS must include in the retrospective reviews a discussion of, on case-

5   by-case bases, the issues identified, recommendations made, and corrective actions

6   taken.

7          As previously reported, the medial expert must make a determination

8   regarding the quality and accuracy of retrospective reviews in order to achieve

9   substantial compliance. Defendants remain in partial compliance with this

10  provision.

11  **SECTION E – Wheelchairs and Prostheses**

12  **Provision E.1(d) – Wheelchairs with Moveable Armrests – Sustained**

13  **Compliance on February 5, 2020. No Further Monitoring.**

14          Under subsection (d) of paragraph 1 of section E of the Agreement,

15          "Defendants further agree that wheelchairs with movable armrests may

16          be provided to Class Members who require them if a custody safe

17          option can be located at a comparable price to wheelchairs the LASD

18          currently purchases. Defendants agree to explore the availability of

19          such wheelchairs and welcome any suggestions Plaintiffs may have."

20

CV 08-03515 DDP

1   The corresponding compliance measure for this provision requires the Department

2   to provide the OIG with a brief summary of its efforts to explore the availability

3   and feasibility of purchasing custody-safe wheelchairs with movable armrests.

4   As reported in the *Inspector General's Third Implementation Status Report*

5   ("*Third Implementation Status Report*"), on February 6, 2018, the Department

6   purchased seven standard-size wheelchairs and three extra-wide wheelchairs with

7   removable, but not movable, armrests. On December 16, 2018, the Department

8   made wheelchairs with removable armrests available to Class Members who

9   require them.

10   On September 20, 2019, the Department provided a list of Class Members

11   who were prescribed and provided wheelchairs with removable armrests. The

12   Department continues to provide wheelchairs with removeable armrests to Class

13   Members who require them. Defendants have achieved sustained compliance with

14   this provision, and the OIG will no longer monitor compliance with this provision

15   for purposes of the Agreement.

16   **Provision E.4 – Return of Prostheses within 24 Hours – Sustained Compliance**

17   **on February 18, 2020.**

18   Under paragraph 4 of section E of the Agreement, "[c]onsistent with existing

19   LASD policy, Defendants will ensure that all prostheses are returned to Class

20   Members within 24 hours if not determined to pose a security risk." The

1  corresponding compliance measures require the Department to promulgate policy

2  consistent with this provision and to analyze a sample of Class Members who use

3  prostheses. As previously reported, the Department promulgated two policies

4  consistent with this provision: the *Johnson* policy and CDM section 5-03/080.00,

5  "Medical Appliances."

6        On October 24, 2019, the Department provided the OIG with a self-

7  assessment indicating that it has maintained substantial compliance. As reported in

8  the *Fourth Implementation Status Report*, the Department had achieved substantial

9  compliance with this provision though personnel were not always consistently

10  documenting the return of protheses on "Arrestee Medical Appliance Clearance

11  Record Forms." Consequently, on July 19, 2019, the Department circulated a

12  revised form and an instructional email to relevant personnel and reports

13  improvements to its documentation practices.

14        In addition to the Department's efforts to improve documentation, the

15  Department reports that personnel surveyed the entire population of five Class

16  Members who utilized prostheses on October 9, 2019, to ensure that they were

17  returned within 24 hours of booking. Of the five Class Members, two were

18  excluded from the sample because they did not have prostheses at the time of

19  booking, and one was excluded because the Class Member reportedly refused the

20

1  return of the prosthesis.[8] The remaining two Class Members reportedly stated that

2  they received their prostheses within 24 hours as required by the provision.

3  During this reporting period, OIG personnel also conducted site visits and

4  interviews at IRC and CRDF reception area, where medical devices are removed

5  and screened, and determined that all relevant personnel were familiar with the

6  requirements of this provision. In addition, OIG personnel interviewed several

7  Class Members at relevant housing locations over multiple site visits, all of whom

8  reported that their prostheses had been returned within 24 hours. Based on

9  documentation provided and OIG monitoring, Defendants have achieved sustained

10  compliance with this provision, and the OIG will no longer monitor compliance

11  with this provision for purposes of the Agreement.

