MAX HUNTSMAN
Inspector General, Bar No. 156780
DARA WILLIAMS
Chief Deputy, Inspector General, Bar No. 130387
ANDRE HARMANDJIAN
Inspector, Bar No. 355367
InspectorGeneral@oig.lacounty.gov
OFFICE OF INSPECTOR GENERAL
312 South Hill Street, 3rd Floor
Los Angeles, California 90013
Telephone: (213) 974-6100; Fax: (213) 974-9346

**Monitors**

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER JOHNSON, DONALD PETERSON and MICHAEL CURFMAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, a public entity; ROBERT LUNA, as Sheriff of County of Los Angeles, and COUNTY OF LOS ANGELES, a public entity,<br><br>Defendants. | CASE NO. CV 08-03515 DDP<br><br>**INSPECTOR GENERAL'S NINTH IMPLEMENTATION STATUS REPORT** |

Pursuant to section V, subsection M, of the Settlement Agreement ("Agreement"), the Los Angeles County Office of Inspector General ("OIG"), the Monitor appointed by this Court, submits the attached *Inspector General's Ninth Implementation Status Report* ("Report") evaluating Defendants' compliance with the terms of the Agreement. This report was prepared by the OIG to provide "reasonable and regular reports" to Plaintiffs and Defendants (collectively referred to as the "Parties") and the Court. This is the ninth report on the implementation status of the Agreement. The OIG is available to answer any questions the Court may have regarding this Report and Defendants' compliance with the Agreement.

Dated: May 13, 2025

Respectfully submitted,

By: _____
Dara Williams
Chief Deputy, Inspector General

CV 08-03515 DDP

INSPECTOR GENERAL'S NINTH          -2-
IMPLEMENTATION STATUS
REPORT

# INSPECTOR GENERAL'S NINTH IMPLEMENTATION

# STATUS REPORT

The Agreement in the above-captioned case provides that the OIG will prepare and submit periodic reports to the Parties and the Court that evaluate Defendants' compliance with the Agreement, which went into effect on April 22, 2015. Defendants have agreed to implement system-wide reform of the conditions of confinement for Class Members within Los Angeles County jails. The Agreement defines Class Members as "all present and future detainees and inmates with mobility impairments who, because of their disabilities, need appropriate accommodations, modifications, services and/or physical access in accordance with federal and state disabilities law." Docket No. 210.2 at 3. The terms of the Agreement apply to any "jail facility used to permanently house inmates with mobility impairments," which is presently Men's Central Jail ("MCJ"), Twin Towers Correctional Facility ("TTCF"), and Century Regional Detention Facility ("CRDF").[1] *Id*. This Report takes into account all data collected

---

[1] At the time the settlement agreement ("Agreement") was executed, only Men's Central Jail ("MCJ") and Twin Towers Correctional Facility ("TTCF") were used to permanently house Class Members. In 2017, women with mobility impairments were transferred from TTCF to Century Regional Detention Facility ("CRDF"), where they continue to be housed permanently. As such, CRDF is subject to the terms of the Agreement, which defines the term "Jail" or "Jail Settings" to include any "jail facility used to permanently house inmates with mobility issues." As is clear from this language, the identification of the two facilities that housed inmates with mobility impairments at the time of the Agreement was not intended to limit compliance with the Agreement to only MCJ and TTCF.

INSPECTOR GENERAL'S NINTH       -3-
IMPLEMENTATION STATUS
REPORT

CV 08-03515 DDP

and analyzed and observations made from April 1, 2024, to March 31, 2025.

Background

On August 24, 2016, the Parties agreed on compliance measures to serve as a guideline for implementing the terms of the Agreement and establish the Agreement's minimum compliance standards. The measures were written based on the Los Angeles County Sheriff's Department's (the "Department" or "LASD") predictions about policies, procedures, practices, and systems that it intended to implement to ensure compliance with the terms of the Agreement. Where necessary to serve the interests of Class Members and the Department, and to promote effective implementation of the Agreement, the OIG will consider alternative evidence as proof of compliance. Precisely how the Department proves compliance with each provision is less important than whether each provision is effectively and durably implemented. Though the OIG is not rigid in its consideration of the types of evidence that support compliance, all evidence submitted must be verifiable, replicable, and sufficient to make a compliance determination. The Department's Custody Compliance and Sustainability Bureau ("CCSB") is responsible for preparing self-assessments and coordinating any additional documentation as requested by the OIG. Correctional Health Services ("CHS") is responsible for providing medical and mental health services to all people incarcerated in the Los Angeles County jails, including Class Members, and

for coordinating, as necessary, with the Department in providing required accommodations.[2]

The OIG makes a compliance finding for each provision based on the degree to which each provision has been effectively and durably implemented. A non-compliance finding means Defendants made no notable progress in achieving compliance with any of the key components of a particular provision. A partial compliance finding means Defendants have made notable progress in achieving compliance with the key components of a particular provision. A substantial compliance finding means Defendants have successfully met all, or nearly all, of the compliance thresholds for a particular provision. A sustained compliance finding means Defendants maintained substantial compliance for a period of at least twelve months following the OIG's initial substantial compliance finding. Once a provision has achieved sustained compliance, the OIG will stop monitoring that provision for purposes of the Agreement.

On June 30, 2016, the Department implemented Custody Division Manual ("CDM") section 5-12/005.10, "Handling of Inmates with Mobility and/or Sensory Impairment." This policy was moved to CDM section 5-03/085.00, "Handling of

---

[2] In 2015, Correctional Health Services, an agency within the Los Angeles County Department of Health Services, assumed responsibility for providing medical and mental health care in the jails from the Los Angeles County Sheriff's Department's Medical Services Bureau.

INSPECTOR GENERAL'S NINTH IMPLEMENTATION STATUS REPORT                    -5-                    CV 08-03515 DDP

Inmates with Mobility and/or Sensory Impairments," on December 19, 2022, and updated in September 2023. Unless otherwise noted, references to the "*Johnson* policy" pertain to this CDM section.

Pursuant to stipulation of the Parties, the Court has severed 38 of the 49 provisions from the Agreement that have either achieved sustained compliance or were documented as "completed" during settlement negotiations and are no longer subject to monitoring by the OIG.[3] *See* Docket Nos. 237, 248, 256. Four additional provisions have achieved sustained compliance but have not been severed from the Agreement.[4] *See* Docket Nos. 259, 269. As such, the OIG will only issue findings on the remaining seven provisions.

Current Status

Over the past 10 years, the Department has made notable progress in improving the conditions that gave rise to the Agreement. The Department's overall reform trajectory was characterized by steady, incremental progress. However, as the Class Member population continues to grow and the Department continues to expand the number of areas where Class Members are housed, concerning issues have emerged that are eroding the Department's reform efforts

---

[3] The 38 severed provisions include A.1, A.2, A.3, A.5(a), A.5(b), A.5(c), A.6, B.1(a), B.1(b), B.1(c), B.2, B.3, C.4(a), C.4(b), C.4(c), C.4(d), C.4(e), C.5, D.3, D.5, D.6, E.1(a), E.1(b), E.1(c), E.1(d), E.2, E.3, E.4, F.2, F.3, G.1, G.4, G.5, H.2, H.3, I.1, J.1, and K.1. *See* Appendix.
[4] The four sustained provisions include D.1, D.2, D.4, and F.1.

INSPECTOR GENERAL'S NINTH IMPLEMENTATION STATUS REPORT

-6-

CV 08-03515 DDP

and posing risks to Class Members.

As reported in the *Inspector General's Eighth Implementation Status Report* ("*Eighth Implementation Status Report*"), the Department expanded the number of areas where Class Members are housed in MCJ and TTCF without sufficient consideration for the terms of the Agreement, resulting in a myriad of issues. In prior years, Class Members at MCJ were generally housed on the 7000 and 8000 floors and Class Members at TTCF were generally housed in modules 232 and 272 (hereinafter referred to as "ADA housing areas"). Class Members are now housed in several areas throughout those facilities. For example, on February 26, 2025, 127 of the 273 (47%) Class Members at MCJ were housed in areas outside of the 7000 and 8000 floors and 29 of the 116 (25%) Class Members at TTCF were housed outside of modules 232 and 272. The vast majority of Class Members who are housed in non-ADA housing areas are prescribed mobility assistive devices other than wheelchairs and require varying types of accommodations that are not always available in non-ADA housing areas.

The Department has made little to no progress in addressing mobility concerns and ADA compliance in non-ADA housing areas. As discussed under provision H.1 (Reasonable Accommodations), many Class Members in those areas continue to face architectural barriers that pose safety risks and are denied accommodations or provided inadequate accommodations. As recommended in the

*Eighth Implementation Status Report*, the Department, in collaboration with CHS, must conduct a comprehensive assessment of its Class Member population to ensure that all Class Members are housed in appropriate areas of the jails and are receiving all required accommodations in accordance with the terms of the Agreement.

