ERIC BATES
Interim Inspector General, Bar No. 170444
DARA WILLIAMS
Chief Deputy, Inspector General, Bar No. 130387
InspectorGeneral@oig.lacounty.gov
OFFICE OF INSPECTOR GENERAL
312 South Hill Street, 3rd Floor
Los Angeles, California 90013
Telephone: (213) 974-6100; Fax: (213) 974-9346

**Monitors**

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER JOHNSON, DONALD PETERSON and MICHAEL CURFMAN, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, a public entity; ROBERT LUNA, as Sheriff of County of Los Angeles, and COUNTY OF LOS ANGELES, a public entity,<br><br>Defendants. | CASE NO. 2:08-cv-03515-MWF-Ex<br><br>**INSPECTOR GENERAL'S TENTH IMPLEMENTATION STATUS REPORT** |

Pursuant to section V, subsection M, of the Settlement Agreement ("Agreement"), the Los Angeles County Office of Inspector General ("OIG"), the Monitor appointed by this Court, submits the attached *Inspector General's Tenth Implementation Status Report* ("Report") evaluating Defendants' compliance with the terms of the Agreement. This report was prepared by the OIG to provide "reasonable and regular reports" to Plaintiffs and Defendants (collectively referred to as the "Parties") and the Court. This is the tenth report on the implementation status of the Agreement. The OIG is available to answer any questions the Court may have regarding this Report and Defendants' compliance with the Agreement.

Dated: March 31, 2026                    Respectfully submitted,

By: _____
Dara Williams
Chief Deputy, Inspector General

2:08-cv-03515-MWF-Ex

INSPECTOR GENERAL'S TENTH          -2-
IMPLEMENTATION STATUS
REPORT

# INSPECTOR GENERAL'S TENTH IMPLEMENTATION

# STATUS REPORT

The Agreement in the above-captioned case provides that the OIG will prepare and submit periodic reports to the Parties and the Court that evaluate Defendants' compliance with the Agreement, which went into effect on April 22, 2015. Defendants have agreed to implement system-wide reform of the conditions of confinement for Class Members within Los Angeles County jails. The Agreement defines Class Members as "all present and future detainees and inmates with mobility impairments who, because of their disabilities, need appropriate accommodations, modifications, services and/or physical access in accordance with federal and state disabilities law." Docket No. 210.2 at 3. The terms of the Agreement apply to any "jail facility used to permanently house inmates with mobility impairments," which is presently Men's Central Jail ("MCJ"), Twin Towers Correctional Facility ("TTCF"), and Century Regional Detention Facility ("CRDF").[1] *Id*. This Report takes into account all data collected and analyzed, and observations made from April 1, 2025, to March 31, 2026.

---

[1] At the time the Agreement was executed, only MCJ and TTCF were used to permanently house Class Members. In 2017, women with mobility impairments were transferred from TTCF to CRDF, where they continue to be housed permanently. As such, CRDF is subject to the terms of the Agreement, which defines the term "Jail" or "Jail Settings" to include any "jail facility used to permanently house inmates with mobility issues." As is clear from this language, the identification of the two facilities that housed inmates with mobility impairments at the time of the Agreement was not intended to limit compliance with the Agreement to only MCJ and TTCF.

INSPECTOR GENERAL'S TENTH IMPLEMENTATION STATUS REPORT

-3-

2:08-cv-03515-MWF-Ex

<u>Background</u>

On August 24, 2016, the Parties agreed on compliance measures to serve as a guideline for implementing the terms of the Agreement and to establish the Agreement's minimum compliance standards. The measures were written based on the Los Angeles County Sheriff's Department's (the "Department" or "LASD") expectations about policies, procedures, practices, and systems that it intended to implement to ensure compliance with the terms of the Agreement. Where necessary to serve the interests of Class Members and the Department, and to promote effective implementation of the Agreement, the OIG will consider alternative evidence as proof of compliance. Precisely how the Department proves compliance with each provision is less important than whether each provision is effectively and durably implemented. Though the OIG is not rigid in its consideration of the types of evidence that support compliance, all evidence submitted must be verifiable, replicable, and sufficient to make a compliance determination.

The Department's Custody Compliance and Sustainability Bureau ("CCSB") is responsible for preparing self-assessments and coordinating any additional documentation as requested by the OIG. Correctional Health Services ("CHS") is responsible for providing medical and mental health services to all people incarcerated in the Los Angeles County jails, including Class Members, and

for coordinating, as necessary, with the Department in providing required accommodations.[2]

The OIG makes a compliance finding for each provision based on the degree to which each provision has been effectively and durably implemented. A *non-compliance* finding means Defendants made no notable progress in achieving compliance with any of the key components of a particular provision. A *partial compliance* finding means Defendants have made notable progress in achieving compliance with the key components of a particular provision. A *substantial compliance* finding means Defendants have successfully met all, or nearly all, of the compliance thresholds for a particular provision. A *sustained compliance* finding means Defendants maintained *substantial compliance* for a period of at least twelve months following the OIG's initial *substantial compliance* finding. Once a provision has achieved *sustained compliance*, the OIG will stop monitoring that provision for purposes of the Agreement.

On June 30, 2016, the Department implemented Custody Division Manual ("CDM") section 5-12/005.10, "Handling of Inmates with Mobility and/or Sensory Impairment." This policy was moved to CDM section 5-03/085.00, "Handling of Inmates with Mobility and/or Sensory Impairments," on December 19, 2022, and

---

[2] In 2015, CHS, an agency within the Los Angeles County Department of Health Services, assumed responsibility from the Los Angeles County Sheriff's Department's Medical Services Bureau for providing medical and mental health care in the jails.

INSPECTOR GENERAL'S TENTH IMPLEMENTATION STATUS REPORT

-5-

2:08-cv-03515-MWF-Ex

updated in September 2023. Unless otherwise noted, references to the "*Johnson* policy" pertain to this CDM section.

Pursuant to stipulation of the Parties, the Court has severed 38 of the 49 provisions from the Agreement that have either achieved *sustained compliance* or were documented as "completed" during settlement negotiations and are no longer subject to monitoring by the OIG.[3] *See* Docket Nos. 237, 248, 256. Four additional provisions have achieved *sustained compliance* but have not been severed from the Agreement.[4] *See* Docket Nos. 259, 269. As such, the OIG will only issue findings on the remaining seven provisions.

Current Status

As reported in the *Ninth Implementation Status Report*, the Department continues to make strides in improving the conditions for Class Members. While progress has been slow at times, the Department has taken significant steps to address several issues. For example, it has exceeded the requirements set forth under provision B.4 (Thermal Clothing) by implementing a process for distributing thermal clothing to all Class Members, without a prescription, upon arrival to the IRC and CRDF Reception Center. Another example, is the

---

[3] The 38 severed provisions include A.1, A.2, A.3, A.5(a), A.5(b), A.5(c), A.6, B.1(a), B.1(b), B.1(c), B.2, B.3, C.4(a), C.4(b), C.4(c), C.4(d), C.4(e), C.5, D.3, D.5, D.6, E.1(a), E.1(b), E.1(c), E.1(d), E.2, E.3, E.4, F.2, F.3, G.1, G.4, G.5, H.2, H.3, I.1, J.1, and K.1. *See* Appendix.
[4] The four sustained provisions include D.1, D.2, D.4, and F.1.

INSPECTOR GENERAL'S TENTH          -6-
IMPLEMENTATION STATUS
REPORT

2:08-cv-03515-MWF-Ex

Department's approach to addressing the requirement in provision G.2 ("ADA" Designation of "ADA" Grievances) that all "ADA" grievances be identified and marked as "ADA." In October 2025, the Department turned to technology, specifically using its digital databases to assist in identifying and marking grievances as required under the provision. Even though the technological update came after this year's self-assessment period, the Department's efforts to find innovative ways to address issues are commendable and the OIG is optimistic this will bring the Department closer to compliance in the coming years.

While the Department has made some notable improvements, historical issues continue to hinder the Department's progress and require serious reforms before the Department can come into compliance with this ten-plus year Agreement. One of the most challenging issues the Department faces is the increase in Class Member population and the locations where the Class Members are housed within the facility. The Department estimated that it had a total of 399 Class Members on February 4, 2025; on December 8, 2025, it estimated that it had a total of 574. This is an approximate 44% increase in Class Members in a span of 10 months, while ADA housing space has remained the same for years.

Due to the lack of ADA housing, the Department has expanded the number of areas where Class Members are housed in MCJ and TTCF without sufficient consideration for the terms of the Agreement, resulting in a myriad of issues. In prior years, Class Members at MCJ were generally housed on the 7000 and 8000 floors and Class Members at TTCF were generally housed in modules 232 and 272 (hereinafter referred to as "ADA housing areas"). Class Members are now housed in several areas throughout those facilities. For example, on January 27, 2026, 213 of the 360 (approximately 59%) Class Members at MCJ were housed in areas outside of the 7000 and 8000 floors and 79 of the 171 (approximately 46%) Class Members at TTCF were housed outside of modules 232 and 272. The vast majority of Class Members who are housed in non-ADA housing areas are prescribed assistive mobility devices other than wheelchairs and require varying types of accommodations that are not always available in non-ADA housing areas.

In its self-assessment, the Department acknowledged the challenges of an increase in Class Member population. Department staff assigned to *Johnson* monitoring reported they are "studying, planning, and budgeting," for an ADA module at CRDF, and expanding the number of ADA-compliant showers and toilets available at MCJ. Currently, both projects are still in the nascent stages of development. While the Department's recognition of this

INSPECTOR GENERAL'S TENTH   -8-
IMPLEMENTATION STATUS
REPORT

issue and attempts to address it are encouraging, the current state of the facilities is not adequate to meet the needs of this population. As discussed under provision H.1 (Reasonable Accommodations), many Class Members in those areas continue to face architectural barriers, which pose safety risks, and are denied accommodations or provided inadequate accommodations. As recommended in the *Eighth and Ninth Implementation Status Reports*, the Department, in addition to planning to expand facilities in CRDF and MCJ, must collaborate with CHS to conduct a comprehensive assessment of its Class Member population to ensure that all Class Members are housed in appropriate areas of the jails and are receiving all required accommodations in accordance with the terms of the Agreement.