12  **SECTION F – ADA Coordinators**

13  **Provision F.1 – ADA Duties – Substantial Compliance as of November 7, 2019.**

14  Under paragraph 1 of section F of the Agreement, "the Department is

15  required to designate one or more ADA coordinator(s) in each Jail Setting and

16  dedicate sufficient resources to ensure that necessary duties are carried out in an

17  appropriate fashion." The provision enumerates duties specific to ADA

18  coordinators, including: ensuring that Class Members receive reasonable

19  _____

20  [8] The Class Member who refused to accept the returned prosthesis had requested a new prosthesis during the initial provider evaluation, and one was provided thereafter.

INSPECTOR GENERAL'S FIFTH        -28-                              CV 08-03515 DDP
IMPLEMENTATION STATUS
REPORT

1    accommodations as prescribed by medical professionals; reviewing, investigating,

2    and resolving ADA grievances in accordance with the Department's grievance

3    policy; answering and logging phone calls made to the ADA coordinator telephone

4    number; training Department personnel working in units that house Class

5    Members; and reporting back to Class Counsel, in writing, on the resolution of

6    ADA grievances submitted by Class Counsel.

7         On November 7, 2019, the Department provided the OIG with a self-

8    assessment indicating that it had achieved substantial compliance. The self-

9    assessment contained a list of all ADA coordinators, a log of third-party

10   complaints related to mobility impairments received by the ADA team email

11   group, and a log of phone calls made to the ADA coordinator telephone number.

12   As of August 28, 2019, the Department has a total of nine ADA coordinators, and

13   one division ADA coordinator. Of the nine ADA coordinators, three are assigned

14   to TTCF, two are assigned to MCJ, three are assigned to CRDF, and one is

15   assigned to Pitchess Detention Center.[9] The log of third-party complaints received

16   by the ADA email group reflects that the complaints received during this reporting

17   period were resolved in a timely manner, which was consistent with the OIG's

18   internal records.

19   _____

20   [9] Pitchess Detention Center is comprised of four jails: North Facility, South Facility, East Facility, and North County
Correctional Facility.

1    During this reporting period, the Department made substantial progress

2  towards ensuring that ADA coordinators assume a greater role in "reviewing,

3  investigating, and resolving" ADA-related grievances received directly from Class

4  Members in facilities that are processed by custody personnel. The division ADA

5  coordinator reportedly reviews the CARTS database on a daily basis to identify all

6  ADA-related grievances from relevant housing locations. The division ADA

7  coordinator logs each of the ADA-related grievances and assigns them to the

8  respective facility's ADA coordinator(s) for proper handling. The division ADA

9  coordinator tracks the progress of each ADA-related grievance and works with the

10  ADA coordinators to ensure that they are properly investigated and resolved.

11    The Department also provided the OIG with a log of phone calls made to the

12  ADA coordinator telephone number from April 1, 2019, through September 30,

13  2019. The Department continues to log phone call information such as the name

14  and telephone number of the caller, a description of the inquiry, the prisoner's

15  information, and the action taken by the ADA coordinators. Defendants have

16  achieved substantial compliance with this provision.

17  **Provision F.3 – Training ADA Coordinators – Sustained Compliance on**

18  **March 12, 2020. No Further Monitoring.**

19    Paragraph 3 of section F of the Agreement provides,

20

1    "[p]laintiffs will assist in training the ADA coordinator(s). The ADA

2    coordinator(s) will be assigned and trained within 60 days of the

3    effective date."

4        The corresponding compliance measure for this provision requires the

5    Department to provide the OIG with training records for ADA coordinators,

6    including rosters and curriculum. As discussed under provision F.1 above, as of

7    August 28, 2019, the Department has a total of nine ADA coordinators, five of

8    whom were newly assigned since the *Fourth Implementation Status Report*, and

9    one division ADA coordinator.

10       The Department continues to provide training to newly assigned ADA

11   coordinators within 60 days of the assumption of ADA coordinator responsibilities.