The scope and magnitude of the issues resulting from the expansion of Class Member housing areas also raise questions as to whether Defendants have regressed in areas that were severed from the Agreement or have previously reached sustained compliance. Indeed, Plaintiffs' counsel have expressed such concerns, while Defendants' counsel contends that no systemic failures have been identified that establish non-compliance with any severed provisions. The OIG, in the course of speaking with Class Members regarding outstanding provisions, has received information suggesting regression in certain areas. The OIG did not conduct a comprehensive assessment of Defendants' compliance with severed provisions and this report does not address whether Plaintiffs' allegations of regression are factually supported.

Several additional factors may be impeding Defendants' reform efforts. First, the Department is not actively monitoring ongoing compliance with all terms of the Agreement. Several problems reported herein are the direct result of deteriorating practices and failures to adhere to established policies and

procedures. For example, as discussed under provision A.7 (Notification in Town Hall Meetings), the Department is not conducting town hall meetings for each housing area at least once per month in accordance with Department policy, let alone meeting the requirement set forth in the provision to notify Class Members of all available programming during the town hall meetings. As discussed under provision H.1 (Reasonable Accommodations), Department personnel are not ensuring that grievance bins have adequate supplies of forms available in accordance with Department policy[5] or providing egg crate mattress toppers to all Class Members in accordance with the Informational Bulletin issued on September 10, 2021.[6] The Department must implement a system to self-identify and self-correct issues as they arise.

Second, the success of the Department's efforts depends largely on consistent and proactive leadership. CCSB – the unit responsible for ensuring compliance with the Agreement – has cycled through three different bureau leaders within a span of one year. Although the previous two captains demonstrated a strong commitment to advancing reform, their short tenures did not afford them with adequate time to fully develop and implement achievable strategies to address

---

[5] *See* Custody Division Manual § 8-01/020.00, *Responsibilities.*
[6] On September 10, 2021, the Department issued an Informational Bulletin titled "Egg-Crate Mattresses for Mobility-Impaired Inmates" that provided guidance on issuing and maintaining egg crate mattresses for all Class Members.

INSPECTOR GENERAL'S NINTH IMPLEMENTATION STATUS REPORT

-9-

CV 08-03515 DDP

areas of non-compliance. Having said that, the OIG has met several times with the current acting captain and is cautiously optimistic about their efforts to resolve issues and advance reform.

Third, the OIG has consistently noted the need for improved collaboration between the Department and CHS to achieve compliance with the terms of the Agreement. Simply stated, full compliance cannot be achieved without greater interagency collaboration. While there has been some improvement in certain areas, other areas remain stagnant. For example, as discussed under provision G.2 ("ADA" Designation of ADA Grievances), the Department has made notable efforts to achieve compliance with the requirements of the provision, yet CHS has made none. The Department and CHS must engage in more purposeful, consistent coordination and collaboration.

Fourth, the Department must take greater care in preparing its self-assessments. The OIG identified issues in three of the four self-assessments that it received for this reporting period. The self-assessment for provision A.7 (Notification in Town Hall Meetings) was missing pertinent documentation. As such, the OIG was unable to verify certain information reported in the self-assessment. In addition, the OIG identified methodological flaws in the self-assessments for provisions G.2 ("ADA" Designation of ADA Grievances) and G.3 (Grievance Response Time). These flaws impacted the Department's ability to

CV 08-03515 DDP

INSPECTOR GENERAL'S NINTH        -10-
IMPLEMENTATION STATUS
REPORT

accurately identify all required data and information pursuant to the compliance measures.

The OIG conducted 31 *Johnson* site visits during this reporting period, which included interviews with Class Members and Department and CHS personnel, as well as compliance spot checks. A total of 286 Class Members housed at MCJ, TTCF, and CRDF were interviewed by OIG staff for the purpose of determining Defendants' compliance with the remaining provisions.[7] As of March 31, 2025, Defendants have achieved substantial compliance with one of the seven remaining provisions. Defendants remain in partial compliance with six provisions.[8]

The issues identified during this reporting period make it unlikely that compliance on the remaining issues will be achieved without additional extensions as agreed to by the Parties and approved by this Court. Defendants should ensure that adequate resources are dedicated towards implementing the terms of the Agreement. The Department and CHS should take more active roles in overseeing compliance and focus on collaboration and agreement between the two agencies. Defendants should also continue to train and brief *all* personnel who work in the

---

[7] Although the daily average population of Class Members fluctuates, 286 Class Members accounted for approximately 70% of the entire Class Member population at the time the interviews were conducted.

[8] The compliance ratings for all 49 provisions as of March 31, 2025, is set forth in the Appendix.

INSPECTOR GENERAL'S NINTH          -11-          CV 08-03515 DDP
IMPLEMENTATION STATUS
REPORT

custody setting on the terms of the Agreement. The OIG not only welcomes, but actively encourages, the Department and CHS to collaborate with its monitoring team to discuss obstacles in areas where compliance has yet to be achieved and develop solutions that meet the requirements set forth in the Agreement while accounting for the complex nature of jail operations.

**IMPLEMENTATION STATUS OF AGREEMENT PROVISIONS**

**SECTION A – Programming**

**Provision A.7 – Notification in Town Hall Meetings – Partial Compliance**

Under paragraph 7 of section A of the Agreement, "[n]otification of available programs will also be provided during 'town hall' meetings at the Jail where appropriate." The corresponding compliance measures for this provision require the Department to promulgate policy and to provide minutes from town hall meetings for two, one-month periods selected by the OIG. As previously reported, the Department promulgated policy consistent with this provision. CDM section 5-14/005.00, "Town Hall Meetings," provides that "every facility is required to conduct a town hall meeting for each housing area at least once per month." The *Johnson* policy requires that information regarding all available programming be provided during town hall meetings. The OIG selected the periods of May 2024 and August 2024 for review.

CV 08-03515 DDP

INSPECTOR GENERAL'S NINTH       -12-
IMPLEMENTATION STATUS
REPORT

CCSB Self-Assessment

On January 22, 2025, the Department provided the OIG with a self-assessment indicating that it is non-compliant with this provision.[9] CCSB used Mobility Impaired Daily Lists provided by Population Management Bureau ("PMB") to identify Class Member housing locations for the selected periods. The self-assessment indicates that CCSB identified a total of 147 meeting minutes documenting town halls held in Class Member housing locations during the selected periods.[10] Of the 147 documented meeting minutes, 54 indicate that Class Members were present. Of those 54 meeting minutes, 31 (57%) reflect that information regarding available programming was provided during the town hall meetings.[11]

CRDF does not have dedicated housing areas for women with mobility impairments. As such, Class Members are housed in various areas throughout the

---

[9] As defined above, a non-compliance finding means that Defendants made no notable progress in achieving compliance with any of the key components of a particular provision. Although Defendants indicated that they are non-compliant with this provision, notable progress has been made with key components of the provision, which is the reason for OIG's finding of partial compliance.

[10] As discussed below, the OIG did not receive copies of all 147 meeting minutes in order to replicate and verify the information contained in the self-assessment.

[11] The OIG does not expect that Class Members will participate in every town hall meeting given that participation is voluntary. However, everyone in the housing area should be given the opportunity to attend town hall meetings and information regarding available programming must be provided when Class Members are present, both of which should be documented consistently in town hall meeting minutes. In addition, CCSB should take an active role in encouraging Class Member participation and such efforts should be documented in future self-assessment reports.

INSPECTOR GENERAL'S NINTH IMPLEMENTATION STATUS REPORT

-13-

CV 08-03515 DDP

facility. CCSB identified 11 Class Member housing locations for May 2024, and 13 Class Member housing locations for August 2024. No town hall meeting minutes were submitted for May 2024. For August 2024, CRDF provided 28 meeting minutes indicating that town halls were conducted in 8 of the 13 Class Members housing locations. Of the 28 meeting minutes, 11 reflect that Class Members were present, but only 4 of which indicate that information regarding available programming was provided.[12]

Class Members at TTCF are housed in several areas throughout the facility. CCSB identified eight Class Member housing locations for May 2024, and eight Class Member housing locations for August 2024. The self-assessment states, "TTCF has two modules where Class Members reside in four different pods (A, B, C, D)." This statement is not accurate. CCSB did not account for the expansion of Class Member housing areas at TTCF and only included ADA housing areas. As such, TTCF was required to submit meeting minutes indicating that town halls were conducted both in ADA housing and non-ADA housing areas where Class members were housed, yet no town hall meeting minutes were submitted for non-ADA housing areas.

For May 2024, the self-assessment indicates that TTCF provided seven

---

[12] For the month of August 2024, meeting minutes reflect that CRDF conducted several town halls in 2100, 2102, 3100, and 3800.

INSPECTOR GENERAL'S NINTH
IMPLEMENTATION STATUS
REPORT

-14-

CV 08-03515 DDP

meeting minutes for the eight identified Class Member housing locations. However, upon reviewing the self-assessment, the OIG discovered that meeting minutes for all eight locations were included in the exhibits. Of the eight meeting minutes, seven reflect that Class Members were present and that information regarding available programming was provided. For August 2024, TTCF provided seven meeting minutes indicating that town halls were conducted in seven of the eight Class Member housing locations. All seven meeting minutes reflect that Class Members were present, but only six of which indicate that information regarding available programming was provided.