Several additional factors continue to impede Defendants' reform efforts. First, the Department is not actively monitoring ongoing compliance with all terms of the Agreement. For example, as discussed under provision A.7 (Notification in Town Hall Meetings), several town hall meeting minutes were missing, or lacked pertinent documentation that could assist in reaching *substantial compliance* with this provision. Second, the Department must take greater care in preparing its self-assessments. For example, the self-assessment for provision A. 7 (Notification in Town Hall Meetings) did not include all Class Member housing locations as identified on the Class Member "Mobility Impaired

Daily Lists." In addition, missing or incomplete town hall meeting minutes did not substantiate whether all Class Members were offered the opportunity to participate in the town halls and that they received notification of available programming. Due to the lack of supporting information, the OIG was unable to verify certain information reported in the self- assessment. The OIG found similar gaps and flaws in methodology when it came to G.3 (Grievance Response Time), where the Department failed to identify which grievances should be handled by custody operations and which should be handled by CHS. These flaws impacted the Department's ability to accurately identify all required data and information pursuant to the compliance measures.

The OIG conducted 56 *Johnson* site visits during this reporting period, which included interviews with Class Members and Department and CHS personnel, as well as compliance spot checks. OIG staff interviewed a total of 251 Class Members housed at MCJ, TTCF, and CRDF for the purpose of determining Defendants' compliance with the remaining provisions.[5] As of March 31, 2026, Defendants have *sustained compliance* with one of the seven remaining provisions. Defendants remain in *partial compliance* with six provisions.[6]

---

[5] Although the daily average population of Class Members fluctuates, 251 Class Members accounted for approximately 43% of the entire Class Member population at the time the interviews were conducted.

[6] The compliance rating for each of the 49 provisions as of March 31, 2026, is set forth in the *Appendix*.

2:08-cv-03515-MWF-Ex

INSPECTOR GENERAL'S TENTH IMPLEMENTATION STATUS REPORT                    -10-

The issues identified during this reporting period make it unlikely that compliance on the remaining issues will be achieved without additional extensions of the settlement term as agreed to by the Parties and approved by this Court. The OIG actively encourages the Department and CHS to collaborate with its *Johnson* monitoring team to discuss obstacles in areas for which compliance has yet to be achieved and develop solutions that meet the requirements set forth in the Agreement while accounting for the complex nature of jail operations.

**IMPLEMENTATION STATUS OF AGREEMENT PROVISIONS**

**SECTION A – Programming**

**Provision A.7 – Notification in Town Hall Meetings – *Partial Compliance***

Under paragraph 7 of section A of the Agreement, "[n]otification of available programs will also be provided during 'town hall' meetings at the Jail where appropriate." The corresponding compliance measures for this provision require the Department to promulgate policy and to provide minutes from town hall meetings for two, one-month periods selected by the OIG. As previously reported, the Department promulgated policy consistent with this provision. CDM section 5-14/005.00, "Town Hall Meetings," provides that "every facility is required to conduct a town hall meeting for each housing area at least once per month." The *Johnson* policy requires Class Members to receive information regarding all available programming during town hall meetings.

INSPECTOR GENERAL'S TENTH        -11-
IMPLEMENTATION STATUS
REPORT

The OIG selected the periods of August and September 2025 for review.

As discussed in the *Ninth Implementation Status Report*, in September 2024, the Department met with the OIG to discuss methods of notifying Class Members of all available programming during town hall meetings. The Department proposed distributing to Class Members during town hall meetings a half-sheet flyer that lists all available programming. The OIG approved of this proposal and reiterated the ongoing expectation that town hall meetings be held in all Class Member housing locations and that information regarding available programming be provided during those meetings.

CCSB Self-Assessment

On December 3, 2025, the Department provided the OIG with a self-assessment indicating that it has achieved *substantial compliance* with this provision.[7] CCSB used "Mobility Impaired Daily Lists" provided by Population Management Bureau ("PMB") to identify Class Member housing locations for the selected periods. CCSB identified 165 housing locations across MCJ, TTCF, and CRDF where Class Members were housed in August and September 2025.

[7] The self-assessment notes that, since January 21, 2025, CCSB conducted a total of 18 facility briefings for newly assigned sergeants, deputies, and custody assistants to reinforce the requirements for conducting and documenting town hall meetings. Additionally, the self-assessment contains 15 staff briefing rosters reflecting that five staff briefings were held in August and September 2025 across MCJ, TTCF, and CRDF.

INSPECTOR GENERAL'S TENTH        -12-        2:08-cv-03515-MWF-Ex
IMPLEMENTATION STATUS
REPORT

Defendants acknowledged four of the 165 locations did not have town hall meeting minutes available.[8]

The OIG reviewed the 43 "Mobility Impaired Daily Lists" that were included in the self-assessment and identified a total of 171 Class Member housing locations for the period of August and September 2025. The OIG notified Defendants of the six additional housing locations that the OIG identified and requested town hall meeting minutes for each of the six locations.[9] Defendants reported that no additional town hall meeting minutes were available. The self-assessment includes a total of 162 town hall meeting minutes.

Class Members at CRDF are housed in various areas throughout the facility. CCSB identified 15 Class Member housing locations for August 2025, and 17 Class Member housing locations for September 2025. For August 2025, CRDF submitted 14 meeting minutes reflecting that town halls were conducted in 13 of the 15 housing locations.[10] Of the 14 meeting minutes, CCSB correctly identified that the meeting minutes from one town hall were deficient due to missing attendee

---

[8] In the self-assessment, the Department acknowledged two missing meeting minutes from CRDF and two missing meeting minutes from TTCF.

[9] The six housing locations identified housed Class Members for at least 30 days and included TTCF modules 211 and 152 and CRDF modules 1200 and 1300.

[10] Based on its review of the "Mobility Impaired Daily Lists," the OIG identified two additional Class Member housing locations at CRDF (modules 1200 and 1300) for August 2025 that were not identified by the Department.

INSPECTOR GENERAL'S TENTH       -13-
IMPLEMENTATION STATUS
REPORT

names and booking numbers.[11] Of the remaining 13 meeting minutes, Defendants submitted two town hall meeting minutes for the same location for August 2025, however, for data integrity purposes OIG excluded one of these meeting minutes for compliance for housing locations reached.[12] Of the remaining 12 meeting minutes, 6 indicated that Class Members were present and that information regarding available programming was provided. For September 2025, CRDF submitted 17 meeting minutes reflecting that town halls were conducted in 17 identified Class Member housing locations.[13] Of the 17 meeting minutes, 14 indicated that Class Members were present and that information regarding available programming was provided.

Class Members at TTCF are housed in several areas throughout the facility. CCSB identified 28 Class Member housing locations for August 2025, and 29 Class Member housing locations for September 2025. For August 2025, TTCF submitted 26 meeting minutes reflecting that town halls were conducted in 26 of the 28 Class Member housing locations.[14] Of the 26 meeting minutes, 20 indicated

[11] CCSB identified the August 24, 2025, CRDF meeting minutes for module 2100, pod 2, as non-compliant.

[12] Town hall meeting minutes included two submissions for the same location conducted on different dates. CRDF module 3400 on August 2, 2025, and August 20, 2025. The meeting minutes for August 20, 2025, were excluded.

[13] Based on its review of the "Mobility Impaired Daily Lists," the OIG identified two additional Class Member housing locations at CRDF (modules 1200 and 1300) for September 2025 which were not identified by the Department.

[14] The Department reported that no town hall meeting minutes were submitted for TTCF module 232, D-pod, and module 272, B-pod.

INSPECTOR GENERAL'S TENTH IMPLEMENTATION STATUS REPORT

-14-

2:08-cv-03515-MWF-Ex

that Class Members were present and that information regarding available programming was provided. For September 2025, TTCF provided 29 meeting minutes reflecting that town halls were conducted in all 29 identified Class Member housing locations.[15] The meeting minutes from one town hall indicated that a town hall was not conducted due to a "scheduling conflict" and two meeting minutes were missing attendee names and booking numbers.[16] Of the remaining 26 meeting minutes, 17 indicated that Class Members were present and that information regarding available programming was provided.

Class Members at MCJ are housed throughout most areas of the facility. CCSB identified 37 Class Member housing locations for August 2025, and 39 Class Member housing locations for September 2025. For August 2025, MCJ submitted 37 meeting minutes reflecting that town halls were conducted in all 37 Class Member housing locations. However, the meeting minutes from one town hall were missing attendee names and booking numbers.[17] Of the remaining 36 meeting minutes, 33 indicated that Class Members were present and that

---

[15] Based on its review of the Mobility Impaired Daily Lists, the OIG identified two additional Class Member housing locations at TTCF (modules 152 and 211) for September 2025 that were not identified by the Department.

[16] The meeting minutes for the September 13, 2025, in TTCF module 131, C-pod, stated that a town hall was not conducted due to a scheduling conflict. The meeting minutes for September 17, 2025, TTCF module 131, A-pod, and September 24, 2025, TTCF 162, A-pod, were missing attendee names and booking numbers.

[17] The meeting minutes for August 20, 2025, in MCJ 6000 floor were missing attendee names and booking numbers.

INSPECTOR GENERAL'S TENTH         -15-
IMPLEMENTATION STATUS
REPORT

2:08-cv-03515-MWF-Ex

information regarding available programming was provided. For September 2025, MCJ submitted 39 meeting minutes reflecting that town halls were conducted in all 39 Class Member housing locations. All 39 meeting minutes indicate that Class Members were present and that information regarding available programming was provided.

As noted above, the OIG identified a total of 171 Class Member housing locations for August and September 2025. However, Defendants provided meeting minutes for only 161 housing locations. Additionally, Defendants deemed that the minutes from one meeting were deficient due to missing attendee names and booking numbers.[18] OIG deemed three meeting minutes as unreliable and unverifiable due to missing attendee names and booking numbers and another as deficient due to the meeting minutes indicating that a town hall was not conducted because of a scheduling conflict.[19] The remaining meeting minutes reflect that 156 of the 171 required town hall meetings were conducted for the months of August

---

[18] CCSB identified the August 24, 2025, CRDF meeting minutes for module 2100, pod 2, as non-compliant.

[19] The meeting minute for September 13, 2025, in TTCF module 131, C-pod, indicated that a town hall was not conducted due to a scheduling conflict. The meeting minutes for September 17, 2025, TTCF module 131, A-pod, September 24, 2025, TTCF module 162, A-pod, and August 20, 2025, MCJ 6000 floor were missing attendee names and booking numbers.

INSPECTOR GENERAL'S TENTH IMPLEMENTATION STATUS REPORT

-16-

2:08-cv-03515-MWF-Ex

and September 2025. Of the 156 town hall meeting minutes, 129 meeting minutes indicated that Class Members were present and that information regarding available programming was provided.