12   Defendants have achieved sustained compliance with this provision, and the OIG

13   will no longer monitor compliance with this provision for purposes of the

14   Agreement.

15   **SECTION G – Grievance Form**

16   **Provision G.2 – "ADA" Designation of ADA Grievances – Partial Compliance**

17       Under paragraph 2 of section G of the Agreement, "[a]ll grievances

18   involving mobility assistive devices and the physical accessibility of the Jail shall

19   be designated 'ADA' grievances even if the inmate who filed the grievance did not

20   check the 'ADA' box." The corresponding compliance measures require the

CV 08-03515 DDP

1    Department and CHS to promulgate policy consistent with the provision, to

2    provide a list of ADA-related grievances for a one-month period selected by the

3    OIG, and to show that those grievances were properly designated ADA grievances.

4    As previously reported, the Department created several policies related to this

5    provision, including the *Johnson* policy and CDM section 8-03/030.00, "ADA-

6    Related Requests and Grievances." The OIG selected the period of August 2019.

7         In order to achieve substantial compliance, 90 percent of the grievances

8    identified must be appropriately designated as ADA. As reported in the *Third*

9    *Implementation Status Report* and the *Fourth Implementation Status Report*, the

10   Department and CHS utilize a multi-category designation system for grievances.

11   The Department reports that ADA-related grievances generally fall under three

12   separate designations within the CARTS database: "Medical Services," "ADA

13   (Medical)," and "ADA." CHS personnel process both "Medical Services" and

14   "ADA (Medical)" grievances, while Department personnel process "ADA"

15   grievances.

16        On October 29, 2019, the Department provided the OIG with a self-

17   assessment indicating that it remains in partial compliance with this provision.

18   During the sampled period, 24 percent of ADA-related grievances were designated

19   as "ADA (Medical)" or "ADA."  However, 70 percent of ADA-related grievances

20   were improperly designated as "Medical Services" within the CARTS database,

1    and six percent were improperly designated as "Living Conditions" or "Showers."

2          On April 11, 2019, and August 29, 2019, the Compliance Nurse Coordinator

3    sent emails to the CHS management staff reminding them to use the appropriate

4    "ADA (Medical)" designation for ADA-related grievances and requesting that they

5    brief all CHS personnel. Despite the reminders, a significant portion of ADA-

6    related grievances continue to be improperly designated as "Medical Services"

7    instead of "ADA (Medical)." CHS should provide staff with additional training on

8    designating ADA-related grievances as "ADA (Medical)," in accordance with

9    CHS policy M12.04, "Grievances – Health Care and Against Staff." Defendants

10   remain in partial compliance with this provision.

11   **Provision G.3 – Grievance Response Time – Partial Compliance**

12         Under paragraph 3 of section G of the Agreement, "[t]he response time for

13   ADA grievances will be no more than that allowed under the standard grievance

14   policy." The corresponding compliance measures require that the Department

15   promulgate policy consistent with this provision and to provide a list of ADA-

16   related grievances for a one-month period selected by the OIG. In order to achieve

17   substantial compliance, 90 percent of the grievances must be responded to within

18   15 days. The OIG selected the period of June 2019.

19         As previously reported, the Department created policies consistent with this

20   provision, including CDM section 8-03/005.00, "Inmate Grievances," CDM

CV 08-03515 DDP

1   section 8-03/030.00, "ADA-related Requests and Grievances," and CDM section

2   8-04/040.00, "Time Frames." These policies require a response time of 15 days for

3   all non-emergency ADA grievances and 5 days for emergency grievances. CHS

4   policy M12.04, "Grievances – Health Care and Against Staff," requires that all

5   medical grievances be analyzed within 24 hours to determine whether there is an

6   urgent or emergent medical condition that requires immediate attention. If not, the

7   response timeframe for medical grievances is 15 days, as with Department policy.

8       On November 20, 2019, the Department provided the OIG with a self-

9   assessment indicating that it remains in partial compliance with this provision.