Class Members at MCJ are housed throughout most areas of the facility. CCSB identified 36 Class Member housing locations for May 2024, and 40 Class Member housing locations for August 2024. For May 2024, the self-assessment indicates that MCJ provided 46 meeting minutes reflecting that town halls were conducted in 30 of the 36 Class Member housing locations. Of the 46 meeting minutes, 11 reportedly reflect that Class Members were present, but only 7 of which indicate that information regarding available programming was provided. For August 2024, the self-assessment indicates that MCJ provided 58 meeting minutes reflecting that town halls were conducted in 34 of the 40 Class Member housing locations. Of the 58 meeting minutes, 18 reportedly reflect that Class Members were present, but only 7 of which indicate that information regarding

available programming was provided.

The OIG was unable to replicate and verify the self-assessment information for MCJ as not all meeting minutes were provided for review. The OIG received 32 of the 46 meeting minutes for May 2024, and 46 of the 58 meeting minutes for August 2024.

In September 2024, the Department met with the OIG to discuss methods of notifying Class Members of all available programming during town hall meetings. The Department proposed distributing a half-sheet flyer to Class Members during town hall meetings that lists all available programming. A copy of the proposed flyer was presented to the OIG during the meeting.[13] The Department indicated that the proposal will initially be implemented at MCJ and, if successful, will be expanded to TTCF and CRDF. The OIG approved of this proposal and reiterated the ongoing expectation that town hall meetings be held in all Class Member housing locations.

OIG Findings and Recommendations

OIG staff spoke with Class Members at CRDF, TTCF, and MCJ regarding

---

[13] In a subsequent email communication, the OIG requested confirmation that the flyer lists all available programming that Class Members have access to that non-mobility-impaired people in custody have in the facilities, including programming made available to veterans and programming offered by CHS. Although participation in each program is subject to certain restrictions, Class Members must be notified of all available programming. The OIG has not yet received the requested confirmation.

CV 08-03515 DDP

INSPECTOR GENERAL'S NINTH        -16-
IMPLEMENTATION STATUS
REPORT

town hall meetings and whether the availability of programming was discussed during those meetings. Although most Class Members were not familiar with the term "town hall meeting," many advised that staff do come around periodically to provide general information and ask if they have any questions or concerns. However, very few Class Members reported being informed of all available programming during these encounters. Furthermore, no Class Members reported having received the half-sheet flyer.[14]

The Department was unable to demonstrate that town hall meetings were conducted in all Class Member housing locations and that information regarding all available programming was provided during town hall meetings. The self-assessment contains several discrepancies and is missing supporting documentation. Nevertheless, the Department's efforts to explore alternative methods to ensure that Class Members are notified of all available programming and ultimately achieve compliance are encouraging. Distribution of the flyers will certainly benefit the Department in its efforts to notify Class Members of all available programming, but that alone will not bring the Department into compliance. Greater efforts should be made to conduct town hall meetings in all Class Member housing areas and town hall meeting minutes should document

---

[14] On September 19, 2024, CCSB confirmed via email that the Department began distributing the half-sheet flyers.

INSPECTOR GENERAL'S NINTH
IMPLEMENTATION STATUS
REPORT

-17-

CV 08-03515 DDP

clearly and accurately whether (1) everyone in the housing area was offered the opportunity to participate in the town hall meeting, (2) Class Members attended or participated in the meeting, and (3) Class Members were notified of all available programming, either verbally or in writing via the distribution of the flyer. Defendants remain in partial compliance with this provision.

**SECTION B – Physical Therapy and Outdoor Recreation**

**Provision B.4 – Thermal Clothing – Substantial Compliance as of January 22, 2025**

Under paragraph 4 of section B of the Agreement,

"Class Members who have been prescribed thermal clothing as a reasonable accommodation for their disability so that they may participate in outdoor recreation will be provided warm coats and/or thermal clothing. LASD shall inform Class Members that they may request thermal clothing as a reasonable accommodation and shall develop and distribute a unit order to ensure that all LASD personnel are aware of this policy."[15]

As previously reported, the Department indicated that it would provide all Class

---

[15] As reported in the *Inspector General's Second Implementation Status Report*, the OIG has determined that "thermal clothing" includes both tops and bottoms, particularly since mobility impairment usually affects individuals below the torso.

INSPECTOR GENERAL'S NINTH       -18-                                    CV 08-03515 DDP
IMPLEMENTATION STATUS
REPORT

Members with thermals, including tops and bottoms, without requiring a prescription, which exceeds the requirements set forth in the Agreement. The corresponding compliance measures require CCSB and the OIG, through regular site visits and interviews with Class Members and custody personnel, to confirm that relevant housing locations maintain an adequate supply of thermal clothing and that all Class Members are provided with thermal tops and bottoms. In September 2023, the Department updated its *Johnson* policy to state, "[i]nmates with mobility and/or sensory impairments shall receive thermal clothing as a reasonable accommodation for their disability. Custody personnel shall ensure inmates classified as such receive thermal clothing upon their arrival to an ADA housing module, and exchange soiled thermals with clean thermals during weekly laundry exchange."

In October 2023, the Department, in response to a motion adopted by the Los Angeles County Board of Supervisors, began providing thermal tops and bottoms to every person in custody who is eligible to receive them, regardless of ADA status or prescription.[16] The Department updated its policy on standard

---

[16] The Board motion requires the Department to provide thermal clothing to any person in custody who requests thermal garments. The Department provides thermals to all persons in custody absent a safety or security concern. The use of the term eligible is meant to convey that these persons do not present such a concern and are therefore eligible to receive thermal garments. *See* Los Angeles County, Board of Supervisors, *Providing Thermal Undergarments to All People in Custody in the Los Angeles County Jails* (July 11, 2023).

INSPECTOR GENERAL'S NINTH          -19-          CV 08-03515 DDP
IMPLEMENTATION STATUS
REPORT

institutional clothing to include one thermal top and one thermal bottom.[17]

CCSB Self-Assessment

On January 22, 2025, the Department provided the OIG with a self-assessment indicating that it had maintained substantial compliance with this provision. The self-assessment contains signature sheets, electronic Uniform Daily Activity Log ("e-UDAL") records, logs, and email confirmations of thermal clothing distribution and/or exchanges from April 1, 2024, to September 30, 2024. The self-assessment also contains a total of 18 CCSB spot check reports reflecting that from April through September 2024, CCSB personnel conducted monthly spot checks at each facility to determine whether Class Members were provided thermal clothing, relevant housing locations maintained an adequate supply of thermal clothing, and thermal clothing exchanges were being carried out as scheduled. CCSB reported that a final assessment was conducted on October 7, 2024, and concluded that Class Members in all relevant housing locations were consistently provided with thermals tops and bottoms. CCSB indicated that most Class Members who were interviewed expressed satisfaction with the thermal distribution and exchange process. No areas for improvement were noted in the

---

[17] *See* Custody Division Manual §§ 6-15/010/00, *Inmate Clothing, Bedding, and Personal Hygiene*, 5-06/010.10, *Allowable Inmate Property - Female Inmates*, and 5-06/010.05, *Allowable Inmate Property - Male Inmates*.

CV 08-03515 DDP

INSPECTOR GENERAL'S NINTH        -20-
IMPLEMENTATION STATUS
REPORT

final assessment.

While all 18 spot check reports reflect that Class Member interviews were conducted, only the reports from CRDF specify the total number of Class Members interviewed and the number of Class Members who reported having received thermals. The CRDF reports reflect that a total of 33 Class Members were interviewed, of which 27 (82%) reported having received thermals. CCSB should include these figures in all spot check reports so that quantitative data can be used to assess overall and facility-level compliance.

Documentation practices for thermal clothing distribution and exchanges vary greatly across facilities. CRDF's unit order requires that custody personnel document the issuance of thermals in the e-UDAL weekly, and that laundry staff obtain signatures from Class Members receiving their thermal sets semimonthly.[18] CRDF provided signature sheets for five of the six months included in CCSB's review reflecting that nearly all listed Class Members confirmed receipt of thermals.[19] No e-UDAL reports were provided for CRDF.

MCJ's unit order requires that thermals be exchanged during regularly

---

[18]  *See* Custody Division Unit Orders, CRDF Unit Order § 5-16-010, *Clothing, Linen, and Bedding*.

[19] Signatures sheets from April 2024 were not available, reportedly due to changes in laundry staff.

INSPECTOR GENERAL'S NINTH IMPLEMENTATION STATUS REPORT

-21-

CV 08-03515 DDP

scheduled clothing exchange and documented in the e-UDAL weekly.[20] MCJ provided e-UDAL reports for ADA and non-ADA housing areas. Laundry staff reported that thermal exchanges were sometimes documented as "thermal" exchanges but more often documented as part of the "underwear" exchanges, which was reflected in the e-UDAL reports.