OIG Findings and Recommendations

OIG staff spoke with Class Members at CRDF, TTCF, and MCJ regarding town hall meetings and whether available programming was discussed during those meetings. Although most Class Members were not familiar with the term "town hall," some advised that Department staff come around periodically to provide general information and ask if they have any questions or concerns. Most of these Class Members reported these encounters did not include information on available programming. Town hall meeting minutes indicated that 167 Class Members participated in town halls in August 2025 and 235 Class Members participated in town halls in September 2025. Town halls conducted during the months of August and September reached approximately 70% of the overall Class Member population. However, less than 20% of Class Members who spoke with the OIG in December 2025, and January 2026 reported attending town halls during which available programming information was provided.

The self-assessment reported that CCSB distributes emails five days a week to all supervising line deputies and sergeants responsible for conducting town hall meetings. CCSB reported that the emails include the "Daily Mobility Impaired

INSPECTOR GENERAL'S TENTH   -17-
IMPLEMENTATION STATUS
REPORT

List" and the half-sheet flyer in English and Spanish as attachments. The Department provided a copy of one such email sent on October 2, 2025, in the self-assessment. The email reminds all supervising line deputies and sergeants to encourage Class Member participation, inform all inmates of available custody programs, distribute the half-sheet flyer, and document the notification in the town hall meeting minutes.

Despite these efforts, only 23 of the 162 meeting minutes reviewed indicated that the half-sheet flyer was distributed during the town hall meeting. Additionally, a majority of Class Members interviewed by the OIG reported not receiving the half-sheet flyer. While some Class Members at MCJ and TTCF reported seeing the half-sheet flyers posted in their housing areas, several of those Class Members expressed that the print size was too small to read or that they possess limited literacy skills.

In the *Ninth Implementation Status Report*, the OIG explained that it does not expect that all Class Members will participate in every town hall meeting given that participation is voluntary. However, everyone in the housing location should be given the opportunity to attend town hall meetings. Information regarding available programming must be provided when Class Members are present and documented consistently in town hall meeting minutes. The OIG explained that each of the meeting minutes should document clearly and accurately whether

INSPECTOR GENERAL'S TENTH         -18-
IMPLEMENTATION STATUS
REPORT

2:08-cv-03515-MWF-Ex

(1) everyone in the housing location was offered the opportunity to participate in the town hall meeting, (2) Class Members attended or participated in the meeting, and (3) Class Members were notified of all available programming, either verbally or in writing via the distribution of the flyer.

The OIG identified several concerns pertaining to the lack of documentation with the town hall meeting minutes contained in the self-assessment. It is important to emphasize that while these concerns do not directly factor into the final compliance determination, they do impact the Department's ability to demonstrate compliance with the requirements of the provision.

First, Department personnel appear to utilize several different versions of meeting minutes forms to document town halls, which hinders the Department's ability to capture consistent and accurate information. Different versions of the form were found to be used both across facilities and within the same facility. Many of these forms contain different fields and instructions on documenting specific information. One particular concern is that some of the forms contained instructions for Department personnel to list attendees and/or participants who attended the town hall, while other forms indicated to list only participants who engaged with questions. The self-assessment indicated that CCSB directed all facilities to utilize a "previously approved memorandum format" to document town halls.

On January 21, 2026, the OIG requested a copy of the approved memorandum format and was advised that the format is "still pending approval."

Second, several meeting minutes were incomplete. The OIG identified meeting minutes with fields that were left blank such as the time the town hall meeting was conducted or included a blank attendance record. Both factors can assist in verifying the delivery of town halls.

Third, several meeting minutes contained conflicting information. For example, the OIG identified meeting minutes that indicated Class Members were present, yet no Class Members were listed in the attendance record. The OIG also identified town hall meeting minutes that indicated no Class Members were present, yet at least one Class Member was listed in the attendance record. The presence of incomplete and inconsistent entries within these documents compromises data reliability, as the reported information cannot be fully verified.

The OIG identified meeting minutes from MCJ indicating that a town hall was conducted in a specific housing location; however, the notes indicate that Department staff only engaged with Class Members in one of the four rows within that housing location, leaving it unclear whether other Class Members were given the opportunity to participate. The OIG reviewed "Mobility Impairment Daily Lists" and confirmed that Class Members were housed in other rows on the day the town hall meetings were conducted. As further review, the OIG looked at Closed-

2:08-cv-03515-MWF-Ex

INSPECTOR GENERAL'S TENTH       -20-
IMPLEMENTATION STATUS
REPORT

Circuit Television (CCTV) footage of the meetings to determine whether Department personnel engaged with Class Members in the other rows and identified five instances in which they did not. In each of these instances, Department personnel were observed conducting a town hall in only one of the four rows even though Class Members were housed in at least one other row. In one instance, Department staff conducted a town hall in one row even though Class Members were housed in the other three rows. The OIG shared these findings with Defendants and requested town hall meeting minutes that account for those other rows. Defendants reported that no additional meeting minutes were available.

On August 20, 2025, the OIG observed Department personnel conduct a town hall meeting in CRDF module 3400. During the meeting, Department personnel provided all necessary information regarding available programming and addressed concerns with care and professionalism. The town hall meeting lasted for about 35 minutes. At the conclusion of the meeting, a limited number of half-sheet flyers were made available to attendees. The OIG reviewed CCTV footage of a town hall meeting conducted in CRDF module 3600 from the same day and identified a significant disparity in the way in which it was conducted. Department personnel appeared to speak to a few individuals off to the side of the module while the remainder of the module was programming. The interaction lasted less than two minutes.

INSPECTOR GENERAL'S TENTH IMPLEMENTATION STATUS REPORT

-21-

2:08-cv-03515-MWF-Ex

While the Department has made strides in providing the required number of town hall meetings, the concurrent use of different forms, the omission of required information, and the presence of internal inconsistencies reflect a lack of standardized documentation practices, which fundamentally undermine the integrity of the information contained in the town hall meeting minutes. Some of these concerns were further evidenced by CCTV spot checks. As such, the Department was unable to demonstrate *substantial compliance* with the requirements of this provision. Defendants remain in *partial compliance* with this provision.

**SECTION B – Physical Therapy and Outdoor Recreation**

**Provision B.4 – Thermal Clothing – *Sustained Compliance* as of January 22, 2026**

Under paragraph 4 of section B of the Agreement,

 "Class Members who have been prescribed thermal clothing as a reasonable accommodation for their disability so that they may participate in outdoor recreation will be provided warm coats and/or thermal clothing. LASD shall inform Class Members that they may request thermal clothing as a

INSPECTOR GENERAL'S TENTH IMPLEMENTATION STATUS REPORT                    -22-

reasonable accommodation and shall develop and distribute a unit order to ensure that all LASD personnel are aware of this policy."[20] As previously reported, the Department indicated that it would provide all Class Members with thermals, including tops and bottoms, without requiring a prescription, which exceeds the requirements set forth in the Agreement. The corresponding compliance measures require CCSB and the OIG, through regular site visits and interviews with Class Members and custody personnel, to confirm that each relevant housing location maintains an adequate supply of thermal clothing and that all Class Members are provided with thermal tops and bottoms. In September 2023, the Department updated its *Johnson* policy to state, "[i]nmates with mobility and/or sensory impairments shall receive thermal clothing as a reasonable accommodation for their disability. Custody personnel shall ensure inmates classified as such receive thermal clothing upon their arrival to an ADA housing module, and exchange soiled thermals with clean thermals during weekly laundry exchange."

In October 2023, the Department, in response to a motion adopted by the Los Angeles County Board of Supervisors, began providing thermal tops and bottoms to every person in custody who is eligible to receive them, regardless of

---

[20] As reported in the Inspector General's *Second Implementation Status Report*, the OIG has determined that "thermal clothing" includes both tops and bottoms, particularly since mobility impairment usually affects individuals below the torso.

INSPECTOR GENERAL'S TENTH IMPLEMENTATION STATUS REPORT

-23-

2:08-cv-03515-MWF-Ex

ADA status or prescription.[21] To formalize the practice, the Department updated its policy on standard institutional clothing to include one thermal top and one thermal bottom.[22]

CCSB Self-Assessment

On December 3, 2025, the Department provided the OIG with a self-assessment indicating that it had maintained *substantial compliance* with this provision.[23] The self-assessment contains signature sheets, electronic Uniform Daily Activity Log ("e-UDAL") records, logs, and email confirmations of thermal clothing distribution and/or exchanges from April 1, 2025, to September 30, 2025. The self-assessment also contains a total of 18 CCSB spot check reports reflecting that from April through September 2025, CCSB personnel conducted monthly spot checks at CRDF, MCJ, and TTCF by interviewing a random selection of Class Members to determine whether they received thermal clothing, confirming that each facility had an adequate supply of thermal tops and bottoms, and ensuring that

---

[21] The Board motion requests that the Department provide thermal clothing to any person in custody who requests thermal garments. The Department provides thermals to all persons in custody absent a safety or security concern. The use of the term eligible is meant to convey that these persons do not present such a concern and are therefore eligible to receive thermal garments. *See* Los Angeles County, Board of Supervisors, *Providing Thermal Undergarments to All People in Custody in the Los Angeles County Jails* (July 11, 2023).

[22] *See* Custody Division Manual §§ 6-15/010/00, *Inmate Clothing, Bedding, and Personal Hygiene*, 5-06/010.10, *Allowable Inmate Property - Female Inmates*, and 5-06/010.05, *Allowable Inmate Property - Male Inmates*.

[23] The Department maintains that if the OIG finds the Department to be in *substantial compliance* with this provision, the provision would have achieved *sustained compliance*, and the OIG should stop monitoring it for purposes of the Agreement.

INSPECTOR GENERAL'S TENTH IMPLEMENTATION STATUS REPORT
-24-
2:08-cv-03515-MWF-Ex

thermal clothing exchanges were being carried out as scheduled.[24] CCSB

conducted a final assessment on October 14, 2025. The final assessment report

concludes that Class Members in all relevant housing locations were consistently

provided with thermals tops and bottoms. While methods for thermal exchange and

distribution varied across facilities, most Class Members reported receiving

thermal clothing and were observed to be wearing thermal clothing during random

CCSB spot checks. CCSB identified areas for improvement such as a lack of

thermal inventory in non-ADA housing areas, limited-to-no supply of larger sizes,

and inconsistent documentation of thermal exchanges. Throughout the assessment

period, CCSB reported efforts to resolve identified gaps and noted ongoing

improvements.