10   During the selected period, 79 percent of the sampled grievances were responded

11   to within 15 days, the majority of which were responded to by CHS personnel. The

12   OIG previously reported concerns with the processing of emergency grievances;

13   however, during this reporting period, the grievances handled by Department

14   personnel were properly downgraded to non-emergency in accordance with

15   Department policy.

16       CHS personnel have stated that a grievance is considered to have been

17   responded to within the appropriate 15-day timeframe when a supervising nurse

18   reviews the grievance and makes a referral for a provider evaluation. However, in

19   some cases included in the self-assessment, the Class Member did not see a

20   medical provider for up to 21 days after the grievance was filed. The OIG reported

1  on this issue in the *Third Implementation Status Report* and the *Fourth*

2  *Implementation Status Report*, yet an adequate remedy has not been proposed.

3  CHS personnel should ensure that grievances are properly designated and

4  accurately tracked and documented throughout the response process. Defendants

5  remain in partial compliance with this provision.

6  **SECTION H – Accommodations**

7  **Provision H.1 – Reasonable Accommodations – Partial Compliance**

8  Under paragraph 1 of section H of the Agreement,

9  "Defendants agree that Class Members shall receive reasonable

10  accommodations when they request them and as prescribed by LASD

11  medical professionals. Accommodations may include, but are not

12  limited to: assignment to lower bunks; changes of clothing; extra

13  blankets; allowance of extra time to respond to visitor calls and attorney

14  visits; shower benches; assistive device to travel outside of a housing

15  module; and assignment to a cell with accessible features."

16  As previously reported, the *Johnson* policy includes language consistent with the

17  terms of this provision. During this reporting period, OIG personnel conducted site

18  visits at relevant housing locations and verified that Department personnel are

19  familiar with the *Johnson* policy's requirement that Class Members receive

20  reasonable accommodations. However, the Department continues to have issues

1 related to Class Member accommodations (as discussed under provisions B.4,

2 C.4(f), and C.4(g) above).

3      On September 5, 2019, the physical-plant expert evaluated a typical cell at

4 CRDF where a Class Member may be housed and determined that the cell required

5 various modifications to meet ADA requirements. Based on the expert's

6 evaluation, concerns remain about whether Class Members are being housed in

7 cells with accessible features. Defendants remain in partial compliance with this

8 provision.

9 **Provision H.3 – Tracking Mobility Assistive Device Requests – Sustained**

10 **Compliance on February 28, 2020. No Further Monitoring.**

11      Under paragraph 3 of section H of the Agreement, "Defendants agree to

12 explore the feasibility of adding a tab to the current medical records system (as part

13 of upgrades), to track mobility assistive device requests and assessments by LASD

14 Medical Professionals of Class Members." The corresponding compliance measure

15 for this provision requires the Department to provide documentation related to

16 Cerner upgrades, as well as their efforts to comply with this provision.

17      On December 5, 2019, the Department provided the OIG with a provision

18 summary reiterating, "the feasibility of upgrading Cerner with a tab to track the

19 initial request for assistive devices is not probable, nor is it cost effective" and

20 therefore, "the procedures currently in place are [the Department's] best options

1  for capturing the required information for this provision." The Department

2  continues to rely on a manual process to track prisoners who are designated as

3  Class Members with a "W" or "U" designation consistent with their initial medical

4  assistive assessments. This information is reviewed on a daily basis by the

5  Compliance Nurse Coordinator for tracking purposes. Since the *Fourth*

6  *Implementation Status Report*, CHS formalized the Compliance Nurse

7  Coordinator's responsibility in a duty statement.

8      Prisoners who are not designated with a "W" or "U" classification during

9  their initial assessment are not tracked. However, in order to ensure that all

10  prisoners are notified of their right to a secondary review, in the event that they

11  dispute the outcome of their initial assessments, CHS created policy that requires

12  medical professionals to notify all prisoners of this right during the initial medical

13  assessment.

14      As previously reported, CHS implemented a tab in Cerner to track secondary

15  review requests on August 28, 2018. CHS personnel continue to utilize the tab in

16  Cerner to initiate and track secondary review requests. For the period of June 2019

17  to November 2019, CHS reports that 150 patients were referred for a secondary

18  review documented through the Cerner tab.