TTCF's unit order does not prescribe specific documentation requirements for thermal distribution or exchanges.[21] In practice, TTCF laundry staff utilize thermal exchange logs to track the exchange of thermals and send confirmation emails to CCSB when thermals are exchanged in modules 232 and 272. TTCF provided a total of 19 thermal exchange logs and 23 email confirmations from April to September 2024. Lastly, the Department's self-assessment makes no mention of documented thermal distribution or exchange for those individuals housed in High Observation Housing ("HOH") who do not have property restrictions on clothing.[22]

OIG Findings and Recommendations

As noted above, the OIG interviewed a total of 286 Class Members. Thirteen Class Members were excluded from the population for this provision prior to

---

[20] *See* Custody Division Unit Orders, MCJ Unit Order § 5-16-030, *Issuance and Collection of Bedding and Towels.*

[21] *See* Custody Division Unit Orders, TTCF Unit Order § 5-16-030, *Exchange of Inmate Clothing.*

[22] *See* Custody Division Manual, § 5-01/050.10, *Housing for Mentally Ill Inmates.*

INSPECTOR GENERAL'S NINTH IMPLEMENTATION STATUS REPORT

-22-

CV 08-03515 DDP

calculating the compliance rate for data integrity purposes.[23] Of the remaining 273 Class Members, 242 reported having received thermal tops and bottoms, resulting in an overall compliance rate of 89%. TTCF achieved the highest compliance rate with 90% of Class Members reported having received thermal clothing, followed by MCJ with 88% and CRDF with 86%.[24] Class Members in non-ADA housing areas of MCJ and TTCF accounted for approximately 68% of those who reported not having received a thermal top and bottom.[25] Class Members who reported not having received thermals indicated that the primary reason was that their size was not consistently available. Other issues included having received either a thermal top or bottom, but not both, and thermals being confiscated during a housing transfer or search, and not being replaced.

The OIG requested the CRDF signature sheet from CCSB for the week it conducted its compliance site visit to determine whether the Class Members who reported not having received thermals were reflected on the sheet. CCSB provided

---

[23] Nine Class Members were housed in High Observation Housing ("HOH") and subject to property restrictions for safety and security purposes, two reported having declined thermals, one was in custody for less than 72 hours and assigned to temporary housing at CRDF at the time they spoke with OIG staff, and one provided a response contrary to the observation of OIG staff and was deemed not credible.

[24] At MCJ, 176 of 199 Class Members reported having received thermals. At TTCF, 47 of 52 Class Members reported having received thermals. At CRDF, 19 of 22 Class Member reported having received thermals.

[25] Of the 23 Class Members who reported not having received thermal tops or bottoms at MCJ, 17 were housed outside of the 7000 and 8000 floors. Of the 5 Class Members who reported not having received thermal tops and bottoms at TTCF, 2 were housed outside of modules 232 and 272.

CV 08-03515 DDP

INSPECTOR GENERAL'S NINTH        -23-
IMPLEMENTATION STATUS
REPORT

the sheet and noted that no signatures were obtained for the week that the OIG conducted its site visit due to the staff member who typically manages laundry exchange being on vacation. Although CCSB reported that all Class Members received their thermals during that week, the OIG was unable to verify this claim without the presence of signatures. Furthermore, one of the Class Members who reported not having received thermals was not listed on the signature sheet, calling into question the veracity of the information contained in the sheet.

Prior to the Department providing thermal clothing to every person in custody who is eligible to receive them, thermal tops and bottoms were provided upon arrival to assigned housing locations. In October 2023, the Department began to distribute thermal clothing at the Inmate Reception Center ("IRC") to all people in custody, including Class Members, except for those placed in HOH. Absent any safety or security restrictions, those who are placed in HOH will receive thermals upon arrival to their permanent housing location. CRDF continued to provide thermals to people in custody upon arrival to their assigned housing location until March 2025, at which point CRDF Reception Center assumed responsibility for distributing thermals to people in custody, including Class Members, who are classified as general population upon arrival to the facility. Those who require additional medical or mental health attention or detoxification are provided with

thermals upon arrival to their permanent housing location.[26] The OIG monitored the intake process at the IRC and CRDF Reception Center and confirmed the distribution of thermal clothing.

OIG staff inspected thermal storage lockers/closets in ADA housing areas at MCJ and TTCF during several site visits and found that they consistently had adequate supplies of thermal tops and bottoms available for distribution.[27] Most non-ADA housing areas at MCJ and TTCF had no inventory at all, and the few that did had a limited supply. However, a majority of custody staff assigned to those areas described a consistent process for requesting and obtaining thermal clothing when needed from intake, laundry staff, or other housing areas.

While having an inventory of thermal clothing in housing area storage is most important in areas where the majority of Class Members are housed, having at least a minimum supply in non-ADA housing areas or floors could help address situations where Class Members do not have thermal clothing and alleviate operational constraints. For example, one Class Member housed at MCJ reported that custody personnel confiscated his thermal clothing during a dorm search. The Class Member claimed that when he asked custody personnel for a new set, he was

---

[26] As discussed below, anyone assigned to HOH at CRDF requires approval from a mental health clinician to receive thermal clothing.

[27] OIG staff confirmed the inventory of thermal clothing in storage lockers in modules 232 and 272 at TTCF, as well as in supply closets and deputy workstations on the 7000 and 8000 floors at MCJ.

INSPECTOR GENERAL'S NINTH IMPLEMENTATION STATUS REPORT

-25-

CV 08-03515 DDP

told none were available and instructed him to wait until clothing exchange.[28] The Class Member reported he was unable to get a set of thermals during clothing exchange because he did not have a set to exchange.[29] Another Class Member housed at CRDF reported custody personnel confiscated her thermal clothing when she was transferred to a medical isolation unit. Upon return to general population housing, the Class Member reported that she requested a new set of thermals from custody personnel but was instructed to wait until clothing exchange due to a lack of available thermals in the storage closet. The Class Member also reported difficulties with obtaining thermal clothing during laundry exchange, stating that larger sizes, which she required, were unavailable, resulting in additional delays.

In addition to the Class Members who cited sizing availability as the primary reason for lacking thermal clothing, approximately 20% of Class Members who confirmed having received thermal clothing stated sizing availability was inconsistent during laundry exchange. In the previous reporting period, CCSB identified the availability of larger sizes (4X, 5X, and 6X) as an area for improvement. Although CCSB indicated that it noticed a decrease in the number of Class Members asking about the availability of larger sizes in this reporting period,

---

[28] Custody personnel are required to ensure that all people in custody receive the proper replacement item in the event that they do not have a soiled item to exchange. *See* Custody Division Manual, § 5-11/060.00, *Bedding, Linen, and Clothing Exchange.*

[29] People in custody are generally expected to exchange type-for-type during clothing exchange to prevent people from acquiring more than the allocated amount of clothing.

INSPECTOR GENERAL'S NINTH IMPLEMENTATION STATUS REPORT

-26-

CV 08-03515 DDP

the Department should continue to improve the availability of varied sizes during laundry exchange for Class Members who have a physical or medical need for them.

Property Restrictions for Class Members in High Observation Housing

The OIG's review also revealed inconsistent restrictions on thermal clothing for Class Members who were in HOH. Currently, HOH is available at TTCF and CRDF. TTCF does not have a blanket prohibition on providing thermal clothing to individuals in HOH, except for those under suicide precautions or those newly placed in HOH.[30] Department policy requires a mental health professional conduct a clinical assessment within 24 hours of initial placement, and as needed thereafter, to determine whether property restrictions are required to maintain safety for individuals in HOH.[31] When restrictions are imposed at TTCF, an "Allowable Inmate Property" listing allowable property is generated and placed on the individual's cell door.[32] In contrast, CRDF's unit order requires that individuals in

---

[30] *See* Custody Division Manual, § 5-01/050.15, *Property Restrictions for Mentally Ill Inmates* ("Upon initial placement in High Observation Housing (HOH), except when transferred directly from Forensic Inpatient (FIP), inmates shall be provided only suicide-resistant blankets, gowns, and approved mattresses, unless otherwise specified, as determined and documented by a Jail Mental Health Services (JMHS) clinician.").

[31] Custody Division Manual, § 5-01/050.15, *Property Restrictions for Mentally Ill Inmates* ("Within 24 hours of initial placement in HOH, a clinician will make recommendations regarding allowable property based upon an individual clinical assessment (Refer to JMHS policy 70.7 Suicide Prevention).").

[32] Custody Division Manual, § 5-01/050.15, *Property Restrictions for Mentally Ill Inmates.*

INSPECTOR GENERAL'S NINTH    -27-    CV 08-03515 DDP
IMPLEMENTATION STATUS
REPORT

HOH not be issued thermals unless CHS deems it appropriate.[33] The lack of explicit approval from a mental health professional effectively prohibits individuals, including Class Members, in HOH from receiving thermals. The Department, in collaboration with CHS, should review and reconcile these conflicting policies to ensure that all Class Members, including those in HOH, receive thermal tops and bottoms when not explicitly restricted for safety or security reasons.