CCSB indicated that thermal inventory varied across facilities and over the

course of the assessment period. While CRDF generally maintained sufficient

thermal clothing, larger sizes were not consistently available. MCJ and TTCF

initially had limited-to-no inventory of thermal clothing in non-ADA housing

areas. CCSB reported that inventory levels at these facilities increased in some

non-ADA housing areas in August, and by September in most such areas.

Additionally, CCSB stated that a majority of custody staff assigned to non-ADA

---

[24] CRDF's last spot check occurred on October 6, 2025.

2:08-cv-03515-MWF-Ex

INSPECTOR GENERAL'S TENTH        -25-
IMPLEMENTATION STATUS
REPORT

housing areas described a consistent process for requesting and obtaining thermal clothing when needed from intake, laundry staff, or other housing areas.

Unlike in the previous reporting period, the Department's self-assessment discusses thermal distribution and exchange for Class Members housed in High Observation Housing ("HOH") at CRDF and TTCF.[25] CCSB indicated that individuals in HOH at TTCF who had no restrictions received thermal exchanges on a weekly basis. Signature sheets from CRDF indicated that at least four individuals in HOH received thermal clothing during laundry exchange.[26]

OIG Findings and Recommendations

As noted above, the OIG interviewed a total of 251 Class Members. Nine Class Members were excluded from the population for this provision prior to calculating the compliance rate for data integrity purposes.[27] Of the remaining 242 Class Members, 211 reported having received thermal tops and bottoms, resulting in an overall compliance rate of 87%. TTCF achieved the highest compliance rate with approximately 95% of Class Members who reported having received thermal

---

[25] *See* Custody Division Manual, § 5-01/050.10, *Housing for Mentally Ill Inmates*.

[26] Three notes state, "Received HOH" and one note states "Deputy gave to her HOH."

[27] Five Class Members were housed in HOH and subject to property restrictions for safety and security purposes; one reported having declined thermals, one was in custody for less than 48 hours and assigned to temporary housing at CRDF at the time they spoke with OIG staff, and two provided conflicting or unclear responses.

2:08-cv-03515-MWF-Ex

INSPECTOR GENERAL'S TENTH IMPLEMENTATION STATUS REPORT

-26-

clothing, followed by MCJ with approximately 84% and CRDF with approximately 70%.

In line with last year's findings, Class Members who reported not having received thermal clothing indicated that the primary reason was that their size was not consistently available. Although some Class Members reported needing larger-sized thermals that the Department should have readily available, others reported needing non-standard sizes that are typically special-order items. One Class Member housed at TTCF reported needing at least a size 8X, another Class Member housed at MCJ reported needing a size larger than 8X, and two Class Members housed at CRDF reported needing a size larger than 10X. All four Class Members reported that they asked custody personnel for their required sizes but were told none were available. Since extended sizes fall outside of the standard inventory and are subject to external vendor availability and lead times, they represent logistical outliers rather than failure in thermal distribution processes. Although the Department maintains that the reported need for larger sizes does not match the needs of the incarcerated population, it ordered an additional supply of size 3X, 4X, 5X, and 6X thermals for CRDF and provided an additional supply of size XL, 2X, 3X, 4X, 5X, and 6X thermals to MCJ. As previously recommended,

INSPECTOR GENERAL'S TENTH      -27-
IMPLEMENTATION STATUS
REPORT

the Department should continue to improve the availability of thermal clothing in larger sizes during laundry exchange for Class Members who have a physical or medical need for them.

As reported in the *Ninth Implementation Status Report*, the Department shifted from providing thermals upon arrival to assigned housing locations to distributing them during intake at the Inmate Reception Center ("IRC") and the CRDF Reception Center. The IRC distributes a thermal top and bottom to all people in custody, including Class Members, except for those placed in HOH. Absent any safety or security restrictions, those who are placed in HOH will receive thermals upon arrival at their permanent housing location. CRDF Reception Center distributes thermal clothing to people in custody, including Class Members, who are classified as general population upon arrival at the facility. Those who require additional medical or mental health attention or detoxification are provided with thermals upon arrival at their permanent housing location.[28] The OIG monitored the intake process at the IRC and CRDF Reception Center and confirmed the distribution of thermal clothing.

OIG staff inspected thermal storage lockers/closets in ADA housing areas at MCJ and TTCF during several site visits and found that most areas consistently

---

[28] Anyone assigned to HOH at CRDF requires approval from a mental health clinician to receive thermal clothing.

INSPECTOR GENERAL'S TENTH          -28-
IMPLEMENTATION STATUS
REPORT

2:08-cv-03515-MWF-Ex

had adequate supplies of thermal tops and bottoms available for distribution.[29] However, on January 6, 2026, OIG staff identified an absence of thermal clothing inventory on the 8000 floor at MCJ. Despite the lack of inventory, most custody staff assigned to the floor described a consistent process for requesting and obtaining thermal clothing when needed from intake, laundry staff, or other housing areas. Inventory varied in non-ADA housing areas at MCJ and TTCF throughout the reporting period. As reported in the *Ninth Implementation Status Report,* although having an inventory of thermal clothing in housing area storage is most important in areas where the majority of Class Members are housed, having at least a minimum supply in non-ADA housing areas or floors could help address situations where Class Members do not have thermal clothing and alleviate operational constraints. CCSB also identified an absence of thermal clothing inventory in non-ADA housing areas at MCJ during their spot checks and suggested that "a few thermal items… be kept in storage within the module" and "talked with laundry staff about the importance of having extra thermals in the modules that accommodate Class Members."

---

[29] OIG staff confirmed the inventory of thermal clothing in storage lockers in modules 232 and 272 at TTCF, as well as in supply closets on the 7000 floor at MCJ.

Property Restrictions for Class Members in High Observation Housing

As previously reported, the OIG's review of policies and unit orders revealed inconsistent language regarding restrictions on thermal clothing for Class Members who are in HOH. Currently, HOH is available at TTCF and CRDF. TTCF's unit order cites Department policy requiring that property restrictions for individuals in mental health housing be determined by a mental health professional after a clinical assessment has been conducted.[30] By contrast, CRDF's unit order uses conditional language, stating that individuals in HOH should not be issued thermals unless deemed appropriate by CHS.[31] As previously reported, the lack of explicit approval from a mental health professional at CRDF effectively prohibits individuals in HOH from receiving thermals.

Defendants contend that no discrepancy exists between TTCF and CRDF's unit orders and maintain that both comply with Department policy. The OIG acknowledges that, in practice, outcomes are generally consistent, as Department policy requires a clinical assessment by a mental health professional within 24

---

[30] TTCF Unit Order § 5-16-030, *Exchange of Inmate Clothing* ("Property restrictions for inmates in mental health housing shall be determined by a mental health professional after a clinical assessment has been conducted (refer to CDM section 05-01/050.15, "Property Restrictions for Mentally Ill Inmates")).

[31] CRDF Unit Orders § 5-16-010, *Clothing, Linen, and Bedding* ("Inmates housed in High Observation Housing (HOH) areas shall not be issued thermals, unless deemed appropriate by CHS, mental health personnel, in consultation with custody."); §5-01-010, *Allowable Inmate Property, Storage of Personal Items, and Contraband Control* ("Inmates housed in High Observation Housing (HOH) areas shall not be issued thermals, unless deemed appropriate by Correctional Health Services (CHS) mental health personnel, in consultation with custody.").

INSPECTOR GENERAL'S TENTH                -30-
IMPLEMENTATION STATUS
REPORT

2:08-cv-03515-MWF-Ex

hours of an individual's initial placement in HOH, and as needed thereafter, to determine whether property restrictions are necessary.[32] The Department should consider eliminating redundancy in the unit orders and streamline policy in the Custody Division Manual to reduce or avoid confusion among custody staff, many of whom previously reported being unaware that individuals in HOH may be issued thermal clothing, and to better communicate that Class Members in HOH should receive thermal tops and bottoms unless restricted for documented safety or security reasons.

The OIG makes compliance findings based on the degree to which each provision has been effectively and durably implemented. Here, the Department exceeded the requirements set forth in the provision by committing to provide thermal tops and bottoms to all Class Members, without requiring a prescription. Although the Department's overall compliance rate decreased from approximately 89% in the previous reporting period to approximately 87%, the Department has streamlined a process for distributing thermal clothing to most people in custody, including Class Members, upon arrival to the IRC and CRDF Reception Center.[33] Absent unusual circumstances, the distribution of thermal clothing at intake allows

---

[32] Custody Division Manual, § 5-01/050.15, *Property Restrictions for Mentally Ill Inmates* ("Within 24 hours of initial placement in HOH, a clinician will make recommendations regarding allowable property based upon an individual clinical assessment (Refer to JMHS policy 70.7 Suicide Prevention).").

[33] The compliance measures for this provision do not prescribe a specific compliance standard percentage that the Department must meet to achieve compliance.

2:08-cv-03515-MWF-Ex

INSPECTOR GENERAL'S TENTH        -31-
IMPLEMENTATION STATUS
REPORT

Class Members to receive thermal clothing consistently and timely. Defendants addressed the concerns raised in the *Ninth Implementation Status Report* in good faith and demonstrated continued improvement in the distribution and exchange of thermal clothing. Defendants achieved *sustained compliance* with this provision, and the OIG will no longer monitor compliance with this provision for purposes of the Agreement.

**SECTION C – Physical Accessibility**

**Provision C.4(f) – Additional Grab Bars and Shower Benches – *Partial Compliance***

Under subsection (f) of paragraph 4 of section C of the Agreement, "Defendants are required to install grab bars and shower benches in approximately thirty (30) cells outside of TTCF modules 231 and 232."[34]  The corresponding compliance measure requires the Department to regularly update the OIG on the construction status. As previously reported, the Department installed 30 grab bars and 30 shower benches throughout CRDF and MCJ, and in TTCF module 272. In order to achieve *substantial compliance* with this provision, a physical-plant expert must evaluate and determine that all installations meet ADA requirements.

---

[34] The Parties have agreed that "outside of TTCF modules 231 and 232" refers to any relevant housing location except for modules 231 and 232 at TTCF.

INSPECTOR GENERAL'S TENTH
IMPLEMENTATION STATUS
REPORT

-32-

2:08-cv-03515-MWF-Ex

As reported in the *Eighth Implementation Status Report*, on April 10, 2023, Defendants retained Michael P. Gibbens to serve as the new physical-plant expert and assist the OIG and the Parties in evaluating compliance with provisions C.4(f) (Additional Grab Bars and Shower Benches) and C.4(g) (Construction of Accessible Beds).[35] Mr. Gibbens completed on-site evaluations of MCJ, TTCF, and CRDF on April 24 and 25, 2023. After a significant delay, the OIG received Mr. Gibbens' report on May 14, 2025.