19      Even though initial mobility device assessments are not systematically

20  tracked, the Department and CHS have met provision requirements to explore the

1  feasibility of modifying Cerner. In addition, the Department added the new tab in

2  Cerner, which has effectively streamlined the process for tracking secondary

3  reviews. Defendants have achieved sustained compliance with this provision, and

4  the OIG will no longer monitor compliance with this provision for purposes of the

5  Agreement.

6  **SECTION J – Training**

7  **Provision J.1 – Training – Sustained Compliance on February 28, 2020. No**

8  **Further Monitoring.**

9      Under paragraph 1 of section J of the Agreement, "[w]ithin 60 days of

10  April 22, 2015, Defendants will begin providing reasonable training to Jail

11  personnel (including medical personnel) consistent with the terms of this

12  Agreement." Among other requirements, the compliance measures for this

13  provision require the Department to provide training rosters, training curricula, and

14  attendance rosters to the OIG.

15      In the *Second Implementation Status Report*, Defendants achieved

16  substantial compliance with this provision. However, in the *Third Implementation*

17  *Status Report*, Defendants were reduced to partial compliance due to deficiencies

18  in several areas related to *Johnson*-policy training and compliance. In the *Fourth*

19  *Implementation Status Report*, Defendants once again achieved substantial

20  compliance.

On October 24, 2019, the Department provided the OIG with a self-assessment with supporting documentation related to this provision for all new custody personnel who were hired from March 2019 through September 2019, including:

- Attendance rosters and the syllabus from De-Escalation and Verbal Resolution Training demonstrating a component about the ADA;

- Attendance rosters from MCJ and TTCF confirming briefings on the *Johnson* policy;

- Attendance roster from MCJ and TTCF and a PowerPoint training titled, "ADA in Custody (Accommodation for Inmates with Disabilities)" that occurred from August to October 2019;

- Attendance rosters from MCJ and TTCF and a PowerPoint training titled, "Disability Rights Laws within Correctional Facilities," that occurred from August to October 2019;

- Rosters from MCJ and TTCF indicating who received a Disability Accommodation Policy ("DAP") card – a quick reference card that summarizes the rights and accommodations of Class Members; and

- Attendance rosters from a two-hour ADA training course at CRDF that covered the *Johnson* policy, both PowerPoint trainings, and the DAP card.

1    The self-assessment also included attendance rosters and the CHS orientation

2    syllabus reflecting the policy on medical provider evaluations and physical

3    therapy. The Department has implemented an effective mechanism to train all

4    custody personnel on the *Johnson* policy. In addition, the Department continues to

5    issue DAP cards to non-custody personnel who are regularly assigned to work

6    overtime in custody for their use as a reference guide when interacting with Class

7    Members. Defendants have achieved sustained compliance with this provision, and

8    the OIG will no longer monitor compliance with this provision for purposes of the

9    Agreement.

10   **SECTION K – Transportation**

11   **Provision K.1 – Transportation in Accessible Vans – Substantial Compliance**

12   **as of September 26, 2019.**

13        Under paragraph 1 of section K of the Agreement, "Class Members who use

14   wheelchairs or other mobility aides are and will continue to be transported in

15   accessible vans and will be secured during transport." The corresponding

16   compliance measures require the Department to promulgate policy consistent with

17   this provision and to provide a daily manifest from the Court Services

18   Transportation Bureau ("CST") reflecting Class Members that require transport in

19   accessible vans for two, one-week periods selected by the OIG. As previously

20   reported, the Department promulgated policy consistent with this provision. The

1    OIG selected the two, one-week periods of April 3, 2019, to April 10, 2019, and

2    September 4, 2019, to September 11, 2019.

3          On September 26, 2019, the Department provided the OIG with a self-

4    assessment indicating that it had achieved substantial compliance with this

5    provision. The self-assessment contained daily manifests utilized by CST

6    personnel, which list Class Members that require accessible van transports, for the

7    two, one-week periods.

8          The OIG, through site visits and interviews, confirmed that Class Members

9    who are deemed to require transports in accessible vans by CHS medical personnel

10   are in fact transported in accessible vans. During this reporting period, the OIG did

11   not receive any complaints regarding Class Members being transported to medical

12   appointments in radio cars. On April 15, 2019, the Department provided

13   documentation that it had purchased two new accessible vans. Defendants have

14   achieved substantial compliance with this provision.