As discussed above, the OIG makes compliance findings based on the degree to which each provision has been effectively and durably implemented. Here, the Department has exceeded the requirements set forth in the provision by committing to provide thermal tops and bottoms to all Class Members, without requiring a prescription. Although the Department's overall compliance rate decreased from 96% in the previous reporting period to 89%, the Department has now instituted a streamlined process for distributing thermal clothing to most people in custody, including Class Members, upon arrival to the IRC and CRDF

---

[33] CRDF Unit Orders § 5-16-010, *Clothing, Linen, and Bedding* ("Inmates housed in High Observation Housing (HOH) areas shall not be issued thermals, unless deemed appropriate by CHS, mental health personnel, in consultation with custody."); §5-01-010, *Allowable Inmate Property, Storage of Personal Items, and Contraband Control* ("Inmates housed in High Observation Housing (HOH) areas shall not be issued thermals, unless deemed appropriate by Correctional Health Services (CHS) mental health personnel, in consultation with custody.").

INSPECTOR GENERAL'S NINTH IMPLEMENTATION STATUS REPORT

-28-

CV 08-03515 DDP

Reception Center.[34] The Department has also updated policies and unit orders to reflect this process. Absent exigent circumstances, the distribution of thermal clothing at intake should allow for Class Members to receive thermals more consistently and timely, especially at CRDF where the Defendants achieved the lowest facility-level compliance rate. Based on these findings the OIG determined that holding Defendants at substantial compliance for this reporting period is the most equitable approach that best reflects Defendants' implementation status for this provision. In order to achieve sustained compliance, Defendants will be required to address the concerns discussed above and demonstrate continued improvement in the distribution of thermal clothing. Defendants remain in substantial compliance.

**SECTION C – Physical Accessibility**

**Provision C.4(f) – Additional Grab Bars and Shower Benches – Partial Compliance**

Under subsection (f) of paragraph 4 of section C of the Agreement, "Defendants are required to install grab bars and shower benches in approximately thirty (30) cells outside of TTCF modules 231 and 232."[35] The corresponding

---

[34] The compliance measures for this provision do not prescribe a specific compliance standard percentage that the Department must meet to achieve compliance.

[35] The Parties have agreed that "outside of TTCF modules 231 and 232" refers to any relevant housing location except for modules 231 and 232 at TTCF.

INSPECTOR GENERAL'S NINTH
IMPLEMENTATION STATUS
REPORT

-29-

CV 08-03515 DDP

compliance measure of this provision requires the Department to regularly update the OIG on the construction status. As previously reported, the Department installed 30 grab bars and 30 shower benches throughout CRDF and MCJ, and in TTCF module 272. In order to achieve compliance with this provision, a physical-plant expert must evaluate and determine that all installations meet ADA requirements.

As reported in the *Eighth Implementation Status Report*, on April 10, 2023, Defendants retained Michael P. Gibbens[36] to serve as the new physical-plant expert and assist the OIG and the Parties in evaluating compliance with provisions C.4(f) (Additional Grab Bars and Shower Benches) and C.4(g) (Construction of Accessible Beds).[37] The physical-plant expert completed on-site evaluations of MCJ, TTCF, and CRDF on April 24 and 25, 2023. It has been over two years since the evaluations were conducted and the OIG and the Parties still have not received

---

[36] Michael P. Gibbens, CASP, ICC, ACE, ACD, is a nationally recognized author, instructor and consultant on the interpretive and technical aspects of disabled accessibility compliance in commercial and residential applications for both public and private sectors.

[37] As reported in the *Inspector General's Fifth Implementation Status Report*, on September 5, 2019, Defendants retained a physical-plant expert to evaluate all installations and modifications. On November 9, 2019, the physical plant expert conducted an on-site evaluation at CRDF and issued a report with findings and recommendations; however, due to unforeseen circumstances, the physical-plant expert was unable to complete the remaining on-site evaluations of MCJ and TTCF. Although the previous expert evaluation CRDF and issued a report, the recommended modifications required extensive construction. Defendants are requesting that the new physical-plant expert re-evaluate CRDF to determine whether any alternative solutions are available to meet ADA requirements.

INSPECTOR GENERAL'S NINTH
IMPLEMENTATION STATUS
REPORT                    -30-                    CV 08-03515 DDP

the expert's report.[38] Because it is necessary to have the expert's report on the physical-plant evaluation to achieve compliance with this provision, Defendants must do one of the following: (1) provide the completed evaluation to the Parties and the Court by May 30, 2025,[39] (2) provide a timeline for when the evaluation report will be finalized and explain the reason for the delay, or (3) retain a new physical-plant expert and provide an estimated timeline for the completion of the evaluation by the newly retained expert. Defendants remain in partial compliance with this provision.

**Provision C.4(g) – Construction of Accessible Beds – Partial Compliance**

Under subsection (g) of paragraph 4 of section C of the Agreement, "Defendants are required to construct approximately ninety-six (96) accessible beds at TTCF module 272." The compliance measure for this provision requires the Department to regularly update the OIG on the construction status. As previously reported, the Department completed construction of the 96 beds at TTCF module 272 on May 30, 2017, and began populating the housing unit with Class Members on June 8, 2017. The Department continues to house Class

---

[38] Over the past two years, the OIG has requested several updates from Defendants' counsel regarding the status of the physical-plant expert's report. Email communications were sent on January 16, 2024, February 13, 2024, May 30, 2024, August 1, 2024, and February 21, 2025. No explanation for the delay has been provided.

[39] This date was chosen as it is the date the settlement term was set to expire. The Parties jointly agreed to extend the term for another year. Asking for the information by the end of the current term seems reasonable.

INSPECTOR GENERAL'S NINTH
IMPLEMENTATION STATUS
REPORT

-31-

CV 08-03515 DDP

Members in TTCF module 272.

The Department provided documentation that all 96 beds in the housing module meet ADA requirements. However, the accompanying toilet and shower modifications have not yet been ADA certified. In order to achieve substantial compliance with this provision, a physical-plant expert must conduct an evaluation and determine that all modifications to the toilet and shower areas used by the occupants of the 96 beds comply with ADA requirements.

The physical-plant expert conducted the required evaluation at TTCF on April 24, 2023. As discussed above under provision C.4(f) (Additional Grab Bars and Shower Benches), the OIG and the Parties are still awaiting the expert's report. Because it is necessary to have the expert's report on the physical-plant evaluation to achieve compliance with this provision, Defendants must do one or the following: (1) provide the completed evaluation to the Parties and the Court by May 30, 2025, (2) provide a timeline for when the evaluation report will be finalized and explain the reason for the delay, or (3) retain a new physical-plant expert and provide an estimated timeline for the completion of the evaluation by the newly retained expert. Defendants remain in partial compliance with this provision.

INSPECTOR GENERAL'S NINTH        -32-
IMPLEMENTATION STATUS
REPORT

**SECTION G – Grievance Form**

**Provision G.2 – "ADA" Designation of ADA Grievances – Partial Compliance**

Under paragraph 2 of section G of the Agreement, "[a]ll grievances involving mobility assistive devices and the physical accessibility of the Jail shall be designated 'ADA' grievances even if the inmate who filed the grievance did not check the 'ADA' box." The corresponding compliance measures require LASD and CHS to promulgate policy consistent with the provision, to provide a list of ADA-related grievances for a one-month period selected by the OIG, and to show that those grievances were properly designated "ADA" grievances. The population of "ADA-related grievances" includes grievances on which the person in custody marked the ADA box or used any of the predetermined search terms.[40]

As previously reported, LASD created several policies related to this provision, including the *Johnson* policy and CDM section 8-03/030.00, "ADA-Related Requests and Grievances." For this reporting period, the OIG selected the period of July 2024. In order to achieve substantial compliance, 90% of ADA-related grievances identified must be properly designated as "ADA." The Department and CHS utilize a categorization system within the Custody Inmate

_____

[40] The predetermined search terms include the following: ADA, mobility, accommodation, wheelchair, crutch, prosthetic, cane, wheel, chair, disability, grab bars, accessible showers, accessible toilet, shower benches, lower bunk, brakes, footrests, prosthesis, walker, crutches, armrest, personal wheelchair, orthopedic shoes, and secondary review.

Grievance Application ("CIGA") to designate grievances. Department personnel resolve ADA-related custody grievances and CHS personnel resolve ADA-related medical grievances.

On January 22, 2025, the Department provided the OIG with a self-assessment indicating that it had achieved substantial compliance with this provision. The self-assessment indicates that a total of 55 grievances containing one or more of the predetermined search terms were identified in CIGA for July 2024. Of the 55 grievances, 10 were deemed to be ADA-related grievances. The self-assessment indicates that 9 of the 10 ADA-related grievances were designated properly. However, none of the ADA-related grievances were actually designated as "ADA." Of the 10 grievances, 1 was designated as "Living Conditions," and the remaining 9 were designated as "Medical Services (Including ADA)."