Upon reviewing the report, the OIG identified several areas that required clarification or elaboration necessary to utilize Mr. Gibbens' findings and opinions to make compliance determinations.[36] Chief among the concerns, Mr. Gibbens' report lacked the factual basis and technical justification necessary to support each finding. On October 2, 2025, the OIG issued a letter to Mr. Gibbens with questions

[35] As reported in the *Inspector General's Fifth Implementation Status Report*, on September 5, 2019, Defendants retained a physical-plant expert to evaluate all installations and modifications. On November 9, 2019, the physical plant expert conducted an on-site evaluation at CRDF and issued a report with findings and recommendations; however, due to unforeseen circumstances, the physical-plant expert was unable to complete the remaining on-site evaluations of MCJ and TTCF. Although the previous expert evaluated CRDF and issued a report, the recommended modifications required extensive construction. Defendants are requesting that the new physical-plant expert re-evaluate CRDF to determine whether any alternative solutions are available to meet ADA requirements.

[36] On June 23, 2025, Plaintiffs' counsel issued a letter to the OIG expressing concerns with Mr. Gibbens' methodology, findings, and conclusions. The OIG shared many of these concerns.

INSPECTOR GENERAL'S TENTH IMPLEMENTATION STATUS REPORT

-33-

2:08-cv-03515-MWF-Ex

regarding his findings and opinions.[37] In its letter, the OIG also provided additional context and background regarding the relevant access improvements.

On November 18, 2025, Mr. Gibbens responded to the OIG in writing and noted that he had no knowledge of, or historical context for, the access improvements that were made pursuant to the terms of the Agreement, nor was he made aware of any of the OIG's implementation status reports. While Mr. Gibbens' letter provided information on the inherent complexities of the ADA standards, it did not provide responses to the OIG's questions. Mr. Gibbens ultimately requested to be removed from any further involvement in this litigation.

The Parties are in the process of searching for candidates to serve as the physical-plant expert. The OIG expects the physical-plant expert to exercise independent professional judgment in determining the governing federal standard based on all relevant information, including technical specifications and historical

---

[37] Defendants' cover letter states, "[i]t is Defendants' understanding that Plaintiffs' counsel also provided the OIG input on the letter prior to its transmission to Mr. Gibbens." This statement is inaccurate. Although Plaintiffs' counsel did request to review the OIG's questions for the expert prior to transmission for the purpose of providing input and feedback, the OIG respectfully declined this request. Maintaining independence and impartiality is crucial for the credibility of the court-appointed monitoring process and sharing the questions with Plaintiffs' counsel for input would have jeopardized these core principles. The OIG met with Plaintiffs' counsel to discuss, at a high-level, any concerns they may have regarding Mr. Gibbens' report, but at no point was input solicited, nor was feedback received, regarding the OIG's questions for the expert. The OIG suggested meeting with Mr. Gibbens and Defendants' counsel to discuss its concerns with the report, but Defendants' counsel requested that the OIG instead provide its questions in writing.

2:08-cv-03515-MWF-Ex

INSPECTOR GENERAL'S TENTH          -34-
IMPLEMENTATION STATUS
REPORT

context, for each access improvement that is evaluated.[38] All necessary and pertinent information must be provided to the expert to facilitate a thorough and objective evaluation. Defendants remain in *partial compliance* with this provision.

**Provision C.4(g) – Construction of Accessible Beds – *Partial Compliance***

Under subsection (g) of paragraph 4 of section C of the Agreement, "Defendants are required to construct approximately ninety-six (96) accessible beds at TTCF module 272." The compliance measure for this provision requires the Department to regularly update the OIG on the construction status. As previously reported, the Department completed construction of the 96 beds at TTCF module 272 on May 30, 2017, and began populating the housing unit with Class Members on June 8, 2017. The Department continues to house Class Members in TTCF Module 272.

The Department provided documentation that all 96 beds in the housing module meet ADA requirements; however, the accompanying toilet and shower modifications have not yet been ADA certified. In order to achieve *substantial compliance* with this provision, a physical-plant expert must conduct an evaluation

---

[38] Specifically, the OIG requests that the expert describe in detail (1) the elements and/or improvements that are inspected, (2) the evaluation of each element and/or improvement, including all relevant measurements that are taken, (3) the relevant federal standard that sets the technical requirement for each element and/or improvement, (4) whether or not the inspected element and/or improvement meets the relevant federal standard, and (5) recommended corrective action, if any, to bring each element and/or improvement into compliance with the relevant federal standard. As discussed under provision C.4(g), an expert's opinions must be supported by a sufficient evidentiary foundation to be deemed reliable.

2:08-cv-03515-MWF-Ex

INSPECTOR GENERAL'S TENTH        -35-
IMPLEMENTATION STATUS
REPORT

and determine that all modifications to the toilet and shower areas used by the occupants of the 96 beds comply with ADA requirements.

Mr. Gibbens conducted an evaluation at TTCF on April 24, 2023, and issued a report on May 14, 2025. However, as discussed above under provision C.4(f) (Additional Grab Bars and Shower Benches), the OIG identified several areas that required clarification or elaboration before utilizing Mr. Gibbens' findings and opinions to make compliance determinations. The OIG was unable to obtain the necessary information from Mr. Gibbens prior to his request to be removed from any further involvement in this litigation.

Mr. Gibbens' May 14, 2025, report concludes that the toilet and shower modifications in TTCF module 272 A, B, C, and D-Pods are "compliant."[39] The report also concludes that the roll-in shower stalls are "substantially compliant" and notes that the 24-inch-long grab bar that is installed behind the seat must be removed.[40] However, the report does not contain any supporting information regarding the specific elements inspected or the technical requirements applied to substantiate each conclusion. Without the required evidentiary foundation, the

---

[39] Michael P. Gibbens, *Johnson, et al v. Los Angeles County Sheriff's Department, et al. U.S.D.C. Case No. CV 08-03515 DDP (JTLx); Findings and Opinions regarding Americans with Disabilities Act (ADA) Disabled Accessibility Compliance*, at 8 (May 14, 2025).

[40] *Id*.

opinions expressed in the report are purely conclusory and cannot be considered reliable.[41]

Defendants' cover letter to the self-assessments requests the OIG find Defendants in compliance with this provision upon proof of removal of the grab bars installed behind the shower seats. During a subsequent meeting with Defendants' counsel, the OIG stated that if Mr. Gibbens can provide the necessary evidentiary foundation to support his conclusions as detailed in the OIG's October 2, 2025, letter to him, the OIG would consider this information to make a compliance determination. On January 23, 2026, Defendants provided the OIG with email correspondence from Mr. Gibbens stating that the 2010 ADA Standards were applied in his evaluation of TTCF module 272 and that ". . .if the grab bar behind each of the shower seats is removed, the showers would comply with the 2010 ADA Standards." The correspondence also noted that Mr. Gibbens was unable to provide any of his measurements since he was ". . . not requested to document the technical measurements for each improvement." Once again, the correspondence lacked the necessary evidentiary foundation to demonstrate compliance with this provision.

---

[41] It is a well-established principle in professional and legal proceedings that an expert's opinion must be supported by sufficient factual basis. Where an expert fails to provide the underlying data or reasoning, the opinions are considered *ispe dixit* (Latin for "he himself said it") and generally deemed inadmissible.

INSPECTOR GENERAL'S TENTH         -37-
IMPLEMENTATION STATUS
REPORT

As indicated above, the Parties are in the process of searching for candidates to serve as the physical-plant expert. Defendants remain in *partial compliance* with this provision.

**SECTION G – Grievance Form**

**Provision G.2 – "ADA" Designation of ADA Grievances – *Partial Compliance***

Under paragraph 2 of section G of the Agreement, "[a]ll grievances involving mobility assistive devices and the physical accessibility of the Jail shall be designated 'ADA' grievances even if the inmate who filed the grievance did not check the 'ADA' box." The corresponding compliance measures require LASD and CHS to promulgate policy consistent with the provision, to provide a list of ADA-related grievances for a one-month period selected by the OIG, and to show that those grievances were properly designated "ADA" grievances. The compliance measures define "ADA-related grievances" as grievances on which the person in custody marked the ADA box or used any of the predetermined search terms in the narrative.[42]

As previously reported, LASD created several policies related to this provision, including the *Johnson* policy and CDM section 8-03/030.00, "ADA-

---

[42] The predetermined search terms include the following: ADA, mobility, accommodation, wheelchair, crutch, prosthetic, cane, wheel, chair, disability, grab bars, accessible showers, accessible toilet, shower benches, lower bunk, brakes, footrests, prosthesis, walker, crutches, armrest, personal wheelchair, orthopedic shoes, and secondary review.

2:08-cv-03515-MWF-Ex

INSPECTOR GENERAL'S TENTH          -38-
IMPLEMENTATION STATUS
REPORT

Related Requests and Grievances." For this reporting period, the OIG selected the period of August 2025. In order to achieve *substantial compliance*, 90% of identified ADA-related grievances must be properly designated as "ADA." In August 2025, the Department and CHS utilized a categorization system within the Custody Inmate Grievance Application ("CIGA") to designate grievances. Department personnel resolve ADA-related custody grievances and CHS personnel resolve ADA-related medical grievances.

On December 3, 2025, the Department provided the OIG with a self-assessment indicating that it had achieved *substantial compliance* with this provision. The self-assessment reflects that a total of 54 grievances containing one or more predetermined search terms were identified in CIGA for August 2025. Of the 54 grievances, 47 were deemed to be ADA-related. The self-assessment concludes that 46 of the 47 ADA-related grievances were designated properly. The one grievance that the Department acknowledged was not properly designated was categorized as "Sheriff." The Department explained that this grievance should have been "split" in CIGA so that the facility ADA coordinator handled the ADA-

INSPECTOR GENERAL'S TENTH    -39-
IMPLEMENTATION STATUS
REPORT

related component and the facility grievance team handled the grievance against staff component.[43]

The OIG reviewed the information contained in the self-assessment and noted that 5 of the 46 grievances the Department reported as designated properly were designated as "Medical Services (including ADA)." The OIG has consistently reported that designating ADA-related medical grievances as "Medical Services (including ADA)" along with all other medical grievances circumvents the terms of this provision and violates the terms of provision G.4 ("ADA" Grievances Not Designated as "Basic" Grievances).[44] Thus, of the 47 ADA-related grievances identified by the Department for August 2025, 1 was improperly designated as "Sheriff" and 5 were improperly designated as "Medical Services (including ADA)."