15

16

17

18

19

20

INSPECTOR GENERAL'S FIFTH          -41-
IMPLEMENTATION STATUS
REPORT

1

**APPENDIX**

2

| DEFENDANTS' *JOHNSON* COMPLIANCE STATUS | | |
|---|---|---|
| **PROVISION** | **DESCRIPTION** | **COMPLIANCE RATING** |
| | **Programming** | |
| A.1 | Access to Programming | Severed |
| A.2 | Non-Disqualification from Programming | Severed |
| A.3 | Escorts to Programming | Severed |
| A.5(a) | Class Members Serve as Trustys on Same Floor | Sustained Compliance |
| A.5(b) | Trusty Tasks | Severed |
| A.5(c) | Identify Jobs | Severed |
| A.6 | Notification of Available Programs | Severed |
| A.7 | Notification in Town Hall Meetings | Partial Compliance |
| | **Physical Therapy and Outdoor Recreation** | |
| B.1(a) | Access to Physical Therapy | Substantial Compliance |
| B.1(b) | Maintenance of Physical Therapy Room | Severed |
| B.1(c) | Physical Therapy Availability | Severed |
| B.2 | Outdoor Recreation Time | Substantial Compliance |
| B.3 | Rotation of Outdoor Recreation Time | Sustained Compliance |
| B.4 | Thermal Clothing | Partial Compliance |
| | **Physical Accessibility** | |
| C.4(a) | Housing Expansion for Class Members – Phase 1 | Severed |
| C.4(b) | Housing Expansion for Class Members – Phase 2 | Severed |
| C.4(c) | Housing Expansion for Class Members – Phase 3 | Severed |
| C.4(d) | Housing Expansion for Class Members – Phase 4 | Severed |
| C.4(e) | Housing Expansion for Class Members – Phase 5 | Severed |
| C.4(f) | Additional Grab Bars and Shower Benches | Partial Compliance |
| C.4(g) | Construction of Accessible Beds | Partial Compliance |
| C.5 | Review of ADA Construction Plans | Severed |
| | **Use of Mobility Devices** | |
| D.1 | Initial Decisions and Ongoing Evaluations | Partial Compliance |
| D.2 | Secondary Reviews | Partial Compliance |
| D.3 | Assistive Device Leaflet | Sustained Compliance |
| D.4 | Tracking Complications | Partial Compliance |
| D.5 | Wheelchair Seating Training | Severed |
| D.6 | Publishing Guidelines for Tracking Complications | Severed |
| | **Wheelchairs and Prostheses** | |
| E.1(a) | Wheelchair Maintenance | Severed |
| E.1(b) | Maintenance of the Wheelchair Repair Shop | Severed |
| E.1(c) | Installing RFID Transmitters | Severed |

20

CV 08-03515 DDP

| PROVISION | DESCRIPTION | COMPLIANCE RATING |
|---|---|---|
| E.1(d) | Wheelchairs with Moveable Armrests | Sustained Compliance |
| E.2 | Return of Personal Wheelchairs | Severed |
| E.3 | Assistive Device Policy | Severed |
| E.4 | Return of Prostheses within 24 Hours | Sustained Compliance |
| | **ADA Coordinators** | |
| F.1 | ADA Duties | Substantial Compliance |
| F.2 | ADA Coordinator Authority | Severed |
| F.3 | Training ADA Coordinators | Sustained Compliance |
| | **Grievance Form** | |
| G.1 | Grievance Form | Severed |
| G.2 | "ADA" Designation of ADA Grievances | Partial Compliance |
| G.3 | Grievance Response Time | Partial Compliance |
| G.4 | ADA Grievances Designation | Severed |
| G.5 | ADA Grievance Maintenance | Severed |
| | **Accommodations** | |
| H.1 | Reasonable Accommodations | Partial Compliance |
| H.2 | Accessibility of Medical Orders | Severed |
| H.3 | Tracking Mobility Assistive Device Requests | Sustained Compliance |
| | **Notification of Rights** | |
| I.1 | Notification of Rights | Severed |
| | **Training** | |
| J.1 | Training | Sustained Compliance |
| | **Transportation** | |
| K.1 | Transportation in Accessible Vans | Substantial Compliance |