Moreover, the Department's self-assessment was based on a flawed data query that produced incomplete data. In order to replicate and verify the information contained in the self-assessment, the OIG manually queried and reviewed CIGA data from July 2024 and identified 16 additional grievances that should have been reported in the self-assessment, increasing the total population of ADA-related grievances to 26. Of the 26 grievances, 11 (42%) were designated as "ADA." The remaining 15 were designated as "Living Conditions," "Medical Services (Including ADA)," or "Health Service Request."

CV 08-03515 DDP

INSPECTOR GENERAL'S NINTH          -34-
IMPLEMENTATION STATUS
REPORT

The OIG also identified a separate process-related issue that impacts the accuracy of the self-assessment. Custody and medical grievance team staff are responsible for inputting information from grievance forms into CIGA. This includes transcribing the contents of the grievance narrative into the synopsis section of CIGA. The efficacy of the query to identify the predetermined search terms largely depends on the accuracy of the transcription. Inconsistencies, misspellings, and incomplete entries directly impact the ability to identify ADA-related grievances.

In March 2025, the OIG shared these findings and concerns with the Department. The Department acknowledged that the 16 grievances should have been identified and reported in the self-assessment. The Department indicated a system glitch prevented certain facility-related subcategories from being captured during the query, and efforts are underway to resolve the issue.

As previously reported, LASD's grievance policy requires staff to designate each grievance into only one category and requires that certain categories be prioritized over others. According to the policy, a grievance against staff is a category that must be prioritized. For example, if a Class Member submits an ADA-related complaint regarding a mobility assistive device that involves a grievance against staff, it must be designated as a grievance against staff and not as ADA. This directly conflicts with the requirements set forth in provision G.2

("ADA" Designation of ADA Grievances). The Department has since added the option to split such grievances in CIGA. Doing so will generate two separate grievances with the same underlying data so the grievance against staff component can be handled on one complaint, and the ADA component can be handled on the second linked complaint. None of the ADA-related grievances from July 2024 utilized the split function so the OIG was unable to determine whether this process works as intended.

As previously reported, in November 2020, CHS discontinued the use of the "ADA (Medical)" designation and began to utilize a designation titled "Medical Services (including ADA)" for all medical grievances, including ADA-related medical grievances. Designating ADA-related medical grievances as "Medical Services (including ADA)" along with all other medical grievances circumvents the terms of this provision and violates the terms of provision G.4 ("ADA" Grievances Not Designated as "Basic" Grievances).[41] The OIG has consistently reported on this issue since the *Inspector General's Sixth Implementation Status Report* ("*Sixth Implementation Status Report*").

Despite the methodological concerns discussed above, the Department has

---

[41] Provision G.4 ("ADA" Grievances Not Designated as "Basic" Grievances) states, "ADA grievances will not be designated as 'basic' grievances." This provision was found in sustained compliance on January 15, 2019, and was severed from the Agreement on May 9, 2019.

made notable efforts to modify systems and processes to achieve compliance with this provision. Despite this, CHS continues to designate ADA-related grievances incorrectly, hampering any progress achieved by the Department. In order to achieve substantial compliance, the Department and CHS must properly designate ADA-related custody grievances and ADA-related medical grievances regardless of whether the person in custody checked the "ADA" box consistent with the terms of the Agreement. Defendants remain in partial compliance.

**Provision G.3 – Grievance Response Time – Partial Compliance**

Under paragraph 3 of section G of the Agreement, "[t]he response time for ADA grievances will be no more than that allowed under the standard grievance policy." The corresponding compliance measures require that LASD promulgate policy consistent with this provision and to provide a list of ADA-related grievances for a one-month period selected by the OIG. The population of "ADA-related grievances" includes grievances on which the person in custody marked the ADA box or used any of the predetermined search terms.[42] In order to achieve substantial compliance, 90% of the grievances must be responded to within 15 days. The OIG selected the period of September 2024.

---

[42] The predetermined search terms include the following: ADA, mobility, accommodation, wheelchair, crutch, prosthetic, cane, wheel, chair, disability, grab bars, accessible showers, accessible toilet, shower benches, lower bunk, brakes, footrests, prosthesis, walker, crutches, armrest, personal wheelchair, orthopedic shoes, and secondary review.

INSPECTOR GENERAL'S NINTH IMPLEMENTATION STATUS REPORT

-37-

CV 08-03515 DDP

As previously reported, the Department created policies consistent with this provision, including CDM section 8-03/005.00, "Inmate Grievances," CDM section 8-03/030.00, "ADA-related Requests and Grievances," and CDM section 8-04/040.00, "Time Frames." These policies require a response time of 15 days for all non-emergency ADA grievances and 5 days for emergency grievances. CHS policy M12.04, "Grievances – Health Care and Against Staff," requires that all medical grievances be analyzed within 24 hours to determine whether there is an urgent or emergent medical condition that requires immediate attention. If not, the response timeframe for medical grievances is 15 days, as with Department policy. CHS reports that a grievance is considered to have been "responded to" within the appropriate 15-day timeframe when a supervising nurse reviews the grievance and makes a referral for a provider evaluation.

On January 22, 2025, the Department provided the OIG with a self-assessment indicating that it had achieved substantial compliance with this provision. The self-assessment indicates that a total of 86 grievances containing one or more of the predetermined search terms were identified in CIGA for September 2024. Of the 86 grievances, 28 were deemed to be ADA-related grievances. The Department excluded the remaining 58 records based on the determination that all 58 "did not pertain to ADA issues." The self-assessment concludes that 26 of the 28 (93%) grievances were responded to within the

required 15-day timeframe.

The OIG reviewed all 26 grievances that were marked as compliant and determined that there was no response to 1 of these grievances within the required 15-day timeframe. The grievance was originally submitted to the Department by the American Civil Liberties Union ("ACLU") on May 28, 2024. The Department provided the ACLU with a disposition on June 11, 2024. Later that day, the ACLU notified the Department that the disposition failed to adequately address the grievance and requested that the Department resubmit the grievance for proper handling. On September 11, 2024, the ACLU requested a status update on the grievance since it had not received an updated disposition. The self-assessment indicates that the disposition was completed on September 27, 2024.

The self-assessment reflects that this grievance was received on September 25, 2024.[43] This is not accurate. As noted above, the ACLU originally submitted this grievance on May 28, 2024, and resubmitted it on June 11, 2024. When accounting for these dates, the Department is well outside of the 15-day timeframe for resolving this grievance. For the grievances identified by the Department in its self-assessment, the Department only responded timely to 25 of the 28 grievances

---

[43] In reviewing CIGA, it appears as though a new grievance was created on September 25, 2024, and designated as "Medical services (including ADA)." The grievance was assigned to CHS staff on December 3, 2024, and the disposition was updated on December 4, 2024.

INSPECTOR GENERAL'S NINTH        -39-                    CV 08-03515 DDP
IMPLEMENTATION STATUS
REPORT

(89%), meaning the compliance rating fell just below the 90% compliance standard.

Furthermore, the same methodological concerns discussed under G.2 ("ADA" Designation of ADA Grievances) above exist for G.3 (Grievance Response Time). The OIG manually queried and reviewed C IGA data from September 2024 and identified 9 additional grievances that should have been reported in the self-assessment, increasing the total population of ADA-related grievances to 37. Although all 9 grievances reflected that they were responded to within the 15-day timeframe, the OIG identified concerns with the way in which some of these grievances were addressed. Eight of the nine grievances were originally submitted on a grievance form by a Class Member but were deemed to be an "inappropriate use of the form" and redesignated as a Health Service Request ("HSR").[44] ADA Coordinators, who are responsible for addressing ADA-related custody grievances, are unable to access HSRs in CIGA. As a result, any custody-related component of the grievance is not accounted for in CIGA and has the potential to go unaddressed even though the medical-related component is responded to within the 15-day timeframe. An ADA-related grievance cannot be

[44] The concerns regarding the redesignation of grievances to HSRs were identified during the OIG's review of provision G.3 (Grievance Response Time). However, it is important to note that these concerns may also impact compliance with provision G.2 ("ADA" Designation of ADA Grievances).

INSPECTOR GENERAL'S NINTH          -40-
IMPLEMENTATION STATUS
REPORT

CV 08-03515 DDP

considered "responded to" until and unless all components of the grievance are addressed. Additionally, the Class Member does not receive a disposition when a grievance is redesignated to an HSR. The OIG reviewed the eight grievances that were redesignated and found that the following two had a custody-related component that went unanswered:

- Grievance 1: The grievant reported that they fell off the top bunk, sustaining injuries, and that they need a cane. The grievant also reported having submitted several grievances and custody request and HSR forms that went unanswered. Although the grievant was referred for a provider evaluation, there was no indication that custody staff investigated the reported fall or the outstanding grievances/requests, or responded to the grievance.