---

[43] As reported in the *Ninth Implementation Status Report*, the Department's grievance policy requires staff to designate each grievance into only one category and requires that certain categories be prioritized over others. According to the policy, a grievance against staff is a category that must be prioritized, which conflicts with the requirements of this provision. To address this concern, the Department added the option to "split" a grievance in CIGA. Doing so will generate two separate grievances with the same underlying data so the grievance against staff component can be handled on one complaint, and the ADA component can be handled on the second linked complaint.

[44] Provision G.4 ("ADA" Grievances Not Designated as "Basic" Grievances) states, "ADA grievances will not be designated as 'basic' grievances." This provision was found in *sustained compliance* on January 15, 2019, and was severed from the Agreement on May 9, 2019.

INSPECTOR GENERAL'S TENTH IMPLEMENTATION STATUS REPORT                    -40-

In the *Ninth Implementation Status Report*, the OIG discussed concerns regarding the redesignation of grievances to Health Service Requests (HSRs).[45] The OIG identified a number of grievances that were originally submitted on a grievance form by a Class Member but were deemed to be an "inappropriate use of the form" and redesignated as a Health Service Request ("HSR"). Once the grievance is redesignated as an HSR, it is processed as a request and categorized as an HSR in CIGA. As a result, the OIG concluded the Department should have included these identified grievances in its self-assessment.

For this reporting period, the OIG independently retrieved CIGA data for August 2025 and queried the predetermined search terms to replicate and verify the information contained in the self-assessment. The OIG once again identified 11 grievances that were originally submitted on a grievance form by a Class Member but were redesignated as an HSR.[46] All 11 identified grievances contained one or more of the predetermined search terms in the narrative and three had the ADA box check marked. Furthermore, all 11 identified grievances raised ADA-related custody or medical complaints or concerns and were not merely requests for

---

[45] The concerns regarding the redesignation of grievances to HSRs were originally discussed under provision G.3 (Grievance Response Time). Although the concerns were identified during the review of provision G.3 (Grievance Response Time), the OIG noted the concerns may also impact compliance with provision G.2 ("ADA" Designation of ADA Grievances).

[46] The ID number for each of the 11 identified grievances are as follows: 25-32-00061, 25-32-00977, 25-33-00352, 25-33-00826, 25-35-00016, 25-35-01017, 25-36-00642, 25-33-00862, 25-36-00709, 25-34-01063 and 25-35-00013.

INSPECTOR GENERAL'S TENTH IMPLEMENTATION STATUS REPORT

-41-

2:08-cv-03515-MWF-Ex

services or information; yet none of these grievances were reported in the Department's self-assessment. The Department must include grievances that are redesignated as HSRs in its self-assessment given that they fall squarely within the definition of an ADA-related grievance. If, upon review, they are found to not contain any ADA-related custody or medical complaints or concerns, they may be excluded from the sample population accordingly.

When accounting for these 11 additional grievances, the total population of ADA-related grievances increases to 58. Of the 58 grievances, 41 were properly designated as "ADA" and the remaining 17 were improperly designated as either "Sheriff," "Medical Services (Including ADA)," or "Health Service Request," resulting in an overall compliance rate of approximately 71%.

The Department reported that on October 8, 2025, it updated CIGA to automatically identify any of the predetermined search terms and designate them as ADA-related custody grievances, medical grievances, or custody requests.[47] The CIGA development team met with the OIG on January 21, 2026, and provided a demonstration of the update. With this update, ADA-related grievances and requests are now automatically flagged with an "ADA" indicator at the top of the grievances/request page and are uniquely color-coded in salmon pink.

---

[47] Additionally, any grievance or custody request that is converted to an HSR in CIGA will also be designated ADA-related.

2:08-cv-03515-MWF-Ex

INSPECTOR GENERAL'S TENTH        -42-
IMPLEMENTATION STATUS
REPORT

Additionally, the Department is able to generate reports of all the grievances and requests that were flagged as "ADA."

Although this update was implemented after the selected sample period and thus not reflected in the Department's self-assessment, the OIG is optimistic about the update and its ability to independently and automatically designate ADA-related grievances and requests as "ADA." Neither the plain language of the provision nor the corresponding compliance measure prohibits Defendants from utilizing an additional designation, on top of the existing categorization system, to designate all ADA-related custody and medical grievances and requests as "ADA." The OIG commends Defendants in their efforts to leverage technology to address longstanding challenges. The implementation of this technology should facilitate a more seamless path toward achieving full compliance in the coming years. Defendants remain in *partial compliance* with this provision.

**Provision G.3 – Grievance Response Time – *Partial Compliance***

Under paragraph 3 of section G of the Agreement, "[t]he response time for ADA grievances will be no more than that allowed under the standard grievance policy." The corresponding compliance measures require the Department to promulgate policy consistent with this provision and to provide a list of ADA-related grievances for a one-month period selected by the OIG. "ADA-related grievances" are defined as grievances in which the person in custody marked the

2:08-cv-03515-MWF-Ex

INSPECTOR GENERAL'S TENTH         -43-
IMPLEMENTATION STATUS
REPORT

ADA box or used any of the predetermined search terms.[48] In order to achieve *substantial compliance*, 90% of the grievances must be responded to within 15 days. The OIG selected the period of September 2025.

As previously reported, the Department created policies consistent with this provision, including CDM section 8-03/005.00, "Inmate Grievances," CDM section 8-03/030.00, "ADA-related Requests and Grievances," and CDM section 8-04/040.00, "Time Frames." These policies require a response time of 15 days for all non-emergency ADA grievances and 5 days for emergency grievances. CHS policy M12.04, "Grievances – Health Care and Against Staff," requires all medical grievances be analyzed within 24 hours to determine whether there is an urgent or emergent medical condition that requires immediate attention. If not, the response timeframe for medical grievances is 15 days, in line with Department policy. An ADA-related grievance cannot be considered "responded to" until and unless all components of the grievance are addressed. CHS reported that a grievance is considered to have been "responded to" within the appropriate 15-day timeframe when a supervising nurse reviews the grievance and makes a referral for a provider evaluation.

---

[48] The predetermined search terms include the following: ADA, mobility, accommodation, wheelchair, crutch, prosthetic, cane, wheel, chair, disability, grab bars, accessible showers, accessible toilet, shower benches, lower bunk, brakes, footrests, prosthesis, walker, crutches, armrest, personal wheelchair, orthopedic shoes, and secondary review.

INSPECTOR GENERAL'S TENTH IMPLEMENTATION STATUS REPORT

-44-

2:08-cv-03515-MWF-Ex

On December 2, 2025, the Department provided the OIG with a self-assessment indicating that it had achieved *substantial compliance* with this provision. The self-assessment indicated that a total of 19 grievances containing one or more of the predetermined search terms were identified in CIGA for September 2025. Of the 19 grievances, 15 were deemed to be ADA-related. The Department excluded four records based on the determination that they "did not pertain to ADA mobility-related issues;" however, they did not provide copies of the excluded grievances. The self-assessment concludes that 15 of the 15 grievances were responded to within the required 15-day timeframe.

The OIG reviewed all 15 grievances and determined that 1 was not adequately responded to. The grievance was originally submitted to the Department by the American Civil Liberties Union ("ACLU") on September 5, 2025. The Department provided the ACLU with a disposition on September 8, 2025, indicating the Class Member's wheelchair order expired on July 11, 2025, and was pending a secondary evaluation. Per the Agreement, the grievant shall "keep an assistant device while a secondary review and/or grievance regarding a decision concerning an assistive device is under review."[49]

---

[49] *Johnson* Compliance Measures, September 2016.

INSPECTOR GENERAL'S TENTH -45-
IMPLEMENTATION STATUS
REPORT

The Department referred the grievance to CHS but failed to provide documentation that the issue identified in the grievance had been resolved.

Furthermore, the same concerns regarding the redesignation of grievances to HSRs that were discussed above under G.2 ("ADA" Designation of ADA Grievances) exist for G.3 (Grievance Response Time).

Crucial to this provision, ADA Coordinators, who are responsible for addressing ADA-related custody grievances, are unable to access HSRs in CIGA. As a result, any custody-related component of the grievance is not accounted for in CIGA and has the potential to go unaddressed even though the medical-related component is responded to within the 15-day timeframe. Additionally, the Class Member does not receive a disposition when a grievance is redesignated to an HSR.

For this reporting period, the OIG independently retrieved CIGA data for September 2025 and queried the predetermined search terms to replicate and verify the information contained in the self-assessment. The OIG once again identified four grievances that were originally submitted on a grievance form by a Class Member but were redesignated as an HSR.[50] All four identified grievances contained one or more of the predetermined search terms in the narrative and had

---

[50] The ID number for each of the four identified grievances are as follows: 25-37-01016, 25-38-00188, 25-39-00006, and 25-39-00125.

INSPECTOR GENERAL'S TENTH        -46-
IMPLEMENTATION STATUS
REPORT

2:08-cv-03515-MWF-Ex

the ADA box check marked. Furthermore, all four identified grievances raised ADA-related custody or medical complaints or concerns and were not merely requests for services or information; yet none of these grievances were reported in the Department's self-assessment. The Department must include grievances that are redesignated as HSRs in its self-assessment given that they fall squarely within the definition of an ADA-related grievance. If, upon review, they are found to not contain any ADA-related custody or medical complaints or concerns, they may be excluded from the sample population accordingly.[51]

When accounting for these four additional grievances, the total population of ADA-related grievances increases to 19. The OIG reviewed the four identified ADA-related grievances and found that two were responded to within the 15-day timeframe. However, the following two contained ADA-related custody components that went unanswered, or the OIG is unable to determine whether or not these grievances have been addressed:

- Grievance 1: The grievant reported an inability to stand without support in the shower. The grievant stated there were no grab bars,

[51] In reviewing CIGA information related to G.2 ("ADA" Designation of ADA Grievances) and G.3 (Grievance Response Time), it became apparent to the OIG that the Department and CHS do not clearly distinguish grievances and requests. The OIG identified several examples of grievances that appeared to be requests but were processed as grievances; and same with requests that appeared to be grievances that were processed as requests. The OIG will engage in discussions with Defendants to determine how to address this matter for the next reporting period.