- Grievance 2: The grievant reported that their cane was taken away by custody personnel despite having a medical order for one. Although the grievant was referred for a provider evaluation, there was no indication that custody personnel investigated whether the cane was taken appropriately or if staff responded to the grievance.

When accounting for these grievances, the Department achieves a compliance rate

of 86%.[45]

Since the development of the compliance measures, there has been a significant evolution in the way ADA-related grievances are processed and handled. As such, the Department should refine the process of identifying ADA-related grievances to ensure they are all captured in accordance with the compliance measures for provisions G.2 ("ADA" Designation of ADA Grievances) and G.3 (Grievance Response Time). Defendants remain in partial compliance.

**SECTION H – Accommodations**

**Provision H.1 – Reasonable Accommodations – Partial Compliance**

Under paragraph 1 of section H of the Agreement,

"Defendants agree that Class Members shall receive reasonable accommodations when they request them and as prescribed by LASD medical professionals. Accommodations may include but are not limited to: assignment to lower bunks; changes of clothing; extra blankets; allowance of extra time to respond to visitor calls and attorney visits; shower benches; assistive device to travel outside of a housing

---

[45] When accounting for the 9 additional grievances that were identified, the total number of ADA-related grievances for the month of September 2024 increases to 37. Of the 37 grievances, the OIG determined that 32 (86%) were responded to within the 15-day timeframe.

module; and assignment to a cell with accessible features." As previously reported, the *Johnson* policy includes language consistent with the terms of this provision.

The primary method for Class Members to request a reasonable accommodation is by submitting a grievance, custody request, or HSR form. The OIG reviewed the availability of these forms at MCJ and found that many Class Member housing locations did not have forms readily available in the designated bins, which impedes Class Members' ability to request reasonable accommodations. On March 28, 2025, OIG staff inspected 76 grievance bins throughout MCJ where Class Members are housed to determine whether grievance, custody request, or HSR forms were available.[46] Of the 76 bins, 50 did not contain any forms, and only 5 contained all 3 forms. The remaining 21 bins were missing at least 1 of the 3 required forms. In addition, Class Members reported that when they request forms from custody staff, they are oftentimes advised that forms are not available or that staff would return with a form, but rarely do.

Egg Crate Mattress Topper

As reported in the *Sixth Implementation Status Report,* LASD leadership agreed to issue an egg crate mattress topper to every Class Member, regardless of

---

[46] OIG staff inspected bins located on the 2000, 3000, 5000, 7000, 8000, and 9000 floor.

INSPECTOR GENERAL'S NINTH          -43-
IMPLEMENTATION STATUS
REPORT

CV 08-03515 DDP

whether they had a prescription. On September 1, 2021, the Department distributed an Informational Bulletin to staff that provides guidance on issuing and maintaining egg crate mattress toppers for all Class Members. The OIG, through site visits and interviews, found that the vast majority of Class Members who were housed on the 7000 and 8000 floors of MCJ, within modules 232 and 272 of TTCF, and throughout CRDF, had received egg crate mattress toppers. By contrast, almost no Class Members housed outside of those areas had received egg crate mattress toppers.

In speaking with Department personnel regarding the provision of egg crate mattress toppers, it became apparent that they required additional training. Some personnel reported they were instructed not to provide egg crate mattress toppers to anyone outside of the 7000 and 8000 floors of MCJ due to safety concerns. Others reported the incorrect belief that Class Members require a prescription to receive an egg crate mattress topper or that CHS staff is responsible for providing egg crate mattress toppers. The Department should provide additional training to all custody personnel regarding the requirement to distribute egg crate mattress toppers to all Class Members, regardless of their housing assignment, and ensure

CV 08-03515 DDP

INSPECTOR GENERAL'S NINTH            -44-
IMPLEMENTATION STATUS
REPORT

that adequate supplies are available for distribution.[47]

Physical Accessibility Issues at MCJ and TTCF

In speaking with Class Members housed in those non-ADA housing areas, it became apparent that the Department did not consider Class Members' needs when expanding the number of housing locations, resulting in undue hardship and unsafe conditions. For example, most showers in non-ADA housing areas of MCJ and TTCF lack grab bars and shower benches. As a result, many Class Members who are housed in those areas reported difficulties with steadying themselves while showering. In addition, Class Members who cannot stand for long periods of time or who need to sit while showering reported having to use plastic chairs that are not intended for use in a shower, significantly increasing the risk of injuries.[48]

Class Members housed in non-ADA housing areas of MCJ also reported difficulties with entering and exiting the shower areas due to the presence of a raised threshold at the bottom of the entrance designed to keep water in the shower basin. OIG staff inspected shower areas in several non-ADA housing areas and

---

[47] CHS should consider providing additional training to staff regarding the distribution of egg crate mattress toppers. Although custody is responsible for distributing egg crate mattress toppers, the OIG's review of medical records revealed that some medical staff do not have a clear understanding of who is responsible for distributing egg crate mattress toppers or the Department's commitment to providing egg crate mattress toppers to all Class Members, regardless of whether they have a prescription.

[48] The Department indicated that it is in the process of identifying ADA-compliant shower chairs or benches to purchase for use in Class Member housing areas.

INSPECTOR GENERAL'S NINTH IMPLEMENTATION STATUS REPORT

-45-

CV 08-03515 DDP

confirmed the presence of raised thresholds, many of which are high enough to present significant challenges to those with mobility impairments.

Class Members housed in ADA housing areas of MCJ also reported facing architectural barriers. OIG staff encountered Class Members with wheelchairs and other mobility assistive devices who were housed in cells or dorms without grab bars next to the toilet. Although there are dedicated ADA showers with grab bars and shower benches located on the 7000 and 8000 floors, Class Members indicate that Department personnel do not always provide them with the opportunity to use the ADA showers.

OIG staff spoke with four Class Members at MCJ who reported slipping and falling while showering due to a lack of accessible features.[49] All four Class Members reported having to use non-accessible showers due to custody staff not always providing them with the opportunity to use the ADA showers. OIG staff reviewed medical records and identified documentation reflecting that two of the four Class Members reported the slip-and-fall injury to medical staff and received medical treatment.[50]

---

[49] Of the four Class Members who reported slip-and-fall shower injuries, two were housed on the 8000 floor, one was housed on the 7000 floor, and one was housed on the 2000 floor.

[50] It is important to note the OIG does not discredit the information from Class Members on the basis that the injury was not reported to medical staff.

INSPECTOR GENERAL'S NINTH IMPLEMENTATION STATUS REPORT

-46-

CV 08-03515 DDP

Lower Bunk Assignment

OIG staff spoke with four Class Members who reported being assigned to a middle or top bunk despite needing a lower bunk. These Class Members expressed difficulties with getting into and out of their bunk because of their mobility impairment.

Classification Codes and Mobility Assistive Device

During site visits, the OIG encountered several Class Members who had a classification code for a mobility assistive device, but did not have their prescribed device(s). Some of these Class Members complained that they have difficulty ambulating without their prescribed mobility assistive device. The OIG spoke with 27 Class Members who reported not having received their prescribed device. OIG staff reviewed medical records for all 27 Class Members and confirmed that 11 had active medical orders for the device they reported not having received at the time they spoke with OIG staff.

The OIG also encountered several Class Members who had a mobility assistive device but were not assigned with the corresponding classification code. In speaking with medical and custody staff regarding this concern, the OIG learned that prescriptions for mobility assistive devices are not actively monitored, resulting in delays in the removal of devices once prescriptions expire and secondary review options are exhausted. Medical and custody staff explained there

is no established process for removing devices from Class Members, or clarity as to who is responsible for doing so, further indicating the lack of collaboration or cooperation between the Department and CHS.

Relatedly, mobility assistive devices are not consistently accounted for. The OIG spoke with a Class Member at MCJ who was housed with three other people in a dorm. There was only one Class Member in this dorm but there were two wheelchairs, three walkers, and a cane. The unaccounted-for mobility devices throughout facilities could contribute to the delay in Class Members receiving their mobility assistive devices. In addition, devices that are not properly inventoried or monitored once they are no longer medically necessary present jail safety and security concerns.

Lastly, the OIG encountered several Class Members whose wristbands do not match their classification. Some of these Class Members expressed concern as to whether their mobility assistive device would be confiscated because of the delay in receiving their wristband with the appropriate classification. Class Members also complained that, at times, custody staff do not abide by the mobility assistive device orders on file or are unaware that they exist. For example, some Class Members report that they require a wheelchair for long distances and for transportation to court but were not provided with the device due to inaccurate wristbands or delays in the classification process.