INSPECTOR GENERAL'S TENTH IMPLEMENTATION STATUS REPORT

-47-

2:08-cv-03515-MWF-Ex

and the water from the shower splashes onto the shower entrance area and forms a pool of water and creates a slip and fall hazard. He also reported that no shower chair is provided for sitting while in the shower of his housing location. Although the grievant was referred for a provider evaluation, there was no indication staff investigated the reported difficulties with the shower or the request to use an accessible shower with grab bars.

- Grievance 2: The grievant reported Department staff removed and confiscated their medically authorized medical devices (orthopedic shoes with insoles). Although the grievant was referred to the provider, there was no indication in the grievance as to whether the issue with the confiscated orthopedic shoes was addressed.

When accounting for these identified grievances, the Department achieves a compliance rate of 84%.[52]

Since the development of the compliance measures, there has been a significant evolution in the way ADA-related grievances are processed and responded to. The Department should refine the process of identifying ADA-

---

[52] When accounting for the four additional grievances which were identified, the total number of ADA-related grievances for the month of September 2025 increases to 19. Of the 19 grievances, the OIG determined 16 (84%) were responded to within the 15-day timeframe.

INSPECTOR GENERAL'S TENTH       -48-
IMPLEMENTATION STATUS
REPORT

2:08-cv-03515-MWF-Ex

related grievances to ensure they are all captured and responded to in accordance with provisions G.2 ("ADA" Designation of ADA Grievances) and G.3 (Grievance Response Time). In addition, Department and CHS personnel should ensure that all components of grievances are sufficiently responded to. Defendants remain in *partial compliance* with this provision.

**SECTION H – Accommodations**

**Provision H.1 – Reasonable Accommodations – *Partial Compliance***

Under paragraph 1 of section H of the Agreement,

> "Defendants agree that Class Members shall receive reasonable accommodations when they request them and as prescribed by LASD medical professionals. Accommodations may include but are not limited to: assignment to lower bunks; changes of clothing; extra blankets; allowance of extra time to respond to visitor calls and attorney visits; shower benches; assistive device to travel outside of a housing module; and assignment to a cell with accessible features."

As previously reported, the *Johnson* policy includes language consistent with the terms of this provision.

The primary method for Class Members to request reasonable accommodations is by submitting a grievance, custody request, or HSR form. The OIG reviewed the availability of these forms at MCJ and found that many Class

Member housing locations did not have forms readily available in the designated bins, which impedes Class Members' ability to request reasonable accommodations.

On January 28, 2026, OIG staff inspected 83 grievance bins throughout MCJ where Class Members are housed to determine whether grievance, custody request, or HSR forms were available.[53] Of the 83 bins inspected, 40 were completely empty, and only 8 contained all three required forms.[54] Of the 83 bins inspected, 20 of the bins had only one to four copies of one of the three required forms. For example, the bin for housing area 2200, row B, only had three grievance forms and zero of the other two forms. Similarly, housing area 2200, row C, only had three custody request forms and zero of the other two forms. At the time of the inspection, there were six Class Members housed between housing area 2200 rows B and C.[55]

The OIG noted 14 of the 83 bins inspected by OIG staff were missing one of the three required forms. Although these 14 bins had two of the three required forms, the quantity of each form that was available in the bin was insufficient for

---

[53] OIG staff inspected bins located on the 1000, 2000, 3000, 4000, 5000, 6000, 7000, 8000, and 9000 floor.

[54] Three of the eight bins inspected only had one grievance form and the quantity of the other forms in the same bin ranged from two to four copies of the same form. For example, the bin for housing area 4600 servicing rows A and C had one grievance form, four custody request forms, and two HSR forms, which is not sufficient for the number of people in this area, let alone Class Members, housed in this area.

[55] Based on the "Mobility Impaired Daily List" for January 27, 2026.

INSPECTOR GENERAL'S TENTH     -50-
IMPLEMENTATION STATUS
REPORT

2:08-cv-03515-MWF-Ex

the number of people housed in those areas. OIG staff found that 11 of the 14 bins

had between one to four copies of a particular form. For example, the bin for

housing area 2300, row A, had one grievance form and four custody request forms.

Similarly, 3600, row D, had three request forms and one HSR form.

The OIG noted one of the 83 bins inspected only had 6 custody request

forms and nothing else. This bin was located in 3200 row C, where five Class

Members were housed at the time of the inspection.[56] Furthermore, Class Members

frequently report that when they request any of the three forms from custody staff,

they are oftentimes advised that forms are not available or that custody staff will

return with a form but rarely do. The lack of consistent access to forms hinders

Class Members' ability to request reasonable accommodations.

Boarding and Disembarking Transportation Bus

Several Class Members with mobility assistive devices other than

wheelchairs expressed difficulties with boarding and disembarking the

Department's buses during transport to and from the jail. Boarding the bus requires

climbing up at least five, and up to seven, steps followed by walking down a

narrow aisle. Class Members reported that their mobility assistive devices are at

times taken from them when boarding the bus, oftentimes one or both of their

---

[56] *Id.*

INSPECTOR GENERAL'S TENTH       -51-
IMPLEMENTATION STATUS
REPORT

hands remain chained to another person, and that no accommodations are provided such as uncuffing one of their hands to help with stability. As a result, Class Members reported struggling to climb the stairs and steady themselves while boarding the bus, as well as struggling to walk down the aisle without adequate support.

Many Class Members reported concerns regarding difficulties with boarding and exiting the bus. Eight Class Members reported falling as they tried to board or were on the bus, one of whom sought medical treatment after falling. OIG staff reviewed medical records and confirmed that the Class Member reported the fall to medical staff and received medical treatment.[57]

Of particular concern, Class Members with significant mobility limitations or disabilities that cause severe pain at times are faced with the untenable decision to risk their safety and board the bus or miss their court hearing. Class Members reported that it is commonly understood that the Department will deem them as a "court refusal" and report this to the courts despite the refusal being due to their inability to board the bus safely.

---

[57] It is important to note the OIG does not discredit the information from Class Members on the basis that the injury was not reported to medical staff.

INSPECTOR GENERAL'S TENTH
IMPLEMENTATION STATUS
REPORT

-52-

2:08-cv-03515-MWF-Ex

Physical Accessibility Issues at MCJ and TTCF

As reported in the *Eighth and Ninth Implementation Status Reports*, Class Members housed in non-ADA housing areas face architectural barriers. For example, most showers in non-ADA housing areas of MCJ and TTCF lack grab bars and shower benches. The Department acknowledges that non-ADA housing areas need improvement. In fact, the Department reported it has identified a need for accessible showers on the 2000, 3000, and 5000 floors of MCJ; however, since the *Ninth Implementation Status Report*, there have been no architectural improvements made to any jail facility where Class Members are housed.

As a result, Class Members continue to struggle with steadying themselves while showering and those who cannot stand for long periods of time reported having to use alternatives to shower benches, like plastic chairs that are not intended for use in a shower. Although the Department has distributed a number of shower chairs with non-slip feet to certain housing areas, the OIG continues to see the use of plastic chairs in showers throughout the facilities.

Additionally, Class Members housed in non-ADA housing areas of MCJ reported difficulties with entering and exiting the shower areas due to the presence of a raised threshold at the bottom of the entrance designed to keep water in the shower basin. OIG staff inspected shower areas in several non-ADA housing areas

and confirmed the presence of raised thresholds, many of which are high enough to present significant challenges to those with mobility impairments.

Similarly, some Class Members housed on the 7000 and 8000 medical floors at MCJ face the same challenges as those housed in non-ADA housing. The dorm-style housing on the 7000 and 8000 floors at MCJ have showers in the dorm; however, those showers also have architectural barriers. OIG staff confirmed that many of these showers have a raised threshold at the bottom of the entrance designed to keep water from spilling out of the shower, do not have an attached bench in the shower, and do not have grab bars. Some Class Members with wheelchairs and other mobility assistive devices who are housed in these dorms reported that they are often required to use the shower in the dorm that has a raised threshold.

Although there are dedicated ADA showers with grab bars and shower benches located on the 7000 and 8000 floors, Class Members indicated Department personnel do not always provide them with the opportunity to use the ADA showers. Some Class Members reported having to wait long periods of time before custody staff escorted them to or from the ADA shower. This in turn causes the Class Member to opt for using the non-ADA shower in their dorm; thus, putting their safety at risk.

OIG staff spoke with six Class Members who reported slipping and falling while showering due to a lack of accessible features. OIG staff reviewed medical records and identified documentation reflecting that one of the Class Members reported the slip-and-fall injury to medical staff.

Lack of Consideration for Class Member Needs

The Department's lack of consideration regarding Class Members' housing needs continues to result in undue hardship and unsafe conditions. OIG staff spoke with several Class Members who reported being housed improperly. In addition to the abovementioned architectural issues, Class Members reported being housed in areas where accessing the shower poses a risk to their safety. For example, several Class Members reported being housed on the lower tier and the working shower being on the upper tier, forcing them to climb and descend a staircase. This places a substantial burden on a Class Member who must negotiate holding their mobility assistive device and shower items in one hand and holding the rail for safety with the other hand.

Traveling to and from Housing Locations

As reported in the *Ninth Implementation Status Report*, several Class Members reported having issues traveling to and from their housing locations. For example, Class Members who are housed on the 5000 floor of MCJ must descend approximately 60 stairs on narrow escalators that are always out of service to get to

INSPECTOR GENERAL'S TENTH       -55-
IMPLEMENTATION STATUS
REPORT

the bus bays to attend court and must ascend the same escalator stairs to return to their housing location. During this reporting period, the majority of the escalators continue to be out of service because there have been no notable facility improvements to improve physical accessibility for Class Members. As a result, Class Members housed in that area continue to report declining yard time and, in some cases, missing medical appointments, due to the inoperable escalators. On January 28, 2026, OIG staff noticed that the ascending and descending escalators to the 2000 floor of MCJ were in service, providing some relief to Class Members housed in that area of the facility. Some of those Class Members reported that they have requested to use the elevator as an accommodation when traveling out of their housing area because they struggle walking up and down the broken escalators and their requests were denied, forcing them to use the broken escalators and risk injury.

Compounding the difficulty of traveling outside their housing location, Class Members reported being rushed by custody personnel when leaving or returning to their assigned housing. In this reporting period, 35 Class Members interviewed by the OIG at MCJ and TTCF reported being rushed when going to court, visitation, or medical appointments. Several of these Class Members reported being told by custody personnel that they will be marked as a "court refusal" if they do not

INSPECTOR GENERAL'S TENTH          -56-
IMPLEMENTATION STATUS
REPORT

hurry. Similarly, seven Class Members at CRDF reported being rushed when traveling to and from their housing locations.