CV 08-03515 DDP

INSPECTOR GENERAL'S NINTH        -48-
IMPLEMENTATION STATUS
REPORT

<u>Boarding and Disembarking Transportation Bus</u>

Class Members with mobility assistive devices other than wheelchairs expressed difficulties with boarding and disembarking the Department's buses during transport to and from the jails.[51] Depending on the type of bus, boarding requires climbing up at least five, and up to seven, steps and walking down a narrow aisle. Class Members reported that their mobility assistive devices are taken from them when boarding the bus, oftentimes one or both of their hands remain chained to another person, and that no accommodation is provided such as uncuffing one of their hands to help with stability. As a result, Class Members reported struggling to climb the stairs and steady themselves while boarding the bus, as well as struggling to walk down the aisle without adequate support. Additionally, five Class Members reported falling while boarding the bus. OIG staff reviewed medical records and identified documentation reflecting that one of the five Class Members reported the fall to medical staff and received medical treatment.

Of particular concern, Class Members with significant mobility limitations or disabilities that result in severe pain at times are faced with the untenable

---

[51] Pursuant to provision K.1 (Transportation in Accessible Vans), which has since been found in sustained compliance and severed from the Agreement, the Department is required to transport Class Members who use wheelchairs in ADA accessible vans.

INSPECTOR GENERAL'S NINTH        -49-
IMPLEMENTATION STATUS
REPORT

CV 08-03515 DDP

decision to risk their safety and board the bus or miss their court hearing. Class Members report that it is commonly understood that the Department will deem them as a "court refusal" and report this to the courts despite the refusal being due to their inability to board the bus safely.[52]

Traveling to and from Housing Locations

During this reporting period, several Class Members reported having issues traveling to and from their housing locations. For example, Class Members who are housed on the 5000 floor of MCJ must descend approximately 60 stairs on narrow escalators that are regularly out of service to get to the bus bays to attend court, and must ascend the same escalator stairs to return to their housing location. Several Class Members reported declining yard time and, in some cases, medical appointments, due to the inoperable escalators. Compounding the difficulty of traveling within the facilities, some Class Members reported being rushed by custody personnel when leaving or returning to their assigned housing. One Class Member reported tripping and falling on the escalators while going to court. OIG staff reviewed medical records and identified documentation reflecting that the Class Member reported the fall to medical staff and received medical treatment.

---

[52] The OIG met with Department and CHS leadership and counsel for Defendants on August 2, 2023, and August 16, 2023, to discuss these concerns. The Department reported that it would conduct an inquiry and work closely with CHS to ensure that Class Members receive appropriate accommodations. Despite the Department's commitments, the OIG continues to receive complaints from Class Members regarding transportation.

INSPECTOR GENERAL'S NINTH IMPLEMENTATION STATUS REPORT          -50-          CV 08-03515 DDP

Similarly, Class Members at CRDF who were housed on the second and third floor of the East Tower reported issues with traveling to and from their housing locations due to the elevators being out of service. As a result, Class Members were faced with the difficult decision to risk their safety and use the stairs or forgo leaving their housing locations. The Department started using the visiting elevator as an alternative to using the stairs; however, using the visiting elevator posed a security risk since they are located outside of the secured area of the facility. As a result, the facility is placed on modified lockdown each time a Class Member who is unable to use the stairs needs to travel outside of their housing location, severely disrupting operations. Furthermore, the Department reported that from May to October 2024, the visiting elevator had been inoperable at least nine times, leaving Class Members with little to no options.

The Department has since relocated most Class Members who were housed on the second and third floor of the East Tower. Additionally, the Department ordered a stair lift chair to help with transporting Class Members up and down the stairs when necessary. The Department reported that phase 1 of the elevator repair project commenced December 9, 2024, and is scheduled to be completed on May 16, 2025.

The OIG spoke with personnel from PMB, the unit responsible for classifying and housing the population within the jails, regarding the process for

housing for Class Members. PMB personnel reported that they rely on information provided by medical staff when determining housing for Class Members. However, this information is typically limited to mobility assistive device, bunk assignment, and long-distance transport orders for mobility-related needs. As a result, PMB does not generally consider other important factors such as a Class Member's need for grab bars or a shower bench or a Class Member's ability to ascend and descend stairs. In fact, PMB personnel reported that they do not have a list of cells with accessible features such as grab bars.

In the *Eighth Implementation Status Report*, the OIG recommended that the Department, in collaboration with CHS, conduct a comprehensive assessment of its Class Member population to ensure that all Class Members are housed in appropriate areas of the jails and receive all required accommodations. The OIG reasserts the urgent need to implement this recommendation, especially since many Class Members continue to face architectural barriers that present unsafe conditions.

In order to achieve compliance, the Department needs to address each of the aforementioned concerns: (1) providing egg crate mattress toppers, (2) ensuring physical accessibility of showers and toilets, (3) ensuring lower bunk assignments, (4) ensuring proper classification codes and that the code is designated properly on wristbands, (5) ensuring access to transportation including ensuring that Class

INSPECTOR GENERAL'S NINTH         -52-
IMPLEMENTATION STATUS
REPORT

CV 08-03515 DDP

members are able to get to the bus bays and are able to board the bus, and (6) providing alternatives to stair use for Class Members who cannot safely navigate stairs. The Department, in collaboration with CHS, should conduct a comprehensive assessment of its Class Member population to ensure that all Class Members are housed in appropriate areas of the jails and are receiving appropriate accommodations in accordance with the terms of the Agreement. Defendants remain in partial compliance with this provision.

**APPENDIX**

| DEFENDANTS' *JOHNSON* COMPLIANCE STATUS | | |
|---|---|---|
| **PROVISION** | **DESCRIPTION** | **COMPLIANCE RATING** |
| | **Programming** | |
| A.1 | Access to Programming | Severed |
| A.2 | Non-Disqualification from Programming | Severed |
| A.3 | Escorts to Programming | Severed |
| A.5(a) | Class Members Serve as Trustys on Same Floor | Severed |
| A.5(b) | Trusty Tasks | Severed |
| A.5(c) | Identify Jobs | Severed |
| A.6 | Notification of Available Programs | Severed |
| A.7 | Notification in Town Hall Meetings | Partial Compliance |
| | **Physical Therapy and Outdoor Recreation** | |
| B.1(a) | Access to Physical Therapy | Severed |
| B.1(b) | Maintenance of Physical Therapy Room | Severed |
| B.1(c) | Physical Therapy Availability | Severed |
| B.2 | Outdoor Recreation Time | Severed |
| B.3 | Rotation of Outdoor Recreation Time | Severed |
| B.4 | Thermal Clothing | Substantial Compliance |
| | **Physical Accessibility** | |
| C.4(a) | Housing Expansion for Class Members – Phase 1 | Severed |
| C.4(b) | Housing Expansion for Class Members – Phase 2 | Severed |
| C.4(c) | Housing Expansion for Class Members – Phase 3 | Severed |
| C.4(d) | Housing Expansion for Class Members – Phase 4 | Severed |
| C.4(e) | Housing Expansion for Class Members – Phase 5 | Severed |
| C.4(f) | Additional Grab Bars and Shower Benches | Partial Compliance |
| C.4(g) | Construction of Accessible Beds | Partial Compliance |
| C.5 | Review of ADA Construction Plans | Severed |
| | **Use of Mobility Devices** | |
| D.1 | Initial Decisions and Ongoing Evaluations | Sustained Compliance |
| D.2 | Secondary Reviews | Sustained Compliance |
| D.3 | Assistive Device Leaflet | Severed |
| D.4 | Tracking Complications | Sustained Compliance |
| D.5 | Wheelchair Seating Training | Severed |
| D.6 | Publishing Guidelines for Tracking Complications | Severed |
| | **Wheelchairs and Prostheses** | |
| E.1(a) | Wheelchair Maintenance | Severed |
| E.1(b) | Maintenance of the Wheelchair Repair Shop | Severed |
| E.1(c) | Installing RFID Transmitters | Severed |

| PROVISION | DESCRIPTION | COMPLIANCE RATING |
|---|---|---|
| E.1(d) | Wheelchairs with Moveable Armrests | Severed |
| E.2 | Return of Personal Wheelchairs | Severed |
| E.3 | Assistive Device Policy | Severed |
| E.4 | Return of Prostheses within 24 Hours | Severed |
| | **ADA Coordinators** | |
| F.1 | ADA Duties | Sustained Compliance |
| F.2 | ADA Coordinator Authority | Severed |
| F.3 | Training ADA Coordinators | Severed |
| | **Grievance Form** | |
| G.1 | Grievance Form | Severed |
| G.2 | "ADA" Designation of ADA Grievances | Partial Compliance |
| G.3 | Grievance Response Time | Partial Compliance |
| G.4 | ADA Grievances Designation | Severed |
| G.5 | ADA Grievance Maintenance | Severed |
| | **Accommodations** | |
| H.1 | Reasonable Accommodations | Partial Compliance |
| H.2 | Accessibility of Medical Orders | Severed |
| H.3 | Tracking Mobility Assistive Device Requests | Severed |
| | **Notification of Rights** | |
| I.1 | Notification of Rights | Severed |
| | **Training** | |
| J.1 | Training | Severed |
| | **Transportation** | |
| K.1 | Transportation in Accessible Vans | Severed |

CV 08-03515 DDP

INSPECTOR GENERAL'S NINTH    -55-
IMPLEMENTATION STATUS
REPORT