As reported in the *Ninth Implementation Status Report*, OIG staff spoke with personnel from PMB, the unit responsible for classifying and housing the population within the jails, regarding the process when housing Class Members. PMB personnel reported they rely on information provided by medical staff when determining housing for Class Members. However, this information is typically limited to mobility assistive device, bunk assignment, and long-distance transport orders for mobility-related needs. As a result, PMB does not generally consider other important factors such as a Class Member's need for grab bars or a shower bench or a Class Member's ability to ascend and descend stairs. In fact, PMB personnel reported they do not have a list of cells with accessible features such as grab bars. While it is unclear if PMB has since modified its process for housing Class Members, there has been limited to no improvement in this area based on observations made by the OIG during this reporting period.

Comprehensive Assessment of Class Members and Mobility Assistive Devices

In the *Eighth and Ninth Implementation Status Reports*, the OIG recommended that the Department, in collaboration with CHS, conduct a comprehensive assessment of its Class Member population to ensure that all Class Members are housed in appropriate areas of the jails and receive all required

INSPECTOR GENERAL'S TENTH       -57-
IMPLEMENTATION STATUS
REPORT

accommodations. The OIG reasserts the urgent need to implement this recommendation, especially since many Class Members continue to face architectural barriers that present unsafe conditions.

It is apparent that the Department cannot achieve *substantial compliance* with this provision until a comprehensive assessment is complete, including conducting an inventory of its mobility assistive devices. OIG staff once again observed unassigned wheelchairs, walkers, and crutches sporadically placed throughout MCJ and TTCF, making it easy for anyone to use without a medical order.

OIG staff spoke with several Class Members at MCJ, TTCF, and CRDF who were in a wheelchair that did not belong to them based on their wristband classification. When questioned regarding the wheelchair, they confirmed that the wheelchair did not belong to them, but they used it to sit. In fact, OIG staff observed several wheelchairs in one Class Member's housing location at TTCF that were not assigned to anyone.

The unaccounted-for mobility assistive devices throughout facilities could contribute to the delay in Class Members receiving their prescribed mobility assistive devices. In addition, mobility assistive devices that are not properly inventoried or monitored once they are no longer medically necessary present jail safety and security concerns. The Department and CHS would benefit from

INSPECTOR GENERAL'S TENTH        -58-
IMPLEMENTATION STATUS
REPORT

establishing an inventory process wherein optical codes, such as bar codes or

quick-response (i.e., QR) codes, are utilized to identify whether a particular

mobility assistive device is medically prescribed to the person in custody using it.

Classification Codes and Mobility Assistive Device

As reported in the *Ninth Implementation Status Report*, OIG staff continue

to encounter Class Members who have a classification code for a mobility assistive

device but did not have their prescribed device(s). The OIG spoke with 16 Class

Members who reported not having received their prescribed device. OIG staff

reviewed medical records for all 16 Class Members and confirmed that seven had

active medical orders for the device they reported not having received at the time

they spoke with OIG staff. These Class Members complained that they have

difficulty ambulating without their prescribed mobility assistive device.

The OIG also encountered several Class Members this reporting period who

had a mobility assistive device but did not have the proper classification code on

their wristband. OIG staff spoke with 34 Class Members that did not have either a

"U" or a "W" on their wristband but had a mobility assistive device.[58] Some of

these Class Members expressed concern that their mobility assistive device would

---

[58] The Department and CHS place a "U" on the wristband when a person is prescribed a cane, walker, or crutches and a "W" when a person is prescribed a wheelchair.

be confiscated because of the delay in receiving their wristband with the proper classification.

Further compounding this problem, medical and custody staff are not actively monitoring prescriptions for mobility assistive devices, resulting in delays in the removal of devices once prescriptions expire. Similarly, medical and custody staff do not have an established process for removing mobility assistive devices from Class Members, or clarity as to who is responsible for doing so, further indicating the lack of collaboration or cooperation between the Department and CHS.

Class Members continue to complain that, at times, custody staff does not abide by the mobility assistive device orders on file or are unaware that they exist. For example, some Class Members report that they require a wheelchair for long distances and for transportation to court but were not provided with the device due to inaccurate wristbands or delays in the classification process.

The Department advised that since the *Ninth Implementation Status Report*, they are fine tuning a "boots on the ground" operation they established wherein the Department's ADA coordinators periodically interface with Class Members to address, *inter alia*, wristband classification issues. While the OIG is not aware of when this operation commenced, it does believe increased ADA coordinator

2:08-cv-03515-MWF-Ex

INSPECTOR GENERAL'S TENTH       -60-
IMPLEMENTATION STATUS
REPORT

engagement and communication with Class Members will help address many of the issues discussed herein.

Egg Crate Mattress Topper

As reported in the *Sixth Implementation Status Report,* the Department leadership agreed to issue an egg crate mattress topper to every Class Member, regardless of whether they had a prescription. On September 1, 2021, the Department distributed an "Informational Bulletin" to staff that provides guidance on issuing and maintaining egg crate mattress toppers for all Class Members. The OIG, through site visits and interviews, found that the vast majority of Class Members who are housed on the 7000 and 8000 floors of MCJ, within modules 232 and 272 of TTCF, and throughout CRDF, had received egg crate mattress toppers. By contrast, a significant number of Class Members housed outside of those areas had not received egg crate mattress toppers. In the *Ninth Implementation Status Report*, the OIG reported that Department personnel required additional training regarding the provision of egg crate mattress toppers. The issue of missing egg crate mattresses toppers is also an area the Department's "boots on the ground" operation will reportedly aim to address.

The Department advised the OIG that since January 21, 2025, they "conducted 21 facility briefings for both existing and newly assigned custody personnel, reaching a total of 349 staff members (including sergeants, senior line

deputies, deputies, and custody assistants)" from CRDF, MCJ, and TTCF "with a particular emphasis on the specific needs and requirements of Johnson class members." Although the OIG has seen some improvement in certain areas, the majority of the issues Class Members reported to OIG staff in the *Ninth Implementation Status Report*, continue to exist in this reporting period. The Department must implement a system to identify issues and correct them as they arise. The OIG continues to strongly urge the Department, in collaboration with CHS, to conduct a comprehensive assessment of its Class Member population and their mobility assistive devices to ensure that all Class Members are housed in appropriate areas of the jails and are receiving appropriate accommodations in accordance with the terms of the Agreement. Defendants remain in *partial compliance* with this provision.

**APPENDIX**

| | DEFENDANTS' *JOHNSON* COMPLIANCE STATUS | |
|---|---|---|
| **PROVISION** | **DESCRIPTION** | **COMPLIANCE RATING** |
| | **Programming** | |
| A.1 | Access to Programming | Severed |
| A.2 | Non-Disqualification from Programming | Severed |
| A.3 | Escorts to Programming | Severed |
| A.5(a) | Class Members Serve as Trustees on Same Floor | Severed |
| A.5(b) | Trusty Tasks | Severed |
| A.5(c) | Identify Jobs | Severed |
| A.6 | Notification of Available Programs | Severed |
| A.7 | Notification in Town Hall Meetings | *Partial Compliance* |
| | **Physical Therapy and Outdoor Recreation** | |
| B.1(a) | Access to Physical Therapy | Severed |
| B.1(b) | Maintenance of Physical Therapy Room | Severed |
| B.1(c) | Physical Therapy Availability | Severed |
| B.2 | Outdoor Recreation Time | Severed |
| B.3 | Rotation of Outdoor Recreation Time | Severed |
| B.4 | Thermal Clothing | *Sustained Compliance* |
| | **Physical Accessibility** | |
| C.4(a) | Housing Expansion for Class Members – Phase 1 | Severed |
| C.4(b) | Housing Expansion for Class Members – Phase 2 | Severed |
| C.4(c) | Housing Expansion for Class Members – Phase 3 | Severed |
| C.4(d) | Housing Expansion for Class Members – Phase 4 | Severed |
| C.4(e) | Housing Expansion for Class Members – Phase 5 | Severed |
| C.4(f) | Additional Grab Bars and Shower Benches | *Partial Compliance* |
| C.4(g) | Construction of Accessible Beds | *Partial Compliance* |
| C.5 | Review of ADA Construction Plans | Severed |
| | **Use of Mobility Devices** | |
| D.1 | Initial Decisions and Ongoing Evaluations | *Sustained Compliance* |
| D.2 | Secondary Reviews | *Sustained Compliance* |
| D.3 | Assistive Device Leaflet | Severed |
| D.4 | Tracking Complications | *Sustained Compliance* |
| D.5 | Wheelchair Seating Training | Severed |
| D.6 | Publishing Guidelines for Tracking Complications | Severed |

| PROVISION | DESCRIPTION | COMPLIANCE RATING |
|---|---|---|
| | **Wheelchairs and Prostheses** | |
| E.1(a) | Wheelchair Maintenance | Severed |
| E.1(b) | Maintenance of the Wheelchair Repair Shop | Severed |
| E.1(c) | Installing RFID Transmitters | Severed |
| E.1(d) | Wheelchairs with Moveable Armrests | Severed |
| E.2 | Return of Personal Wheelchairs | Severed |
| E.3 | Assistive Device Policy | Severed |
| E.4 | Return of Prostheses within 24 Hours | Severed |
| | **ADA Coordinators** | |
| F.1 | ADA Duties | *Sustained Compliance* |
| F.2 | ADA Coordinator Authority | Severed |
| F.3 | Training ADA Coordinators | Severed |
| | **Grievance Form** | |
| G.1 | Grievance Form | Severed |
| G.2 | "ADA" Designation of ADA Grievances | *Partial Compliance* |
| G.3 | Grievance Response Time | *Partial Compliance* |
| G.4 | ADA Grievances Designation | Severed |
| G.5 | ADA Grievance Maintenance | Severed |
| | **Accommodations** | |
| H.1 | Reasonable Accommodations | *Partial Compliance* |
| H.2 | Accessibility of Medical Orders | Severed |
| H.3 | Tracking Mobility Assistive Device Requests | Severed |
| | **Notification of Rights** | |
| I.1 | Notification of Rights | Severed |
| | **Training** | |
| J.1 | Training | Severed |
| | **Transportation** | |
| K.1 | Transportation in Accessible Vans | Severed |